## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **JAMIE LEONARD**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 4:19-cv-00927 |
| v. | ) | |
| | ) | |
| **ST. CHARLES COUNTY POLICE** | ) | |
| **DEPARTMENT, ST. CHARLES** | ) | **JURY TRIAL DEMANDED** |
| **COUNTY DEPARTMENT OF** | ) | |
| **CORRECTIONS, C.O. HARRIS, S.P.O** | ) | |
| **FISHER, LISA BAKER, THOMAS LUPO,** | ) | |
| **KATIE KRANKEL, NURSE MARTIN,** | ) | |
| **NURSE THERESA** and **DR. JOHN (OR** | ) | |
| **JANE) DOE,** | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

**COMES NOW** Plaintiff Jamie Leonard ("Plaintiff"), by and through his attorneys, and for his Complaint states as follows:

### Statement of Claim

1.    On July 19, 2017, Plaintiff was taken into custody by the Wentzville Police Department (hereinafter referred to as "Wentzville").

2.    On July 20, 2017, Plaintiff was transferred to the St. Charles County Police Department and/or St. Charles County Department of Corrections (the St. Charles County Police Department and St. Charles County Department of Corrections are hereinafter collectively referred to as "St. Charles"), where he lost his eye after an attack by certain St. Charles' employees.

3.    Prior to losing his eye, both Wentzville and St. Charles had been made aware that Plaintiff had an eye condition called Reiter's Syndrome and had developed an eye condition called uveitis/iritis as a result of his Reiter's Syndrome.

4.      Also, Wentzville and St. Charles were made aware of Plaintiff's eye condition by multiple phone calls from Plaintiff's family and in person discussions by Plaintiff's family.

5.      In fact, Wentzville and St. Charles were advised by medical professionals and even accepted medication for Plaintiff's eye condition prior to his abuse by St. Charles employees.

6.      Furthermore, prior to the attack that ultimately caused Plaintiff to lose his left eye, both Wentzville and St. Charles had been made aware that Plaintiff was suffering from a mental condition that required Jamie to be monitored and restrained.

7.      Medical professionals had even advised Wentzville that Plaintiff was in very poor mental state, and one of Wentzville's officers even personally knew Plaintiff and stated that Plaintiff was not in his right mind.

8.      On July 22, 2019, a St. Charles officer unlawfully used an instrument issued to him by St. Charles, his pepper spray, to spray Plaintiff very close to his face and eyes in violation of St. Charles' policies and procedures.

9.      St. Charles' employees then allowed Plaintiff's eye and mental state to continually worsen for approximately 40 minutes instead of seeking immediate medical attention.

10.     Had those St. Charles' employees sought immediate medical attention, Plaintiff's eye might have been saved at this point.

11.     As a result of those officers' delay, Plaintiff's eye worsened to the point that Plaintiff, in great pain and with a worsening mental state, removed his left eye from his eye socket.

12.     Afterwards, a St. Charles lieutenant admitted to Plaintiff's mother that his officers should never have shot Plaintiff in the eye with pepper spray.

13.     Plaintiff now does not have his left eye because of the careless decisions made by and excessive force used by St. Charles' employees.

- 2 -

**Jurisdiction and Venue**

14.     Plaintiff Jamie Leonard brings this civil rights lawsuit pursuant to 42 U.S.C. § 1983 for violation of his Fourth Amendment rights

15.     The Court has original jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the Constitution and laws of the United States. The Court also has supplemental jurisdiction of Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a), as the claims are so related to the claims arising under federal law that they form part of the same case or controversy under Article III of the United States Constitution.

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), in that all Defendants reside in this judicial district and a substantial part of the events and omissions giving rise to this claim occurred in this district.

**Parties**

17.     Plaintiff Jamie Leonard is, and at all times stated herein was, an individual person, resident, and citizen of the State of Missouri over the age of 18 years.

