Exhibit E

```
            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF MISSOURI
                  EASTERN DIVISION


JAMIE LEONARD,                )
                              )
        Plaintiff,             )
                              )
        vs.                    ) No. 4:19-CV-00927-RLW
                              )
ST. CHARLES COUNTY, et al.,   )
                              )
        Defendants.            )
```

DEPOSITION OF DONTE FISHER, produced, sworn and examined on AUGUST 23, 2019, between the hours of nine o'clock in the forenoon and five o'clock in the afternoon of that day, at the offices of St. Charles County Counselor, 100 N. Third Street, St. Charles, Missouri 63301, before Jeanne M. Pedrotty, a Certified Court Reporter (MO) and Certified Shorthand Reporter (IL), in a certain cause now pending in the United States District Court, Eastern District of Missouri, Eastern Division, between JAMIE LEONARD, Plaintiff, vs. ST. CHARLES COUNTY, et al., Defendant; on behalf of the Plaintiff.

## Page 26

1  Q. And so if you would asked her, Nurse
2 Martin. Would you be able to receive a medical
3 history for Inmate Leonard?
4  A. If it was a planned, yes.
5  Q. I would like to take a quick few minutes
6 break just to stand up and stretch a bit.
7   (Whereupon, a short break was taken.)
8  Q. (By Mr. Applewhite) So I'd like to talk a
9 bit about what you did observe specifically about
10 Inmate Leonard. I'm going to refer to him as Jamie in
11 this deposition because it's easier to say than Inmate
12 Leonard?
13  A. That's fine. We'll say Jamie, okay.
14  Q. So Jamie, you described some of the actions
15 that you observed personally?
16  A. Uh-huh.
17  Q. Could you please be as specific as possible
18 about any actions you observed regarding Jamie prior
19 to the cell search?
20  A. Well, during the course of the night he was
21 doing like a lot of pacing back and forth, looking out
22 the back cell window, standing on top of his bunk, and
23 also he was naked. He would yell out profane language
24 occasionally, but not much. Continuously flushing the
25 toilet, and that's really it. But throughout the

## Page 27

1 whole night like the whole night. He didn't -- I
2 don't want to be vulgar or anything like that.
3  Q. That's all right.
4  A. But he was also like ejaculating and stuff
5 like that, just throughout the whole night, so -- I
6 mean I have seen a lot of things, but, you know,
7 that's what just kept my antenna up as far as him that
8 particular night. And he was the only one awake.
9  Q. He was the only one awake?
10  A. Yeah. The whole night, so that is about
11 it.
12  Q. So did you see him sleep at all that
13 evening?
14  A. None. None. He didn't sleep at all.
15  Q. And the things that he would yell -- I'm
16 asking the best of your memory specifically what did
17 he yell?
18  A. I can't answer the question. I'm not too
19 sure. I just know he was yelling.
20  Q. Okay. Did he say anything in particular to
21 you?
22  A. No. Never said anything particular to me.
23  Q. All right. And in terms of what he did
24 throughout the evening, you said you have seen a lot
25 of things, was his behavior particularly unusual for

## Page 28

1 an inmate on SPU?
2  A. Define "particular".
3  Q. Well, what I'd say is it would be so
4 abnormal that you would see it maybe once every year?
5  A. No.
6  Q. So you had seen other inmates behave like
7 Jamie during the past year before?
8  A. Yes.
9  Q. Okay. When inmates would be behaving that
10 way, what typically would you be informed as to why
11 they were behaving that way in advance by medical
12 staff?
13  A. Yes.
14  Q. Okay. What was the usual reason that you
15 would receive for why they would be behaving that way?
16  A. Most?
17  Q. Yes.
18  A. They are highly intoxicated or drug induced
19 the majority of the time.
20  Q. And the other cases, would it be mental
21 illness?
22  A. Some. But usually when mental health
23 aspect of it come in, they do more self harming than
24 the things he was doing.
25  Q. Okay. His things are more obnoxious and

## Page 29

1 less detrimental?
2  A. Right. Exactly.
3  Q. So he didn't seem to be a threat to
4 himself?
5  A. No.
6  Q. Why was he on the suicide prevention unit?
7  A. Well, usually when inmates come in, as he
8 did, and they get questioned, a series of questions
9 like. And if they don't answer the questions to the
10 liking of the nurse department or aren't able to be
11 assessed well, they'll normally come to the suicide
12 prevention unit for close observation.
13  Q. When you say "close observation", what does
14 that entail?
15  A. That entail 15-minute check staggering
16 throughout the night to make sure that they don't harm
17 themselves or someone else. And we do checks and we
18 pipe, like electronic pipe that's hooked to a fob in
19 between each cell. We pipe them, 15 minutes
20 staggering times.
21  Q. Well, that electronic pipe are you able to
22 see in the cell?
23  A. Yes.
24  Q. How big an area is the SPU, square footage
25 perspective?

