Exhibit M

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JAMIE LEONARD,                  )
                                )
    Plaintiff,                  )
                                )Cause No. 4:19-CV-00927-RLW
vs.                             )
                                )
ST. CHARLES COUNTY, ET AL.,     )
                                )
    Defendants.                 )

VIDEOTAPED DEPOSITION OF DEBBIE ECHELE
TAKEN BY GARY K. BURGER, JR., ESQ.
ON BEHALF OF THE PLAINTIFF
FEBRUARY 6, 2020

---

REPORTED BY KAREN M. RUSSO
CERTIFIED COURT REPORTER MO No. 628
CERTIFIED SHORTHAND REPORTER IL No. 084.004526
REGISTERED PROFESSIONAL REPORTER

RUSSO REPORTING, LLC
1025 COMMODORE DRIVE
ST. LOUIS, MISSOURI, 63117
Russoreporting@gmail.com
www.RussoReportingLLC.com

Page 74

1  get it?
2  A. No.
3  Q. And you guys knew he was acting psychotically,
4  right?
5  A. Yes.
6  Q. I mean -- okay. You've seen the notes where
7  there was --
8  A. Yes.
9  Q. -- evidence of very strange behavior,
10 statements, nude, trying to get in people's bunks saying
11 that he wanted to -- I have to get my soul out because it
12 is time for me to die?
13 A. Yes. So you asked if there was any improvement
14 since that. That's one of the things that we've
15 improved --
16 Q. So now had that -- I interrupted you.
17 A. So getting an order for that ahead of time if
18 we feel that there's going to be a situation, we can get
19 the order from the psychiatrist sooner and be able to use
20 that.
21 Q. Can you get the order from the on staff doctor
22 too?
23 A. No.
24 Q. He wouldn't give you an order for Haldol for
25 someone like Leonard?

Page 75

1  A. No, typically we don't the on call medical
2  doctor for anything psychiatric. We have a contracted
3  psychiatrist for that.
4  Q. When you say psychiatrist you don't mean
5  someone's personal psychiatrist. You have another
6  psychiatrist on call that you can call to get orders for
7  meds?
8  A. Yes.
9  Q. So if -- I'll show you this so you're not in a
10 vacuum here. Number 9, Exhibit 9, the top, that's the
11 statement I was just referencing. Your nurse went and
12 saw him that night at 1:30 in the morning before this
13 happened. If now -- are you saying that now if something
14 like that would happen you guys would contact the
15 psychiatrist to get an order on board in case a calming
16 or antipsychotic medication was needed for a patient?
17 A. Yes and no. So the psychiatrist is not -- we
18 don't hire him to be on call. He's hired to be on site 8
19 to 12 hours a week. However, if the nurses call the
20 medical supervisor and we discuss the situation, we can
21 help determine if it's a reason that we need to call him
22 because we typically --
23 Q. He's not on call, but you have access to him?
24 A. Correct, we don't pay him to be on call 24/7.
25 Our contract is for on site.

Page 76

1  Q. Who is this person?
2  A. Dr. Battula.
3  Q. B or P?
4  A. B-A-T-T-U-L-A.
5  Q. Mr. Leonard was at your facility for a couple
6  days before this?
7  A. He got there on the 20th, yes.
8  Q. So possible he would have seen -- if you had
9  the psychiatrist now possible he would have seen him in
10 that time?
11 A. No, because he came in on a Thursday and the
12 psychiatrist isn't there until Monday. I mean their
13 appointment would be Monday. He's only there twice a
14 week.
15 Q. So -- all right, thank you. Any other lessons
16 learned?
17 A. Well, can I speak with my attorney first?
18 Q. Let's do it this way. If we could maybe say
19 not that I can think of now, and then I'm going to
20 continue to ask more questions. And then if you think of
21 any later I'll give you that opportunity.
22 A. Okay.
23 Q. Is that fair?
24 A. Yes.
25      MR. HEFFNER: Would it be possible just to

Page 77

1  take a little recess to use the restroom? I don't have
2  to talk with her.
3       MR. BURGER: Yes, that is possible. We'll
4  go off the record.
5       MR. HEFFNER: Okay, thank you.
6  Q. (By Mr. Burger) So I have another question for
7  you, totally brand new. Any other lessons you learned
8  from this incident?
9  A. No.
10 Q. So I've marked a number of policies through
11 Exhibit 20. Are there any other policies, written
12 policies, related to provision of medical care to
13 inmates, communicating about medical care or medical
14 conditions, other than the ones I've marked and showed
15 you?
16 A. No, I don't believe so.
17 Q. Are there -- couple follow-up questions. You
18 said there was another policy about providing medical
19 care to inmates at one point in your testimony today. Do
20 you remember that?
21 A. Not policy, but practice.
22 Q. And then so my question is, is there a written
23 policy about providing medical care to inmates while
24 they're there and did I show it to you already?
25 A. Specifically about -- I don't think so. I mean