18.     Defendants Correctional Officer Harris (DSN 460), Special Police Officer/Senior Prison Officer Fisher (DSN 938), Sergeant Lisa Baker (DSN 336), Corporal Thomas Lupo (DSN 349), Corporal Katie Krankel (DSN 338), Nurse Martin (DSN 942) and Nurse Theresa (DSN 943) were employees with the St. Charles Department of Corrections and/or the St. Charles County Police Department at the time of the events described herein. These individuals are sued in their individual capacities, but they are described using their job titles herein because some of their first names have not yet been made available to Plaintiff.

19.     Defendant St. Charles Police Department is a governmental entity responsible for providing police services for the County of St. Charles, Missouri.

20.     Defendant St. Charles County Department of Corrections is a governmental entity responsible for providing adult detention services for the County of St. Charles, Missouri.

21.     At this time, it is unknown which of the persons referenced in this Complaint worked on behalf of the St. Charles Police Department, which of the persons acted on behalf of the St. Charles County Department of Corrections and which of the persons acted on behalf of both institutions. That information will be reasonably obtainable through discovery.

22.     Defendant Dr. John (or Jane) Doe is the physician responsible for overseeing the healthcare of Plaintiff while he was in the custody at the St. Charles County Police Department and/or St. Charles County Department of Corrections. His or her name and identity are not yet known for certain but will be reasonably obtainable through discovery.

23.     The aforementioned defendants are collectively referred to as the "Defendants".

### Factual Allegations

24.     On July 19, 2017 Plaintiff experienced a psychotic hallucination episode.

25.     Plaintiff went to Wentzville, Missouri on or around 10:00 am that day, where he had an encounter with the Wentzville Police Department (hereinafter referred to as "Wentzville").

26.     Plaintiff was fully compliant and followed all instructions given to him by law enforcement as they took him into custody.

27.     Plaintiff's mother (referred to herein as "Michelle"), concerned for Plaintiff's safety and whereabouts, searched for Plaintiff and subsequently discovered that Plaintiff had been placed into police custody.

28.     Michelle explained to a Wentzville police officer that Plaintiff had a medical history of psychotic episodes and that Plaintiff's medical provider had stated to her that Plaintiff

needed to be admitted to that medical provider's care for a psychological evaluation before his arrest.

29.     The officer replied to Michelle that Plaintiff was deemed fit for confinement.

30.     Michelle protested Wentzville's determination and informed them that Plaintiff was seeing a retinal specialist for his left eye as he had Reiter's syndrome as well as an eye infection, iritis/uveitis, which required daily use of eye medication.

31.     Michelle made pleas to several other Wentzville officers to have her son reevaluated or at the very least separated to reduce the risk of injury.

32.     Wentzville refused all requests, despite at least one of its officers having known Plaintiff previously, being able to testify that Plaintiff's behavior was abnormal.

33.     Indeed, the hospital to which Plaintiff was taken to determine if he was fit for confinement, SSM Health St. Joseph Hospital in Wentzville, Missouri, reported through Matthew P. Hoffman, RN, the morning of July 19, 2017 as to Plaintiff:

> "Asked if hears voices and laughs and states "Yeah. Lots of fuckin voices, haha." awaits Cl evaluation. Police states pt is fit for confinement."

34.     As a result of the foregoing, Wentzville was made aware of Plaintiff's mental issues and eye issues.

35.     Wentzville transferred Plaintiff into the custody of St. Charles at least as early as 10:45 pm on July 19, 2017.

36.     St. Charles either learned from Wentzville that Plaintiff had the aforementioned mental issues and eye issues before transferring Plaintiff to St. Charles, or St. Charles should have attempted to learn about Plaintiff's medical conditions before accepting Plaintiff into its custody.

- 5 -

37.　　In addition, on July 19, 2017, Michelle contacted the nursing supervisor at St. Charles to explain the seriousness of Plaintiff's entire medical situation, including but not limited to the pain that Plaintiff experienced in his left eye and his mental health issues that required further medical attention.

38.　　Michelle arrived at St. Charles to deliver medications for her son, where she spoke to more of St. Charles' employees about the medication for Plaintiff's eyes and why he needed it.