Page 38

1  MR. HEFFNER: I'll object. I think it
2  still calls for speculation, but I'm instructing you
3  to go ahead and answer the question if you can,
4  Officer.
5  MR. APPLEWHITE: And maybe read it back so
6  he can hear it.
7  (Whereupon, the last question was read
8  back.)
9  THE WITNESS: No.
10  Q. (By Mr. Applewhite) So you would not have
11 ordered the use of pepper spray?
12  A. No.
13  Q. No as in you would not have?
14  A. Right.
15  Q. And then the third method -- I guess I
16 didn't hear it right. There is seg report, pass down,
17 and what's the third method that you might have
18 documented issues with an inmate?
19  A. Those are only two. There is not a third.
20  Q. Okay.
21  A. The only other thing is the seg report is
22 wrote down and then we verbally tell one another what
23 it is that's going on with the particular inmate. But
24 those main two will be seg report and written down and
25 pass down book.

Page 39

1  Q. Okay.
2  A. Yeah.
3  Q. Why did you want to become a suicide
4 prevention officer?
5  A. Out of my 27 years of being a correction
6 officer, it was one of the things I didn't do, so I
7 wanted it on my resume.
8  Q. Okay. Well, you do seem to have a pretty
9 impressive resume.
10  A. I appreciate you.
11  Q. Actually, I see you have five stars
12 underneath your CERT, what do the stars signify?
13  A. Years of service. You only can get a star
14 for every five years. So I have 27, so this November
15 it will be 28 and then next November it will be 30.
16  Q. Okay. Congratulations.
17  A. Thank you.
18  Q. Now, did Jamie start -- did Jamie first
19 enter the SPU under your watch or was there SPO before
20 you that Jamie entered under?
21  A. I don't remember. I don't remember.
22  Q. So let's get to the event where you entered
23 the cell.
24  A. Okay.
25  Q. So during your 8-hour shift you had not yet

Page 40

1 entered the cell for Jamie?
2  A. Outside of the 15 minutes.
3  Q. Outside of the 15 minutes before you came
4 in?
5  A. Right.
6  Q. So does it always occur in the 15 minutes?
7  A. Prior and after.
8  Q. So prior to you think it's more than likely
9 that Jamie was under a different SPO before you?
10  A. Maybe.
11  Q. Okay. So the cell search is always
12 happening not during the 8-hour shift but at the
13 beginning and end?
14  A. Yes.
15  Q. Why -- why is that?
16  A. Well, usually the searches is done before
17 and after because there's been occurrence throughout
18 the night -- throughout the day rather. So for every
19 occurrence, they have outside exposure there is a
20 chance that they could have something brought into
21 their cell from when they was outside rec'ing. So
22 that give us an opportunity to be able to go through
23 their stuff. So that's that would be my reasoning for
24 it is. But secondly, I mean it keeps them on their
25 toes on respective situation on what need to be done.

Page 41

1 They hate it, though.
2  Q. The inmates?
3  A. Yes.
4  Q. Sure. So in a 24-hour day an inmate would
5 have their cell searched three or four times?
6  A. Yep. Yes. I'm sorry. Yes.
7  Q. Was there a yellow sheet for Jamie that you
8 remember?
9  A. I can't answer that question. See, that's
10 thing. I don't remember if he was already in the unit
11 prior to me getting there or came during my shift.
12 Because the first thing, if he was already in my unit
13 before I got there, of course, there wouldn't have
14 been a yellow sheet because the yellow sheet stays
15 with the medical department when he gets sent to
16 medical. And if he came during my shift he came
17 directly from booking straight to my unit per medical.
18 So always been a seg report, a segregation report on
19 when he comes to the unit. I would personally never
20 see the yellow sheet. It will always just been a
21 segregation report on the inmate.
22  Q. Is a segregation report written for each
23 inmate on the SPU?
24  A. Yes.
25  Q. And you're able to review it?