## Page 110

1  Q. She saw him at 1:37. Then she saw him after
2  the OC spray and before he injured his eye, correct?
3  A. Yes.
4  Q. Did she make any mental status inquiry with
5  him?
6  A. He's already scheduled to see the mental health
7  counselor on the 22nd.
8  Q. Can you answer my question?
9  A. What do you mean? That is the -- so she looks
10 to see if he has an appointment and he has an
11 appointment.
12 Q. Would you agree with me that when she saw him
13 at 1:37 she quoted his statements about his suicidality
14 and self harm and she asked him what changed in his
15 mental status and he advised her and she quoted those in
16 the notes?
17 A. Uh-huh.
18 Q. Is that a yes?
19 A. Yes.
20 Q. And in -- it doesn't seem like there's any
21 inquiry with him about what he's feeling or whether he
22 wants to hurt himself at 6:45 in that note. Is that
23 fair?
24 A. Yes.
25 Q. And you have it in front of you as well, sorry.

## Page 111

1  A. Yeah, so he's under observation by the
2  officers, not observation by the nurses.
3  Q. How do you know whether he was under
4  observation by the officers?
5  A. Because he's in the suicide prevention unit
6  where he's on close observation. That means that he's
7  being checked on less than every 15 minutes, his well-
8  being.
9  Q. So did you talk to her about Ms. Martin about
10 how or why -- did you talk to Ms. Martin about this
11 event?
12 A. When I got back from vacation, yes.
13 Q. What was your -- tell me about that
14 conversation.
15 A. I honestly don't remember everything, but I
16 know --
17 Q. Tell me anything.
18 A. Okay. So I first of all I wanted to make sure
19 after her seeing this and it was --
20 Q. She was okay?
21 A. Right.
22 Q. That's your focus, right, when you talk to
23 Fisher, Scott, and Martin, are you okay?
24 A. Yes, because when I got back from vacation the
25 inmate is not in our custody right now.

## Page 112

1  Q. And you sent an e-mail making sure everybody
2  was okay and directing people to EAP?
3  A. Yes.
4  Q. Did you ever reach out to the inmate?
5  A. No.
6  Q. Did you ever reach out to his mom?
7  A. No. I'm not allowed.
8  Q. To what?
9  A. To reach out to an inmate or their mother.
10 Q. To see how they are after they're injured?
11 A. Correct.
12 Q. Why not?
13 A. It's against policy.
14 Q. Where is that written?
15 A. We are not allowed to contact inmates or their
16 family once they're not in custody.
17 Q. Okay. Where is that written down?
18 A. That's a practice in corrections that's part of
19 correctional -- it's just correctional practices. I'm
20 not sure if it's written in a policy, but we all know
21 we're not allowed to speak -- we can't have contact with
22 inmates. That's in policy No. 5.
23 Q. Okay. I'm just asking. I don't know.
24 A. Yeah, we are no not allowed to initiate the
25 calls.

## Page 113

1  Q. Tell me about your conversation with Ms.
2  Martin. You asked her if she was okay and she needed EAP
3  counseling. What else did you ask her about?
4  A. I believe that I just -- I kind of reinforced
5  that she did a good job and then tried to put some, you
6  know, gauze over the eye and things like that and just
7  more about -- you know, it's hard. You can't really
8  prepare for something like what she had to deal with, so
9  I mostly let her kind of talk about the incident.
10 Q. What did she say?
11 A. Well, she was pretty shook up over what she
12 saw, but she also felt that she responded appropriately
13 and she provided first aid, made sure EMS was called.
14 So, I mean, she did a good job.
15 Q. Did you ever ask her why she didn't pick up on
16 the impending eye injury when she saw him at 6:45?
17 A. That goes back to documentation and verifying
18 if that's a current condition or if that's something that
19 was in the past. And she did say, you know, she can look
20 at the chart and see that he was already seen by our
21 physician and seen for a fit for confinement. So the
22 Reiter's syndrome wasn't verified as a current condition
23 based on the information that we have, and we were
24 awaiting records for Dr. Linda Hunt, but those records --
25 I mean he left before we got anything.