39.　　St. Charles' medical personnel and officers never notated or complied with any of Plaintiff's medical issues or needs.

40.　　Plaintiff's history of psychosis and Plaintiff's Reiter's syndrome were consciously disregarded, and he was erroneously deemed fit for confinement by St. Charles.

41.　　Despite receiving information about the seriousness of Plaintiff's medical situation, St. Charles did not take further medical action to protect Plaintiff.

42.　　At this time, Sgt. Lisa Baker and Cpl. Thomas Lupo were the shift supervisors.

43.　　Plaintiff immediately began manifesting mental symptoms to St. Charles.

44.　　At 1:05 am on July 22, 2017, Jamie attempted to choke himself by putting his hand down his throat due to his psychosis, at which point St. Charles' medical staff was notified, and Nurse Martin responded.

45.　　Nurse Martin observed that Plaintiff was blowing his nose so hard that it was causing his nose to bleed.

46.　　Furthermore, Plaintiff was yelling. When Nurse Martin asked Plaintiff why he was behaving this way, Plaintiff stated: "I have to get my soul out because it is time for me to die."

47.　　Despite this incident, St. Charles took no action to give Plaintiff additional medical care. Other than fixing Plaintiff's nose bleed, Nurse Martin simply admonished Plaintiff.

- 6 -

48.    St. Charles' medical supervisor was made aware of the foregoing by Nurse Martin.

49.    In addition, S.P.O. Fisher informed S.P.O. Scott (DSN 993) that Plaintiff was received to the unit and had continued to display erratic behavior by standing on his bunk nude, repeatedly flushing the toilet, shouting and banging his head on the door and walls.

50.    No further action was taken to protect Plaintiff despite his obvious psychosis at this point. Not even restraints were used on Plaintiff to keep him from harming himself.

51.    Instead, S.P.O. Fisher, S.P.O. Scott and C.O. Harris decided that the appropriate response to this situation was to search Plaintiff's cell at approximately 6:40 am that day.

52.    Prior to entering Plaintiff's cell, S.P.O. Fisher directed C.O. Harris to prepare to use his pepper spray.

53.    Specifically, the chemical agent that C.O. Harris was being directed to use is an aerosol weapon named Oleorsin Capsicum, or "O.C. spray", which is a substance derived from cayenne pepper plants.

54.    The St. Charles county Department of Corrections states that the following may result from the use of O.C. spray for approximately 30-45 minutes:

(a)    a painful burning sensation in the eyes, involuntary eye closure, profound tearing, visual impairment, and protracted redness; and

(b)    psychological effects, such as fear, anxiety and possible panic.

[The above subsections (a) and (b) are hereinafter referred to as the "known results of pepper spray".]

55.    The St. Charles County Department of Corrections had policies and procedures governing the use of pepper spray in place at this time, including but not limited to:

(a)     "If the situation allows, the on-duty shift supervisor will contact medical to see if the inmate has a respiratory or heart condition that could be affected by the chemical agent or if the inmate is allergic to pepper. In those cases, O.C. Spray will not be used."

(b)     The officers should "determine if serious medical condition requiring emergency services exist:" such as such as if the subject is (i) "under the influence of alcohol or drugs," (ii) "if the subject requests medical attention" or (iii) "if the subject loses consciousness."

(c)     Tactical withdrawal or disengagement possibilities are supposed to be considered.

(d)     Per the policy documents, people who have bizarre behavior episodes and/or risk of drugs are even at risk of death after using O.C. spray.

(e)     The spray should not be deployed at distances of less than three feet to avoid the "hydraulic needle effect." The hydraulic needle effect is when close-range spray causes more serious eye irritation by attacking the cornea with a concentrated stream of liquid.

(f)     After use, the subject is supposed to be monitored for at least two hours.

[The above subsections (a) through (f) are hereinafter referred to as the "Policies".]

56.     Instead of checking with medical staff to see if Plaintiff had a medical condition or asking for medical staff to be present with an effective sedative, the officers entered Plaintiff's cell with O.C. Spray in hand.