**Page 46**

1  Q. Okay. So just walk me through the cell
2  search. You said everything was going fine.
3  A. You want to start with the beginning?
4  Q. Yeah. Slow motion.
5  A. So from the beginning of the time when we
6  approached the cell, I'm going to go back a little
7  bit. Before we approached the cell, I asked Harris to
8  come in to assist with the visual. He complied. As
9  we go into the cell, I opened up the trap which is
10 what we call the wicket, the door, and I gave him the
11 directive of can you turn around and please put your
12 arms through the wicket so I can handcuff you. He
13 did. I handcuffed him. Then I said step to the rear
14 of the cell and kneel down. He did. And then I
15 entered the unit, immediately after Scott come in and
16 start doing a search. While there I put a soft hand
17 touch on his shoulder to keep him, you know, close to
18 the cell and I'm also telling him if you do not comply
19 to all these directives we will employ the spray. I
20 don't even remember if he nodded his head saying if he
21 understood or not. I just know that he turned this
22 way and then he turned this way, and then he got up.
23 And then as he was getting up, I was trying to gain
24 control. He is a pretty big guy. And I know I'm not
25 a small guy, but he's a pretty big dude you know. And

**Page 47**

1  then I got this arm -- if I can remember correctly
2  Scott got the other arm. And by this time he is like
3  charging like control was like not controlled. And
4  that's when Harris sprayed. And once he sprayed him,
5  we got him to the mat and then I secure the legs,
6  Scott secured, I believe it was like the bottom part
7  of the arm. I'm not sure. I can't remember exactly,
8  and then if I also can remember, I believe Harris
9  pinched his shoulder, had his shoulder. And by that
10 time we radioed in for backup. Officers coming in,
11 and then Officer Bathke relieved me and Scott of our
12 duties and then decon'd him, cleaned him up, put him
13 in the cell with more water so he could decon himself.
14 He was screened and scanned by the medical department,
15 and allowed to stay in cell 1. We took him out of the
16 infected unit cell and then he was in cell 1. And by
17 this time I was already gone, not out of the building,
18 but in an area which we do our reports.
19 Q. For the use of force report?
20 A. Yeah. Use of force report.
21 Q. And how many drafts of your use of force
22 report were written?
23 A. Only one.
24 Q. And did you consult anyone while writing
25 your use of force report?

**Page 48**

1  A. No. We can't consult one another when we
2  do our reports because we don't want it to sound the
3  same or as if we copied from one another. So everyone
4  pretty much do their report from what they visual and
5  their recollection of the situation. I think it's a
6  good tool because it shows that you are only writing
7  what you wrote and I can only write what I saw. And
8  in that heat of the moment, you know, you really don't
9  see much other than what it is that you are doing
10 because it's like tunnel vision, safety of the inmate,
11 safety of the officers; everybody coming out well.
12 Q. Okay. And so no one told you what to say
13 in your report?
14 A. Oh, no. No, sir.
15 Q. Now, let's actually pull that report out
16 real quick.
17     (Whereupon, Exhibit 3 was marked for
18 identification.)
19 Q. (By Mr. Applewhite) I'm going to hand you
20 what's marked Exhibit 3. Take your time and read
21 that.
22     MR. HEFFNER: Donte, please take your time
23 and review it before you answer any questions.
24     THE WITNESS: Okay.
25 Q. (By Mr. Applewhite) All right. Is this

**Page 49**

1  the use of force report that you wrote?
2  A. This is not a use of force report but it's
3  an incident report. Yes, I did write this. Use of
4  force report is completely different from this.
5  Q. And actually let me hand you, I believe,
6  Exhibit 2. Is this a use of force report?
7  A. Yes. This is use of force.
8  Q. Okay. So the first page of that, you
9  filled out a form similar to this?
10 A. No. I don't have to fill out use of force
11 report because I wasn't the one that actually deployed
12 the OC. Usually the person that fills this out --
13 who does this is the person that actually deploys the
14 OC.
15 Q. So the first page of Exhibit 2 is what's
16 filled out by the person that actually uses the force?
17 A. Yes.
18 Q. Okay. So your incident report, going back
19 to Exhibit 3, is this what was written by you
20 immediately after the search of Jamie's cell in which
21 he was sprayed?
22 A. Yes.
23 Q. And is anything in this report inaccurate?
24 A. No, sir.
25 Q. Okay. Here it says that Inmate Leonard,