57.     Plaintiff, who was obviously not in his right mind, did not stay on his knees as directed and walked toward the officers.

58.     C.O. Harris pepper sprayed Plaintiff in the face as directed by his superior.

59.     When C.O. Harris discharged his pepper spray into Plaintiff's eyes, he did so at a distance of much less than three feet.

60.     Plaintiff fell to the ground and was subdued.

61.     Instead of immediately contacting medical staff, S.P.O. Fisher, S.P.O. Scott and C.O. Harris chose to complete their inspection of Plaintiff's cell.

62.     When C.O. Baethke (DSN 435) arrived, he encountered a strong smell of O.C. Spray as well as the three officers inspecting Plaintiff's cell.

63.     After inspecting Plaintiff's cell, Sgt. Lisa Baker directed that Plaintiff be transferred to new cell.

64.     Multiple officers then carried Plaintiff to a new cell.

65.     On-duty Nurse Theresa then inspected Plaintiff and directed that his eyes be washed out with water.

66.     The officers and medical staff then left Plaintiff in his new cell unsupervised, unmonitored and alone.

67.     At this time, Cpl. Thomas Lupo left as a shift supervisor, and Cpl. Katie Krankel took over a shift supervisor.

68.     Sgt. Lisa Baker remained a shift supervisor both immediately before and immediately after the spraying incident with Plaintiff.

69.     Plaintiff was yelling loudly in his cell at this point.

70.     Instead of monitoring Plaintiff in his cell, training was provided at that time in which the staff was told that Plaintiff appears to be under the influence of drugs.

71.     Meanwhile, the known results of pepper spray were taking effect.

- 9 -

72.     As the known results of pepper spray took effect, when combined with Plaintiff's psychosis and his aforementioned eye conditions, Plaintiff's mental state worsened as did his left eye, creating a medical emergency.

73.     At this point, Plaintiff was still unsupervised, unmonitored and not restrained.

74.     Not being in a rational state of mind and experiencing excruciating pain, Plaintiff started physically clawing at his eye.

75.     At least one officer may have noticed that Plaintiff was clawing at his eye and banging his head against his jail cell, but, if so, that officer took no action.

76.     Per William S. Forness, RN, from SSM Health St. Joseph Hospital in St. Charles, Missouri, later that morning:

> "According to CO's that are with him he was banging his head on the floor and the bars of the jail and trying to pull out his left eye, he had been prying at his eye. Until they noticed that it was bleeding and they realized that it was partially removed from the socket and they sent him here."

77.     In other words, despite having an opportunity to intervene, at least one officer may have even allowed Plaintiff's behavior to continue uninterrupted for several minutes until Plaintiff fully removed his left eye.

78.     Plaintiff losing his eye was as a result of an excessive use of force in that the Policies were violated in the way that the pepper spray was used:

(a)     The on-duty shift supervisors did not contact medical to determine if Plaintiff would have a negative medical reaction to pepper spray. Had the on-duty shift supervisors done this, they would have learned that pepper spray should not have been used on Plaintiff.

- 10 -

(b)     The officers failed to take action even though a serious medical condition requiring emergency services existed, such as (i) being under the influence of drugs, (ii) Plaintiff's family seeking medical attention for Plaintiff's mental state and eye condition, and/or (iii) Plaintiff losing consciousness after the use of pepper spray.

(c)     The officers did not consider tactical withdrawal or disengagement possibilities instead of proceeding with a cell check in the first place.

(d)     The officers failed to consider the risk of physical harm to Plaintiff given his bizarre behavior and/or risk that drug use was still affecting him prior to deploying O.C. spray instead of having a medical professional use a sedative.

(e)     The pepper spray was used well below a distance of much less than three feet, harming Plaintiff further.

(f)     Plaintiff was not monitored for at least two hours after the use of O.C. spray.

(g)     If he was monitored, no action was taken to prevent Plaintiff from removing his eye after at least one officer observed Plaintiff attempting to remove his eye.

[The above subsections (a) through (g) are hereinafter referred to as the "Violations".]

79.     As discussed, supra, not one St. Charles employee intervened until Plaintiff already had been digging into his eye socket for multiple minutes.

80.     Once the officers discovered that Plaintiff's eye was missing, emergency services were contacted.

81.     Upon arrival at the scene, medical services swiftly sedated Plaintiff with Haldol injections.

- 11 -

82.    Once sedated, Plaintiff was then transported to SSM Health St. Joseph Hospital in St. Charles, Missouri.

83.    SSM Health St. Joseph Hospital in St. Charles, Missouri was unable to provide the needed care for Plaintiff, so Plaintiff was then transported to Saint Louis University Hospital.

84.    The same day after the aforementioned eye loss took place, Plaintiff was returned to St. Charles.

85.    Michelle learned of the incident hours after it occurred on July 22, 2017.

86.    She contacted St. Charles Lieutenant Michael McKee (DSN 301), who stated that St. Charles did not have Plaintiff's medical issues documented.

87.    This excuse by Lieutenant McKee is invalid in that: (a) St. Charles should have taken efforts to learn about Plaintiff's medical issues from Wentzville when St. Charles accepted custody of Plaintiff, (b) Plaintiff's family personally informed St. Charles about Plaintiff's medical conditions and even provided St. Charles with medicine for the conditions, (c) St. Charles' staff personally witnessed Plaintiff's abnormal mental state prior to using pepper spray, and (d) in any event, the Violations of the Policies occurred, allowing Plaintiff to be damaged.

88.    Lt. McKee further stated that to Michelle that her son, Plaintiff, should never have been sprayed with pepper spray if he had an eye problem.

89.    Once Michelle was notified, she immediately started seeking treatment for Plaintiff from his psychiatrist and his doctors for the trauma that he suffered.

90.    Unfortunately, as late as the evening of that same day, SPO Robinson (DSN 953), witnessed Plaintiff "playing" with his eye, at which point officers finally restrained Plaintiff.

91.    Due to Plaintiff's injuries, the untimely treatment provided by St. Charles and the Violations of the Policies, Plaintiff permanently lost his left eye.

92.     No contraband was ever discovered in Plaintiff's cell despite multiple subsequent cell searches.

### COUNT 1:
### Violations of Plaintiff's Fourth Amendment Rights Pursuant to 42. U.S.C. § 1983

COMES NOW Plaintiff, and states as follow for his Count 1 against Defendants:

93.     Plaintiff realleges and incorporates by reference the foregoing paragraphs.

94.     On or about July 21, 2017 and July 22, 2017, Defendants, under color of state law as St. Charles police officers, subjected Plaintiff to, or caused Plaintiff to be subjected to the, the deprivation of his Fourth Amendment right under the United States Constitution to be free from unreasonable seizures of his person and the use of excessive force.

95.     Upon information and belief, the officers were deliberately acting in accordance with a St. Charles pattern, practice, or custom of using excessive force during the detention of individuals, including intentionally ignoring the Policies when using pepper spray.

96.     As a direct and proximate result of the Violations of the Policies, Plaintiff suffered numerous serious injuries as described herein, including, but not limited to, loss of his left eye, fear for his life, depression, anxiety, and substantial pain and suffering – physically, mentally, and emotionally.

97.     The cost of Plaintiff's medical care, after factoring in unknown future medical care, will be an amount that cannot be pled with greater specificity.

98.     The conduct of the Defendants was intentional, outrageous, and demonstrated evil motive and a reckless or callous indifference to Plaintiff's rights, thus entitling Plaintiff to punitive damages.

99.     To the extent that Plaintiff prevails in the instant case, he is entitled to an award of attorney fees and costs pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiff respectfully asks the Court to award him compensatory damages against Defendants in amount that is fair and reasonable, for punitive damages, costs, and attorney fees, for injunctive relief against the St. Charles barring it from encouraging, requiring, or permitting its police force to engage in the unlawful patterns and practices as described herein, and for such other legal or equitable relief the Court deems appropriate.

**COUNT 2:**
**Conspiracy to Violate Plaintiff's Fourth Amendment Rights Pursuant to 42. U.S.C. § 1983**

COMES NOW Plaintiff, and states as follows for his Count 2 against defendants C.O. Harris, S.P.O. Fisher, Sgt. Lisa Baker, Cpl. Thomas Lupo, and Cpl. Katie Krankel (the "Count 2 Defendants"):

100.    All preceding paragraphs are re-alleged and incorporated herein.

101.    The Count 2 Defendants reached a mutual understanding and conspired with each other to violate Plaintiff's civil rights. In furtherance of this conspiracy, the Count 2 Defendants committed several overt acts including, but not limited to, the following:

(a)    They permitted Plaintiff to be pepper sprayed in Violation of the Policies;

(b)    They failed to prevent or stop the Violation of the Policies;

(c)    Upon information and belief, one or more of the Count 2 Defendants turned off the video at certain times during Defendant's confinement in an attempt to conceal the Violation of the Policies;

(d)    The Count 2 Defendants agreed to file incident reports that falsely magnify the threat posed by Plaintiff in an attempt to justify their Violation of the Policies; and

(e)    The Count 2 Defendants agreed to file incident reports in a false attempt to claim that there was no Violation of the Policies.

102.    As a direct and proximate result of the conspiracy between the Count 2 Defendants, Plaintiff was unreasonably seized in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution, which are protected under 42 U.S.C. § 1983.

103.    As a direct and proximate result of the conspiracy and violent attack by the Count 2 Defendants, Plaintiff suffered numerous serious injuries as described herein, including, but not limited, to loss of his left eye, fear for his life, depression, anxiety, and substantial pain and suffering – physically, mentally, and emotionally.

104.    The cost of Plaintiff's medical care, after factoring in unknown future medical care, will be an amount that cannot be pled with greater specificity.

105.    The conduct of the Count 2 Defendants was intentional, outrageous, and demonstrated evil motive and a reckless or callous indifference to Plaintiff's rights, thus entitling Plaintiff to punitive damages.

106.    To the extent Plaintiff prevails in the instant case, he is entitled to an award of attorney fees and costs pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiff respectfully asks the Court to award him compensatory damages against the Count 2 Defendants in amount that is fair and reasonable, for punitive damages, costs, and attorney fees, and for such other legal or equitable relief the Court deems appropriate.

## COUNT 3:
## Violation of Plaintiff's 14th Amendment Rights, Pursuant to 42 U.S.C. § 1983

COMES NOW Plaintiff, and states as follows for his Count 3 against defendants Nurse Martin, Nurse Theresa and Dr. John (or Jane) Doe (the "Count 3 Defendants"):

107.    All preceding paragraphs are re-alleged and incorporated herein.

108.    While in the care of St. Charles, Plaintiff's complaints and conditions clearly indicated that his eyes should not be subjected to pepper spray. These complaints and conditions

included, but were not limited to: (a) the knowledge that pepper spray causes a painful burning sensation in the eyes, involuntary eye closure, profound tearing, visual impairment, and protracted redness; (b) oral conversations in which it was expressed to St. Charles orally that Plaintiff had an eye condition called Reiter's Syndrome and had also developed uveitis/iritis; (c) being provided with medicine for Plaintiff's eye problems; (d) having the opportunity to receive the foregoing information from Wentzville and/or actually having received the foregoing information from Wentzville; and (e) having the opportunity to and/or actually sufficiently inspecting and monitoring Plaintiff's eyes after pepper spray was used on Plaintiff.

109.    While in the care of St. Charles, Plaintiff's complaints and conditions clearly indicated he was at serious risk of harm to himself as a result of his psychosis. These complaints and conditions included, but were not limited to: (a) knowing that pepper spray may cause psychological effects, such as fear, anxiety and possible panic; (b) Plaintiff choking himself in an attempt to extract his soul from his body in the belief that death was imminent; (c) blowing his nose so hard that he had caused his nose to bleed; (d) standing on his bunk nude; (e) repeatedly flushing the toilet; (h) appearing to be under the influence of drugs; (f) loudly shouting; (g) banging his head on the door and walls; and (h) clawing at his eye in an attempt to remove it.

110.    The members of the medical staff were aware of all of these problems and of Michelle's numerous and frequent requests to allow Plaintiff to go the hospital.

111.    Dr. John (or Jane) Doe knew of Plaintiff's condition after having reviewed Plaintiff's records and/or been orally informed of them by Nurse Martin, Nurse Theresa and/or other nurses, who provided care to Plaintiff while he was in the custody of St. Charles.

112.    In response, the Count 3 Defendants should have done the following, but did not do so: (a) prohibit the use of pepper spray on Plaintiff; (b) recognize the situation as a potential

- 16 -

medical emergency; (c) provide emergency care or treatment; discover or diagnose Plaintiff's condition; (d) have a physician examine Plaintiff and his records to evaluate his condition and determine the appropriate course of diagnosis or treatment, or whether a referral to another facility was appropriate; (e) prioritize Plaintiff's progressively disabling condition over other inmates or non-emergency procedures; (f) give Plaintiff appropriate diagnostic tests or treatment; (g) take Plaintiff to a hospital; or (h) otherwise refer Plaintiff to an outside facility for appropriate diagnostic tests or treatment.

113.     Accordingly, under the color of state law as local entities authorized and required to provide medical care to inmates and detainees in the custody of St. Charles, the Count 3 Defendants subjected Plaintiff to, or caused Plaintiff to be subjected to, a deliberate indifference to his serious medical needs, in violation of his Fourteenth Amendment rights to due process of law and to be free of punishment prior to adjudication of guilt.

114.     As a direct and proximate result of the Count 3 Defendants' deliberate indifference to Plaintiff's serious medical needs, Plaintiff suffered numerous serious injuries as described herein, including, but not limited, to loss of his left eye, fear for his life, depression, anxiety, and substantial pain and suffering – physically, mentally, and emotionally.

115.     The cost of Plaintiff's medical care, after factoring in unknown future medical care, will be an amount that cannot be pled with greater specificity.

116.     The conduct of the Count 3 Defendants was intentional, outrageous, and demonstrated evil motive and a reckless or callous indifference to Plaintiff's rights, thus entitling Plaintiff to punitive damages.

117.     To the extent that Plaintiff prevails in the instant case, he is entitled to an award of attorney fees and costs pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiff respectfully asks the Court to award him compensatory damages against the Count 3 Defendants in amount that is fair and reasonable, for punitive damages, costs, and attorney fees, and for such other legal or equitable relief the Court deems appropriate.

**PLAINTIFF REQUESTS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

STATE OF MISSOURI )
                                        ) SS.
COUNTY OF ST. CHARLES )

On this 16th day of April , 2019 before me, a Notary Public in and for said state, personally appeared Jamie Leonard, known to me to be the person who executed the foregoing and acknowledged to me that he read the foregoing Complaint, and that the facts therein are true and correct according to the best of his best knowledge and belief.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.

_____
Jamie Leonard, Plaintiff

_____
Notary Public

My Commission Expires: 8-4-19

KATHLEEN E. MAHURIN
Notary Public, Notary Seal
State of Missouri
St. Charles County
Commission # 15637008
My Commission Expires 08-04-2019

Respectfully submitted,

**DONNER APPLEWHITE, ATTORNEYS AT LAW**

By:     */s/ Steven A. Donner*
          Steven A. Donner, #63789
          Thomas R. Applewhite, #64437
          1108 Olive Street, Suite 200
          St. Louis, Missouri 63101-1949
          Phone:        (314) 240-5350
          Facsimile:    (888) 785-4461
          Email:         steve.donner@da-lawfirm.com
                          tom.applewhite@da-lawfirm.com

***Attorneys for Plaintiff***

- 18 -