# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **JAMIE LEONARD**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:19-cv-00927-MTS |
| | ) | |
| **ST. CHARLES COUNTY, STEVEN** | ) | |
| **HARRIS, DONTE FISHER, LISA** | ) | |
| **BAKER,** and **THERESA MARTIN,** | ) | |
| | ) | |
| Defendants. | ) | |

---

## MEMORANDUM IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

Thomas R. Applewhite, #64437MO
Steven A. Donner, #63789MO
**DONNER APPLEWHITE**
906 Olive Street, Suite 1110
St. Louis, Missouri 63101
Phone: (314) 293-3526
Facsimile: (888) 785-4461
Email: tom.applewhite@da-lawfirm.com
Email: steve.donner@da-lawfirm.com

CO-COUNSEL FOR PLAINTIFF

Gary K. Burger, #32460MO
**BURGER LAW, LLC**
500 N. Broadway, Suite 1860
St. Louis, Missouri 63102
Phone: (314) 542-2222
Facsimile: (314) 542-2229
Email: gary@burgerlaw.com

CO-COUNSEL FOR PLAINTIFF

# TABLE OF CONTENTS

I.     Factual Summary ........................................................................................ 3

II.    Expert Findings and Admissions ............................................................. 4

       A.     Admissions from Director Keen's Deposition ............................. 5

       B.     Admission as to Mr. Katsaris' Findings ...................................... 8

III.   Recent § 1983 Decisions Against St. Charles County ........................... 13

       A.     Smith v. St. Charles County ....................................................... 13

       B.     Qandah v. St. Charles County ..................................................... 15

       C.     Ramsey v. St. Charles County .................................................... 17

IV.    Mr. Leonard Was at Least a Pretrial Detainee ...................................... 19

V.     Mr. Leonard's Constitutional Rights Were Violated ............................. 20

       A.     Lack of Medical Care Pre-Pepper Spray .................................... 20

       B.     Excessive Force in Pepper Spraying ........................................... 21

       C.     Lack of Medical Care Post-Pepper Spray ................................... 22

VI.    *Monell* Liability Attaches to Defendant ................................................. 23

       A.     Defendant Ratified the Constitutional Violations ...................... 23

       B.     Certain Policies Were Unconstitutional as Written .................... 24

       C.     Deliberately Indifferent Failure to Train or Supervise ............... 28

       D.     Unconstitutional Unofficial Customs ......................................... 29

VII.   Conclusion ................................................................................................ 30

**<u>TABLE OF AUTHORITIES</u>**

<u>Page Nos.</u>

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 247-248 (1986) .................................................................... 2

Andrews v. Neer, 253 F.3d 1052,
1060–61 (8th Cir.2001) ...................................................................... 19, 20

*Atkinson v. Babcock Sch. Dist.*,
460 F. Supp. 1190 (W.D. Pa. 1978) .......................................................... 2

BJP, L.L.C. v. Kitsap Cty., No. 10-5678 RJB,
2011 WL 3298661 (W.D. Wash. Aug. 1, 2011) ........................................ 2

Bliek v. Palmer, 916 F. Supp. 1475
(N.D. Iowa 1996), aff'd, 102 F.3d 1472 (8th Cir. 1997) .......................... 2

*Burkhart Advert., Inc. v. City of Auburn, Ind.*,
786 F. Supp. 721 (N.D. Ind. 1991) ............................................................ 2

*Doe v. Forest Hills Sch. Dist.*, No. 1:13-CV-428,
2015 WL 9906260 (W.D. Mich. Mar. 31, 2015) ...................................... 2

*Fernandez v. City of New York*, 457 F. Supp. 3d 364 (S.D.N.Y. 2020),
reconsideration denied, No. 17 CIV. 789 (PGG),
2020 WL 3448019 (S.D.N.Y. June 24, 2020) ........................................... 2

*Lollie v. Johnson,* No. 14-CV-4784 SRN/HB,
2015 WL 3407931 (D. Minn. May 27, 2015) .......................................... 24

*Monell v. New York City Dept. of Social Servs.*,
436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ........ 1, 2, 13, 15, 16, 18, 19, 23, 24, 29

*Moreland Properties, LLC v. City of Thornton*,
559 F. Supp. 2d 1133 (D. Colo. 2008) ...................................................... 2

*Osuagwu v. Gila Reg'l Med. Ctr.*,
938 F. Supp. 2d 1142 (D.N.M. 2012) ........................................................ 2

*Qandah v. St. Charles Cty., Missouri*, No. 4:20CV53 JCH,
2021 WL 808857 (E.D. Mo. Mar. 3, 2021) ........................... 13, 15, 16, 17

*Quraishi v. St. Charles Cty., Missouri*,
986 F.3d 831 (8th Cir. 2021) .................................................................. 3

*Ramsey v. St. Charles Cty.*, No. 4:15-CV-00776 JAR,
2017 WL 2843574 (E.D. Mo. June 30, 2017) ................... 13, 17, 18, 19, 20

*Robison v. Clawson*, No. 4:12-CV-2205 NAB,
2014 WL 1910284 (E.D. Mo. May 13, 2014) ................................... 19, 20

*Scott v. Harris*, 550 U.S. 372, 380,
127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) ........................................... 3

*Smith v. St. Charles Cty.*, No. 4:18-CV-171 JCH,
2021 WL 253998 (E.D. Mo. Jan. 26, 2021) ............................... 13, 14, 15

*Swain v. Town of Wappinger*, No. 17 CIV. 5420 (JCM),
2019 WL 2994501 (S.D.N.Y. July 9, 2019), appeal withdrawn,
No. 19-2681, 2019 WL 8015205 (2d Cir. Sept. 30, 2019), and
appeal dismissed, 805 F. App'x 61 (2d Cir. 2020) ................................ 2

*Weaver v. Reagen*, 701 F. Supp. 717, 723 (W.D. Mo. 1988),
aff'd as modified, 886 F.2d 194 (8th Cir. 1989) ................................. 2

*Wilson v. Spain*,
209 F.3d 713, 715 (8th Cir. 2000) ............................................... 20

**Statutes**

42 U.S.C. § 1983 ................................................... 1, 2, 13, 23

**Federal Rules**

Fed. R. Civ. P. 56(a) ................................................................. 2

Fed. R. Evid. 801(d)(2)(C) ........................................................... 8

Fed. R. Evid. 801(d)(2)(D) ........................................................... 8

**Constitution of the United States of America**

U.S. Const., amend. IV ..................................................... 1, 2, 19

U.S. Const., amend. VIII .................................................. 1, 20, 21

U.S. Const., amend. XIV ............................................... 1, 2, 19, 20, 21

## MEMORANDUM IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Jamie Leonard (hereinafter, "Mr. Leonard" or "Plaintiff") has moved for summary judgment only against defendant St. Charles County[1] (hereinafter, "Defendant"). Mr. Leonard only moves for summary judgment against this Defendant because Mr. Leonard's case against this Defendant has already been largely admitted by Defendant; any material fact that Defendant may claim is controverted is blatantly contradicted by the record.[2] As will be discussed in more detail below, Plaintiff produced two highly-qualified experts in this case for the purpose of demonstrating liability. In response to Plaintiff's two retained experts, Defendant produced its current Director, Daniel Keen, as a non-retained expert. Director Keen gave almost entirely favorable testimony for Plaintiff, and even adopted all of the findings of one of Plaintiff's experts. Furthermore, in addition to binding precedent from the Eighth Circuit and the United States Supreme Court that demonstrates a violation of Mr. Leonard's rights, there is recent persuasive authority against Defendant itself in other § 1983 cases in the Eastern District of Missouri.

Given Defendant's own admissions through Director Keen and its pleadings, the significant evidence that Plaintiff presents along with his experts and admissions, and the recent judicial findings against this very Defendant in this District, summary judgment for Mr. Leonard is appropriate in this case. Mr. Leonard requests that summary judgment be granted as to Defendant's liability only on Count 1 of his Fourth Amended Complaint[3] to remove the legally complicated issue of *Monell* liability from the jury's consideration, leaving only the question of damages to the jury.

---

[1] Mr. Leonard originally filed this case against the St. Charles County Department of Corrections, but Defendant filed a motion to have that defendant named as St. Charles County only. <u>Doc. 16</u>.

[2] Mr. Leonard incorporates by reference his Statement of Uncontroverted Material Facts as if fully set forth herein. Citations to his Statement of Uncontroverted Material Facts herein are abbreviated as "PSUMF".

[3] Count 1 is a *Monell* Claim for Violations of Fourth, Eighth and Fourteenth Amendments.

**ARGUMENT**

Summary judgment may be granted for a plaintiff in a § 1983 *Monell* context.[4] The "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Bliek v. Palmer*, 916 F. Supp. 1475, 1479 (N.D. Iowa 1996), aff'd, 102 F.3d 1472 (8th Cir. 1997) (granting summary judgment for plaintiff on Fourteenth Amendment due process claim) (internal citations and quotations omitted). Summary judgment is appropriate when a party shows there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986). A "genuine issue" of fact exists only if a reasonable factfinder could find in favor of the opposing party. *Weaver v. Reagen*, 701 F. Supp. 717, 723 (W.D. Mo. 1988), aff'd as modified, 886 F.2d 194 (8th Cir. 1989) (granting summary judgment for plaintiff) <u>citing</u> *Anderson v. Liberty Lobby, Inc.* at 251. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that [contradicted] version of the facts for purposes

---

[4] *BJP, L.L.C. v. Kitsap Cty.*, No. 10-5678 RJB, 2011 WL 3298661 (W.D. Wash. Aug. 1, 2011) (summary judgment granted for plaintiff on Fourteenth Amendment claim as to § 1983 *Monell* liability); *Osuagwu v. Gila Reg'l Med. Ctr.*, 938 F. Supp. 2d 1142 (D.N.M. 2012) (summary judgment granted for plaintiff on Fourteenth Amendment claim as to § 1983 *Monell* liability); *Fernandez v. City of New York*, 457 F. Supp. 3d 364 (S.D.N.Y. 2020), reconsideration denied, No. 17 CIV. 789 (PGG), 2020 WL 3448019 (S.D.N.Y. June 24, 2020) (summary judgment granted for plaintiff on a Fourth Amendment claim as to § 1983 *Monell* liability); *Doe v. Forest Hills Sch. Dist.*, No. 1:13-CV-428, 2015 WL 9906260 (W.D. Mich. Mar. 31, 2015) (summary judgment granted for plaintiff on failure to train under *Monell*); *Moreland Properties, LLC v. City of Thornton*, 559 F. Supp. 2d 1133 (D. Colo. 2008) (summary judgment granted for plaintiff as to official policy under *Monell*); *Swain v. Town of Wappinger*, No. 17 CIV. 5420 (JCM), 2019 WL 2994501 (S.D.N.Y. July 9, 2019), appeal withdrawn, No. 19-2681, 2019 WL 8015205 (2d Cir. Sept. 30, 2019), and appeal dismissed, 805 F. App'x 61 (2d Cir. 2020) (summary judgment granted for plaintiff on Fourteenth Amendment claim as to § 1983 *Monell* liability); *Atkinson v. Babcock Sch. Dist.*, 460 F. Supp. 1190 (W.D. Pa. 1978) (summary judgment granted for plaintiff as to § 1983 *Monell* liability); *Burkhart Advert., Inc. v. City of Auburn, Ind.*, 786 F. Supp. 721 (N.D. Ind. 1991) (summary judgment granted for plaintiff again as to § 1983 *Monell* liability).

of ruling on a motion for summary judgment." *Quraishi v. St. Charles Cty., Missouri*, 986 F.3d 831, 836 (8th Cir. 2021) (defendant's version of the facts was blatantly contradicted by the record at *838-839) <u>citing</u> *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

## I. FACTUAL SUMMARY

Ultimately, this is a case about a suicide prevention unit that completely disregarded its mentally ill inmate's needs, needlessly harmed that inmate, and then abandoned this individual in a cell to harm himself, again, in *the suicide prevention unit*. By Defendant's own admission, most of the people who end up in Defendant's jail have mental health problem or a drug addiction problem. [PSUMF 56]. When Mr. Leonard arrived at Defendant's jail in July 2017, he was in the midst of a severe mental health crisis. [PSUMF 9, 11, 13, 35-42, 101]. His acute psychosis became so severe that he was transferred to the suicide prevention unit. [PSUMF 53, 54]. Mr. Leonard also arrived with an eye condition called uveitis/iritis, also known as Reiter's syndrome, in his left eye, of which Defendant was notified. [PSUMF 2, 4, 15, 28, 66, 99, 166]. After failing to care for Mr. Leonard's eye condition at all and exacerbating his mental health crisis, Defendant's officer caused Mr. Leonard to be needlessly pepper sprayed in his left eye while he was handcuffed. [PSUMF 24, 28, 29, 32-34, 44-45, 52, 71, 73, 79, 81, 89, 107, 117, 120]. No meaningful aftercare was provided to Mr. Leonard after he was sprayed in his left eye. [PSUMF 131-160, 162-163, 167-171]. Defendant's officers then actually watched as Mr. Leonard gouged out his left eye over the course of minutes in his cell at the suicide prevention unit. [PSUMF 174, 175, 184-202, 207, 217-218]. Mr. Leonard's expert, Ken Katsaris, aptly compared this turn of events to watching an inmate tie a noose and hang himself in a suicide prevention unit and is the most egregious failure in a medical/physical crisis ever reviewed by him. [PSUMF 214, 352]. Defendant did not investigate this incident at all. [PSUMF 231-234]. Like with other incidents that have occurred throughout the years at Defendant's jail, no adverse action was taken against any of the participants. [PSUMF

236-243, 253-259]. Instead, Defendant's Assistant Director heartily thanked and praised all of the involved officers for their actions against Plaintiff, ratifying their actions. [PSUMF 241-242].

## II.    EXPERT FINDINGS AND ADMISSIONS

Plaintiff produced the following experts in this case for the purpose of demonstrating liability: (1) W. Ken Katsaris, who is a law enforcement, corrections and security consultant and trainer, and (2) Susan Lawrence, MD, a medical physician with significant correctional facility experience. [PSUMF 322]. Defendant then named Director Keen as its "non-retained" expert in response to Mr. Katsaris and Dr. Lawrence. [PSUMF 332]. As is outlined in detail below, Director Keen surprisingly testified in favor of Plaintiff's case, going so far as to state that he does not disagree with any of Mr. Katsaris' opinions that are stated in his expert report. [PSUMF 333].

Mr. Katsaris, who directed the Theodore Bundy Serial Murder Investigation, has testified primarily for defense counsel in his decades of experience working in the field of law enforcement, corrections and security.[5] [PSUMF 331]. He has forty-five plus years of teaching tens of thousands of officers from all fifty states in practical, hands-on use of force and deadly force issues, and he has extensive experience doing case evaluations for the purpose of presenting reports and opinions to the Court. *Id*. He is currently, and has been for over twenty-five years, the Senior Instructor for the nationally acclaimed AELE Seminars on Jail and Prison Standards and Procedures, which includes instruction on the law and application of force involving incarcerated prisoners, as well as instruction on suicide prevention/intervention policy and procedures for all aspects of prisoner monitoring. *Id*. For over twenty years, Mr. Katsaris taught part-time in the Regional and State Corrections Academy, which included instruction on all issues of care, custody and control of prisoners, including the correctional officers' responsibility for proper prisoner monitoring,

---

[5] This paragraph only highlights a portion of Mr. Katsaris' professional background. For additional supporting information, please see Exhibit 6 – Katsaris Report.

transport, use of force, tactical management and suicide prevention. *Id*. In particular, in addition to the aforementioned inmate mental health experience, Mr. Katsaris has significant experience in the proper use of chemical sprays on inmates. *Id*.

Other than Mr. Leonard's treating physicians and a nurse on Defendant's staff, Director Keen was the only expert disclosed by Defendant. [PSUMF 332]. Notably, Director Keen made the following admissions:

A. <u>Admissions from Director Keen's Deposition</u>. Director Keen made the following statements at his deposition:

1. Director Keen became the Director of Defendant in May 23, 2018. [PSUMF 273].

2. **If the standards that Director Keen admits were not followed below were complied with at the time that Mr. Leonard was confined in July 2017, "[m]ore likely than not, this [harm to Mr. Leonard's eye] would have been avoided."** [PSUMF 271].

3. Mr. Keen agrees that it is a "fair assumption" that there was "obviously" a "problem with adhering [to] policy" before Director Keen took over as Director of Defendant. [PSUMF 270].

4. When he became Director of Defendant, Director Keen had to "get back to policies" and train all officers on the "appropriateness of the use of force", including Suicide Prevention Officer Donte Fisher (hereinafter, "Fisher") and Officer Steven Harris (hereinafter, "Harris"). [PSUMF 272].

5. For example, since Director Keen began his tenure as Director of Defendant on May 23, 2018, he had to make changes to get Defendant "in line to make sure we're following what a planned use of force is and we're making sure we're calling [Defendant's] medical department prior to any use of force." [PSUMF 273].

6. Defendant now has Medical approve a pepper spray use of force such as the one that was inflicted upon Mr. Leonard in advance and has medical staff present for such a use of force. [PSUMF 274].

7. There must be an be aggressive action toward an officer to justify the use of pepper spray, and Mr. Leonard was not engaged in aggressive action toward an officer. [PSUMF 113, 114].

8. Mr. Leonard was pepper sprayed for not following directions during a cell search. [PSUMF 116].

9. The "if the situation allows" standard that is in the pepper spray policy that was in effect on July 22, 2017 and was still in effect as of April 1, 2021 required officers to check with Defendant's medical department prior to a use of force if there was not an immediate threat from the inmate. [PSUMF 87].

10. Mr. Leonard was not an immediate threat, so the situation allowed for the officers to contact Defendant's medical department prior to the use of force. [PSUMF 88].

11. There was no need for a cell search. [PSUMF 71].

12. Mr. Leonard was unable to follow direction at the time of the pepper spraying and decontamination incident. [PSUMF 140].

13. A person who is going through a mental health episode needs to be treated differently after the application of pepper spray because a person in a mental health episode may not react well to being pepper sprayed and may be unable to follow directions. [PSUMF 138].

14. "[W]hen [Defendant] received this individual, Defendant knew that he was a high alert individual. Everyone [at Defendant] should have been put on alert." [PSUMF 12].

15. It was clear that Mr. Leonard "was going through some type of mental health episode[.]" [PSUMF 101].

16. It is contraindicated to use pepper spray on someone who is going through a mental health episode. [PSUMF 102].

17. Pepper spray should not have been readied for use prior to entering Mr. Leonard's cell. [PSUMF 108].

18. Mr. Leonard should not have been pepper sprayed while handcuffed because pepper spray should not be used on a handcuffed person. [PSUMF 118]

19. Fisher was not in a position of authority to tell an officer to take his pepper spray out prior to entering Mr. Leonard's cell. [PSUMF 83].

20. Neither Baker nor any supervisor was consulted about using the pepper spray on Mr. Leonard. [PSUMF 89].

21. Fisher's and Harris' use of the pepper spray on Mr. Leonard was a planned use of force. [PSUMF 82].

22. Defendant's medical department should be consulted before any use of force. [PSUMF 273, 275].

23. Medical was not consulted prior to this planned use of force, and "necessary" medical information was not provided to the correctional officers prior to the use of force. [PSUMF 67, 89].

24. "Medical was notified by a family member of Mr. Leonard's about some of his behavior and his condition and then his condition with his eye. … [T]hat's information that needs to be shared with security in case if an incident occurs. … [T]hat information should have been passed on to security to make them aware that certain things cannot – certain tools cannot be used on this individual to gain compliance." [PSUMF 66-69].

25. After being pepper sprayed, Mr. Leonard should have been moved to the shower to be decontaminated. [PSUMF 157].

26. The response of the officers to Mr. Leonard digging into his eye was too slow. [PSUMF 211].

27. Since May 23, 2018, Defendant's "medical and mental health providers are to go down and counsel with [an individual in the suicide prevention unit] before force is used on them[,]" which is an appropriate correctional practice that needed to be implemented by Director Keen. [PSUMF 273].

28. However, Defendant has a policy of not having a psychiatrist or other mental health professional meet with a mentally ill inmate on the suicide prevention unit every weekend and most likely did not have a mental health counselor available for Mr. Leonard on July 22, 2017. [PSUMF 314].

29. Had a psychiatrist or other mental health professional been available for Mr. Leonard on July 22, 2017, it is "[v]ery possible" that the injury to Mr. Leonard could have been avoided. [PSUMF 50].

30. Haldol was available on July 22, 2017 at the Defendant's jail and could have been provided to Mr. Leonard had Nurse Theresa Martin (hereinafter, "Martin") simply picked up the phone and called the psychiatrist. [PSUMF 46].

31. It is among the best correctional practices to investigate use of force incidents after they occur to learn from potential mistakes or potential policy violations so staff can be better trained and/or have policies changed. It is contraindicated to use pepper spray on someone who is going through a mental health episode. [PSUMF 256].

32. An investigation should have been conducted into how the harm incident with Mr. Leonard happened and why. [PSUMF 235].

33. There has never been any investigation or inquiry into this matter after the day that Mr. Leonard "was sprayed and tore his eye out", and the use of force was approved that day before noon. [PSUMF 232].

34. If Director Keen had done an investigation, he would have asked if Harris and Fisher were taking a revenge action against Mr. Leonard because of Mr. Leonard's conduct the evening of July 22, 2017. [PSUMF 237].

35. Director Keen claims that he is planning to change the pepper spray policy to state that any subject has to be cleared prior to a planned use of pepper spray. [PSUMF 289, 290].

36. To date, none of the policies that Director Keen found to be deficient have been changed despite beginning his tenure in 2018.  [PSUMF 289].

37. Director Keen blames COVID-19 for not having updated Defendant's policies. [PSUMF 289].

By his own admission, Director Keen is <u>the</u> "head" of the St. Charles County Department of Corrections and the "top officer" and was endorsed as the Defendant's "non-retained" expert. [PSUMF 273, 332]. These 37 admissions of a party opponent were made <u>in April 2021</u> after all evidence had been adduced.[6] *Id*. Plaintiff intends to call Director Keen as a live witness if Defendant does not call him as witness. Even if he were not called as a witness, and even disregarding that these admissions were made as a part of a deposition in this very case, Director's Keen's statements would be admissions of a party opponent in that (a) Director Keen made these statements while authorized to make them as an expert disclosed by Defendant pursuant to Fed. R. Evid. 801(d)(2)(C), and (b) these statements were made while Director Keen was the Director of Defendant pursuant to Fed. R. Evid. 801(d)(2)(D).

B.    <u>Admission as to Mr. Katsaris' Findings</u>. Director Keen specifically stated the following regarding Mr. Katsaris' findings in his deposition (emphasis added below):

<u>From Page 8, Lines 3 and 5-6:</u>

---

[6] Plaintiff had Director Keen's deposition set within the discovery window, but Defendant requested that Director Keen's deposition to be moved to April 1, 2021.

Q.      What have you looked at?

A.      I looked at … the expert testimony from Mr. Ken Katsaris.

From Page 64, Lines 1-6:

Q.      Do you have any – I know you have Ken Katsaris's report in front of you. I know you haven't seen his deposition. A number of the things that you've told me about are things that he talked about and criticisms he had as well. Did you see that?

A.      Yes.

**Q.      Are there any opinions or criticisms that Katsaris has in his report that you disagree with?**

**A.      <u>There would be only one area that I would point out</u> is when said about planned use of force, them going into each cell doing a search is part of procedures, the part of the plan, that small discussion we had earlier to have the OC out is where that planned part comes in.**

**Q.      Okay. <u>That's the area that you disagree with Katsaris about?</u>**

**A.      <u>It's not necessarily a disagreement.</u>**

Page 65, Lines 6-19:

Q.      So we know – so I was at Katsaris's deposition. Here's some things he said on the planned use of force issue. He said, and I'm paraphrasing, that with there being – that the officers there, they anticipated a problem searching his cell because of his conduct. They had a collection of three people who were going to go into the cell. They armed themselves with a higher level of force than would ordinarily be utilized when performing a cell check. They had an actual meeting where they discussed it. And those things to him indicated it was a planned use of force, among others. **Do you agree or disagree with those ideas also supporting the idea that this was a planned use of force?**

**A.      I agree.**

Out of that report of Ken Katsaris with which Director Keen said that he agreed, below are some of the findings of Mr. Katsaris that are material to this discussion:

1.      "This file of materials is very representative of serious deviations of below recognized, trained, and accepted detention facility practices." [PSUMF 334].

2. "These practices were not accidental or simple mistakes, but rather deviations from clear policy statements, below acceptable training for implementation of policy, and clearly deviations below the recognized, trained, and accepted practices for providing the proper care, custody and control of prisoners." [PSUMF 335].

3. "[T]he corrections officers of the St. Charles County Department of Corrections (SCCDOC) involved with Plaintiff Jamie Leonard (Leonard) did not follow the SCCDOC Policies and Procedures, and that the policies of the SCCDOC were deficient in clarity and specific guidance." [PSUMF 336].

4. "These deviations, in addition to a clear lack of training, were the direct cause of Leonard's injuries." [PSUMF 337].

5. "[T]his deviation was followed by the inconceivable omission of the officers['] failure to intervene, as Leonard gouged out his own eye." [PSUMF 338].

6. "The irritation and contamination by the OC Restraint Spray was not properly addressed by the officers or medical staff." [PSUMF 339].

7. "The eye injury from the use of OC Restraint Spray, and the subsequent gouging out of Leonard's eye was preventable." [PSUMF 340].

8. "I have sufficient experience to know what the recognized and accepted interface procedures are, and should be, between the medical staff, and the corrections staff, to opine on the communications procedures required for the constitutional implementation of care, custody, and control of prisoners in a detention center, and that was a failure in this case." [PSUMF 341].

9. "After carefully reviewing the Second Amended Complaint filed in this case, I fully agree with the entirety of the assertions by the Plaintiff[']s attorneys of record on this file.[7] After a review of paragraphs nine (9) through one hundred twenty five (125), I find it compelling to incorporate these factual assertions as part of this report and my opinions. While somewhat duplicative at times, the assertions of fact are consistent with the materials I reviewed in Attachment "A", are accurate and supported by records, and testimony." [PSUMF 342].

10. "Prior to the beginning of the cell search and use of OC Chemical Restraint Spray on Leonard, I can find no excuse for not involving a medical staff person since a cell search was not an emergency." [PSUMF 343].

11. "The use of force against Leonard as a result of attempting to perform a cell search, did not comport with the SCCDOC policy nor the generally recognized, trained, and accepted procedures on the use of OC Chemical Restraint. The level of resistance required nationally and by SCCDOC Policy is "active

---

[7] This is Document 51 in this case. Because Director Keen did not disagree with any of the findings in Mr. Katsaris' report, he has necessarily agreed that ¶¶ 9-125 of the Second Amended Complaint are true.

aggression." My review of the cell video does not indicate this required level of resistance by Leonard. He was not cooperative, but not combative or attempting to harm the officers. And, there were three officers to control a handcuffed-behind-the-back Leonard. Not only was the entry into the cell for a cell search not appropriate, but the use of OC Spray was not justified by Leonard's level of resistance. Nor was Leonard a "serious physical threat."" [PSUMF 344].

12. "Furthermore, the SCCDOC Policy prohibits OC Spray to be deployed closer than four (4) feet. My view of the cell video shows the application began at about 12-18 inches from Leonard's face. The SCCDOC training clearly indicates the potential of eye injury if applied closer than three (3) feet. And, in this case, Leonard already suffered from an eye disease which totally contraindicated the use of OC Spray." [PSUMF 345].

13. "Baker testified that if she was contacted, she would have consulted medical before authorizing the use of OC Spray. But, even knowing this compromise of policy, as the reviewing authority, Baker was required to write a report on the incident in which Baker was not critical of any of the officer's actions, and found the use of force appropriate as their conduct was also ratified by each higher level of authority in the SCCDOC." [PSUMF 346].

14. "Either Baker did not know, or was not trained appropriately, on the policy, or the confusing statement in the policy "if the situation allows," did not provide the guidance necessary for use of OC Spray. I believe this statement makes the policy deficient and subject to subjective decision making. The statement actually gives authority without supervisory authorization, which is not the recognized, trained, and accepted procedure in detention facilities for a planned use of force." [PSUMF 347].

15. "It is also recognized by SCCDOC Procedures, as testified to by officers that any "planned use of force" must be authorized by a supervisor. It is my opinion that the meeting (briefing) prior to attempting Leonard's cell search, participated in by Corrections Officers Donte Fisher (Fisher), Steven Harris (Harris), and Scott, directed by Fisher, met the requirements of a "planned" use of force. Fisher alerted Harris and Scott about the bizarre behavior of Leonard during the night, and as a result had sufficient belief to tell Harris to be ready to use the OC Chemical Restraint Spray. There is no other way to define this assessment by Fisher other than a "plan" to use force. Therefore, the need for supervisory approval was necessary, but not sought or even thought about. This is significant because it accrues to my opinion of the deficient policy, and deficient training on the use of force requirements by SCCDOC as well as the recognized, trained and accepted procedures throughout the nation." [PSUMF 348].

16. "The use of OC Spray was not only contraindicated for the reasons in my opinions above, but the use of the OC Spray was totally not called for by Leonard's resistance. The spray was also inappropriately deployed. For all of

the reasons cited, the use of the OC Spray exceeded the test of the actions of the prudent officer assessing the need for a control agent reserved, by policy, for "inmates who pose a serious physical threat to staff or inmates." Leonard did not attempt to "hit, kick, spit, swing, or throw objects that could potentially harm or injure anyone within striking distance" (Policy, Use of OC Spray, SCCDOC, and ACA Standards cited in the Policy). It is my opinion that the force used on Leonard exceeded the force authorized by policy and nationally accepted practices." [PSUMF 349].

17. "A further violation of SCCDOC Policy occurred when Martin did not supervise the decontamination process, and Fisher, Harris, and Scott simply moved Leonard to another cell, took off his handcuffs, and directed him to use the sink in the cell to decontaminate himself of the OC Spray that was directed at his eyes, and from a very close injurious distance. The use of the cell sink, not an "eye wash station," as directed in policy, began the painful process of Leonard gouging at his eyes, in obvious frustration and pain, as can be seen, and verified, by the cell video. Again, a violation of the OC Spray Policy. And, in addition, the violation of medical directions of SCCDOC for Martin who was required to provide medical assistance for decontamination." [PSUMF 350].

18. "Each and every one of the actions by Fisher, and Harris, to plan and deploy an unauthorized use of force, vis-a-vis the deployment of OC Spray - combined with the lack of proper medical intervention, and the lack of the use of an eye wash station - was an escalating causation toward the final injurious actions taken by Leonard against himself, without intervention, which resulted in the loss of one of his eyes." [PSUMF 351].

19. "While Leonard did gouge his own eye out, he did so while officers simply watched Leonard's agony and pain, which is so abundantly clear from the cell video. While the officers watched Leonard gouging at his eye, they did call medical, and Martin did rush back to the cell. The officers['] lack of proper intervention to Leonard's actions is totally unjustified. As I earlier opined, Leonard should have been assisted with decontamination, and an "eye wash station," utilized with medical assistance. Neither was afforded to Leonard. Martin testified that when she arrived at Leonard's second cell, after the OC Spray use, four to five officers were in the hall outside of the cell. She testified no one, in her opinion, tried to stop Leonard. However, it is not necessary to rely on Martin's opinion, the cell video confirms that Leonard fell to the floor, turned over, was gouging at his eye, and blood was visible on the floor. No officer made an entry from the time Leonard was standing at the sink, to turning and gouging, to falling, rolling, and bleeding. **This failure of intervention is the most egregious failure to intervene in a medical/physical crisis, in a detention center, that I have ever reviewed or seen. It was obvious Leonard needed to be helped, and stopped from self-injury. I can only compare this lack of intervention to the possible scenario where an inmate, on suicide watch, is watched and monitored by corrections officers while he/she ties a noose, puts it around their neck, and attempts suicide by hanging before**

the officers intervene. **Obviously, that is a comparable scenario, in my opinion.** Officers would, and should, be terminated for that kind of omission. There was not even discipline for the officers in Leonard's case." [PSUMF 352].

20. "The lack of discipline, or even finding any violations of policy, is simply ratification of the use of disproportionate unjustified, and against policy force, and failing to intervene in a serious injurious compromise Leonard was doing to himself while an officer(s) watched. And, he was classified as a "special watch" inmate, and in a cell in the "special observation unit." It is incredible that the circumstances of the OC Spray without authorization even occurred. I find it is a total disregard of the correctional mission, especially for the unit Leonard was in, to just let him harm himself without drastic discipline imposed on the officers. In this case the SCCDOC didn't even find that policy or procedures were violated. This is proof of "ratification," in my opinion." [PSUMF 353].

## III.     RECENT § 1983 DECISIONS AGAINST ST. CHARLES COUNTY

These incredible admissions by Defendant's Director and "non-retained" expert notwithstanding, there is persuasive authority that has been developed in three opinions against this same Defendant that involve excessive force and inadequate medical care. District Judge Jean Hamilton recently allowed two different plaintiffs' § 1983 *Monell* claims against this very Defendant to survive in (1) *Smith v. St. Charles Cty.*, Missouri, No. 4:18CV171 JCH, 2021 WL 253998 (E.D. Mo. Jan. 26, 2021) and (2) *Qandah v. St. Charles Cty.*, Missouri, No. 4:20CV53 JCH, 2021 WL 808857 (E.D. Mo. Mar. 3, 2021). Furthermore, District Judge John Ross allowed excessive force claims against Defendant to survive summary judgment in *Ramsey v. St. Charles Cty.*, No. 4:15-CV-00776 JAR, 2017 WL 2843574 (E.D. Mo. June 30, 2017). None of these plaintiffs filed their own summary judgment motions (perhaps because they did not receive the same dumbfounding admissions in their cases), but the rulings against Defendant's summary judgment motions are instructive to this Court nonetheless to Mr. Leonard's subsequent analysis as to Defendant's *Monell* liability.

### A.  Smith v. St. Charles County

In or around January 2017, plaintiff Eric Smith turned himself into the St. Charles County jail to serve a 12-day sentence for a traffic violation. *Smith* at \*1. Mr. Smith started fighting with another inmate in response to something the other inmate said. *Id*. An officer sprayed Mr. Smith in the face with mace, which resulted in mace pouring into his ear. *Id*. Without giving any verbal warning, another officer grabbed Mr. Smith from behind and threw Mr. Smith to the ground in a violent takedown maneuver. *Id*. In the performance of this takedown maneuver, Mr. Smith's head was slammed into a metal stool. *Id*. A nurse tended to Mr. Smith at the scene and then took him to Medical. *Id*. at \*2. Mr. Smith was eventually transported to the hospital. *Id*. The hospital instructed that Mr. Smith should receive Motrin and an ice pack every two hours. *Id*. Mr. Smith returned to the hospital and his condition worsened, experiencing pain, fatigue, nausea, dizziness and light-headedness. *Id*. Despite Mr. Smith's complaints as to what medical treatment he should have received, Defendant refused to provide Mr. Smith with the Motrin and the ice pack that was prescribed for him. *Id*. Mr. Smith saw "floaters and little dots", passed out and woke up on the floor. When Mr. Smith informed Defendant that he had passed out, Defendant's officer simply replied, "Oh," and continued walking past Mr. Smith's cell. *Id*. Upon his release from the jail, Mr. Smith visited the emergency room, where he was diagnosed with a subdural hematoma requiring a burr hole brain drain evacuation, drilling two dime-sized holes in Mr. Smith's head and inserting a hose to drain the blood. *Id*. Mr. Smith suffers from the effects of this injury to this very day. *Id*.

Judge Hamilton found that a genuine issue of material fact remained with respect to whether Defendant's officer exhibited deliberate indifference to Mr. Smith's serious medical needs. *Id*. at \*5. "In other words, the Court [found] a reasonable factfinder could conclude [Defendant's officer] knew of, but deliberately disregarded, a serious medical need when he allegedly ignored [Mr. Smith's] requests for medical assistance." *Id*. Judge Hamilton also found

that a genuine issue of material fact remained with respect to whether Defendant's officer utilized excessive force during the incident in question. *Id*. at *6. "The Court finds that a reasonable jury could conclude that [Mr. Smith] was in compliance with correctional officers' orders, and posed no threat to the safety and security of the institution when he was assaulted." *Id*. As to *Monell* liability for Defendant itself, Judge Hamilton found that "a reasonable jury could conclude [Defendant] had notice of a pattern of unconstitutional acts committed by correctional officers with respect to both utilizing excessive force and denying medical care. [Mr. Smith] further [presented] evidence that [Defendant] adopted deficient supervision and training practices with deliberate indifference to the constitutional rights of others, that these training practices were the product of the County's deliberate and conscious choices, and that the practices proximately caused Plaintiff's injury." *Id*. at *8.

Mr. Leonard's case has similarities to the *Smith* case in that force was inflicted upon Mr. Leoanrd was far greater than what was called for by the jailers. [PSUMF 119-122]. Also like in *Smith*, a nurse tended to Mr. Leonard that minimized his medical needs [PSUMF 45, 48, 66, 68, 69, 154, 161, 167] and then refused to provide him with medicine and treatment [PSUMF 28, 29, 32, 44, 52, 162, 178]. Similar to how Mr. Smith's clearly worsening situation was ignored with his hematoma, so was Mr. Leonard's worsening psychosis, eye disease and subsequent prolonged gouging out of his eye. [PSUMF 166, 167, 179, 181-192, 330]. Mr. Leonard had to ultimately have surgery like Mr. Smith to treat the significant, permanent injuries that Mr. Leonard, namely, the loss of his eye and the reality that he can now go blind much more easily on account of only having one eye. [PSUMF 152, 227]. Finally, all of this damage to Mr. Leonard could have been avoided by Defendant properly training, supervising and correcting the unconstitutional acts of its officers and staff. [PSUMF 271, 327-331, 338, 342, 343, 353].

**B. Qandah v. St. Charles County**

Mr. Qandah was jailed in the St. Charles County jail from March 3, 2014 to February 6, 2015. *Qandah* at *1. On or about December 8, 2014, an inmate announced an intention to beat up Mr. Qandah. *Id.* at *2. To gain unlawful access to Mr. Qandah's cell, the would-be attacker simply asked one of Defendant's officers about gaining access to Mr. Qandah's cell. *Id.* The inmate then sat in front of Mr. Qandah's cell, and Defendant's officer hit the button to open the door to Mr. Qandah's cell. *Id.* That inmate then viciously attacked Mr. Qandah, damaging Mr. Qandah's face and jaw. *Id.* After the altercation, Mr. Qandah asked to be taken to a hospital to get an x-ray for the pain in his jaw, was not permitted to see a doctor with a mobile x-ray machine contracted by Defendant, and had six to nine complaints relating to medical care ignored by Defendant. *Id.* The pain in his jaw was so severe that Mr. Qandah had to request liquid food in the weeks following the attack, and he still experiences pain in his jaw to this day. *Id.*

With respect to Mr. Qandah's excessive force claim, Judge Hamilton found that a genuine issue of material fact remained with respect to whether Defendant's officer exhibited deliberate indifferent to a substantial risk of serious harm to Mr. Qandah by opening his cell door to allow the attacker inside. *Id.* at *5. As to Mr. Qandah's lack of medical care claim, the Court found "that a reasonable factfinder could conclude that [Defendant's Lieutenant Michael] McKee knew of, but deliberately disregarded, a serious medical need when he allegedly ignored Plaintiff's requests for medical assistance. *Id.* at *6. As to *Monell* liability for Defendant itself, Judge Hamilton found that "a reasonable jury could conclude [Defendant] had notice of a pattern of unconstitutional acts committed by correctional officers with respect to both condoning or overlooking the use of force by inmates on other inmates, and denying proper medical care. [Mr. Qandah] further [presented] evidence that [Defendant] adopted deficient supervision and training practices with deliberate indifference to the constitutional rights of others, and that these training practices were the product

of [Defendant's] deliberate and conscious choices, and that the practices proximately caused Plaintiff's injury." *Id*. at *8.

Mr. Leonard's case is also analogous to *Qandah* to the extent that Mr. Leonard's cell was unnecessarily accessed with the highly likely result that Mr. Leonard would suffer needless injury. [PSUMF 71]. Like Mr. Qandah, Mr. Leonard was denied ready access to a physician that could have seriously mitigated the damage that was inflicted. [PSUMF 43-45, 50, 52, 305]. Like Mr. Qandah, multiple appeals were made to Medical that fell on deaf ears (in Mr. Leonard's case, through his mother). [PSUMF 13, 15, 17-20]. Mr. Quadah still suffers from his injury to this very day, like Mr. Leonard, who will have a permanent reminder of one of the saddest days of his life for the rest of his life. [PSUMF 227]. Lastly, like in the case of Mr. Qandah, Mr. Leonard's damage could have been avoided through proper supervision, training, and correction by Defendant. [28, 195, 199, 202-206, 210, 213, 214, 229, 230, 271, 334-340]. Instead, like in *Qandah*, despite being on notice of a pattern of unconstitutional acts committed by correctional officers with respect to both condoning or overlooking the use of force by inmates on other inmates, and denying proper medical care, Defendant condoned the conduct against Mr. Leonard instead of engaging in steps to correct the behavior of its officers and staff. [PSUMF 231, 232, 238-248].

### C. Ramsey v. St. Charles County

Plaintiff Patsha Ramsey was a pretrial detainee confined at the St. Charles County jail between December 2012 and September 2013. *Ramsey* at *1. Ms. Ramsey attempted suicide and was transferred to the suicide prevention unit at the jail, where she remained for the duration of her detention. *Id*. Correctional officers at the jail labeled her as a problem inmate", which included forcing her to be in her cell naked and physically assaulting her, including the unnecessary use of pepper spray. *Id*. She was restrained to a table for up to longer than two weeks, and the Defendant's staff "all made the statement if it was our daughter or our sister, we would have a problem with

it." *Id*. at \*3. Then-Assistant Director Vaughn directed that Ms. Ramsey be restrained "until further notice." *Id*. at \*4. Although then-Director Crawford stated that he intended to end the practice after Ms. Ramsey attempted suicide by wrapping the chain restraining her to table around her neck, he did not actually order the practice to end. *Id*. The Court also noted multiple instances of Ms. Ramsey claiming to be pepper sprayed while restrained. *Id*. at \*5.

Judge Ross determined that "genuine issues of material fact exist[ed] as to whether restraining [Ms. Ramsey] to a table was objectively reasonable under the circumstances." *Id*. While there was no dispute that Ms. Ramsey was "a challenging inmate with a consistent history of aggression, defiance, self-destructive and anti-social behaviors", "it [was] also undisputed that she had "serious mental health needs" and Defendants were aware of those needs." *Id*. While restraints may be employed as a means to temporarily restrain a mentally ill inmate who is acting out, restraints may not be used for punishment alone." *Id*. As to *Monell* liability, the Court found that "[a]lthough there is little affirmative evidence in the record of failure to train and supervise, there is certainly evidence of a lack of understanding among corrections officers as to SCCDOC policies on the use of restraints and OC spray and inconsistency surrounding the implementation of those policies." *Id*. at \*7. "The circumstantial evidence creates a material fact issue as to whether Defendants were deliberately indifferent in training and supervising their officers, and in light of Defendants' concession that [Ms. Ramsey had] presented some evidence in the record of failure to train and supervise, summary judgment will be denied." *Id*. (internal citations omitted).

Mr. Leonard's case is also comparable to *Ramsey* in so far as both Mr. Leonard and Ms. Ramsey were in the suicide prevention unit for obvious mental illness. [PSUMF 9, 54, 55]. Like Ms. Ramsey, Mr. Leonard was left in his cell naked and was recognized as a challenging inmate because of his mental health issues while at the jail. [PSUMF 73, 74]. Like with Ms. Ramsey, a

lack of understanding among corrections officers as to SCCDOC policies on the use of restraints and OC spray and inconsistency surrounding the implementation of those policies was present (Defendant admitted as much as to OC spray in its own answer). [PSUMF 253, 264, 265, 268-270, 272, 273, 282, 285-287, 291-294]. While Ms. Ramsey was pepper sprayed while restrained, Mr. Leonard pepper sprayed while detained. [PSUMF 117]. Also, here, while Ms. Ramsey had *some evidence* in the record of a failure to train and supervise, there are a series of flat-out admissions in Mr. Leonard's case. [PSUMF 252, 267-270, 279-281, 287-293, 334-337, 344]. Like with Ms. Ramsey, if Mr. Leonard was someone's son or brother, a person would have a problem with what was done to Mr. Leonard.

## IV.    MR. LEONARD WAS AT LEAST A PRETRIAL DETAINEE

The case of *Robison v. Clawson*, No. 4:12-CV-2205 NAB, 2014 WL 1910284 (E.D. Mo. May 13, 2014) also was a summary judgment finding against an officer of Defendant's for excessive force, but there was no finding against Defendant itself because the plaintiff in that case withdrew her *Monell* claims in favor of a (prohibited by binding precedent) respondent superior theory. *Robison v. Clawson*, No. 4:12-CV-2205 NAB, 2014 WL 1910284 (E.D. Mo. May 13, 2014). While *Monell* liability is not discussed in that case, the difference between an arrestee and a pretrial detainee is discussed at length, so it is useful for determining whether Mr. Leonard is an arrestee or a pretrial detainee.

"The Fourth Amendment protects against deprivations of liberty and specifically, against the use of excessive force during an arrest, investigatory stop, or other "seizure" of a person. By contrast, the Due Process Clause of the Fourteenth Amendment protects against conditions of pretrial confinement that amount to punishment." *Robison* at *3 (internal citations omitted). "In *Andrews v. Neer*, the Eighth Circuit outlined a continuum of excessive force claims brought by persons in custody:

In ... situations in which excessive force is alleged by a person in custody, the constitutional standard applied may vary depending upon whether the victim is an arrestee, a pretrial detainee, or a convicted inmate of a penal institution. If the victim is an arrestee, the Fourth Amendment's "objective reasonableness" standard controls. The evaluation of excessive-force claims brought by pre-trial detainees, although grounded in the Fifth and Fourteenth Amendments rather than the Fourth Amendment, also relies on an objective reasonableness standard. While we have not drawn a bright line dividing the end of the arrestee's status and the beginning of the pre-trial detainee's status, it is clear that the state may not punish a pretrial detainee. Excessive-force claims brought by prisoners fall under the protections provided by the Eighth Amendment's prohibition of cruel and unusual punishment." *Robison* at *4 <u>quoting</u> *Andrews v. Neer*, 253 F.3d 1052, 1060–61 (8th Cir.2001) (internal citations omitted).

"Between arrest and sentencing lies something of a legal twilight zone." *Id*. <u>quoting</u> *Wilson v. Spain*, 209 F.3d 713, 715 (8th Cir.2000). In any event, Mr. Leonard was not convicted of anything, so he is at least a pretrial detainee. Given the damning admissions in this case, Mr. Leonard wins whether he is an arrestee or a pretrial detainee. Therefore, for purposes of both Plaintiff's excessive force and inadequate medical care claims, this memorandum's analysis proceeds as if Mr. Leonard was a pretrial detainee. To be crystal clear, Mr. Leonard is not conceding that he was not an arrestee on July 22, 2017; it is just immaterial to this analysis because Defendant has functionally admitted to Mr. Leonard's Complaint.

## V.     MR. LEONARD'S CONSTITUTIONAL RIGHTS WERE VIOLATED

There are three basic ways in which Mr. Leonard's constitutional rights were violated: (1) in the reprehensible lack of medical care that he received from Defendant before the cell search that lead to him being pepper sprayed, (2) in the excessive force that he suffered as a result of Defendant's completely unnecessary search of his cell, and (3) the insane disregard for his medical needs after he was pepper sprayed by Defendant.

### A.  Lack of Medical Care Pre-Pepper Spray

"A pretrial detainee's claims are evaluated under the Fourteenth Amendment, and [he] is "entitled to at least as much protection under the Fourteenth Amendment as under the Eighth

Amendment." Therefore, a detainee's Fourteenth Amendment claim of deliberate indifference is analyzed under the deliberate indifference standard for an Eighth Amendment violation." *Ramsey* at *5 (internal citations omitted). "To proceed with [his] deliberate indifference claim, [Mr. Leonard] must demonstrate that (1) he suffered from a serious medical condition, (2) Defendants knew of the condition, and (3) Defendant deliberately disregarded the condition." *Id*.

The completely uncontroverted evidence put forth by Mr. Leonard established that he suffered from acute psychosis and uveitis/iritis, both of which are serious medical conditions. [PSUMF 2, 4, 7, 11, 68]. Mr. Leonard's mother ensured that Defendant knew all about his serious medical conditions. [PSUMF 13, 15, 17, 19, 20]. Of course, Defendant was put on notice regarding Mr. Leonard's condition as a result of his strange behavior that night. [PSUMF 35-42]. Mr. Leonard's medicines were not provided to him at all despite Defendant knowing about both his conditions and his medicines. [PSUMF 28, 29, 32]. Being removed from medication exacerbated his psychosis. [PSUMF 32-35]. He was not given Haldol, an effective sedative, until it was way too late. [PSUMF 50, 51, 221]. Defendant admits that all Martin had to do was call an on-duty psychiatrist. [PSUMF 44, 45, 50]. However, Defendant could not be bothered to verify a prescription literally handed to it by Mr. Leonard's mother, much less call a physician. [PSUMF 23, 24, 27].

### B. Excessive Force in Pepper Spraying

The Due Process Clause of the Fourteenth Amendment protects pretrial detainees from "the use of excessive force that amounts to punishment." *Id*. at *2. A pretrial detainee's right to be free from excessive force is founded on the Due Process Clause and, unlike the Eighth Amendment, the Clause prohibits any punishment of a pretrial detainee, whether cruel-and-unusual or not). *Id*. Thus, a court must decide whether force was applied in a good-faith effort to maintain or restore discipline, or "to injure, punish or discipline" the detainee. *Id*. In deciding

whether the force used against a pretrial detainee is "excessive," "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id*. "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'" *Id.* Factors relevant to assessing the objective reasonableness of force used include: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id*. In accordance with Kingsley, the Court makes the reasonableness determination from the perspective of a reasonable officer on the scene; accounts for the legitimate interests that stem from the need to manage the facility; and gives deference to policies which allows the use of restraints "to prevent self-injury or injury to others." *Id*.

Again, Director Keen, Defendant's own disclosed expert and highest-level officer, agrees with Mr. Katsaris' analysis. [PSUMF 333]. Mr. Leonard will not recite everything that was stated above, other than to restate that Mr. Katsaris specifically found the following: "**It is incredible that the circumstances of the OC Spray without authorization even occurred. I find it is a total disregard of the correctional mission**[.]" [PSUMF 354] <u>Katsaris Report, p. 15</u>. (emphasis added). Nothing was objectively reasonable about preparing pepper spray for an unnecessary cell search in a suicide prevention unit, not checking with Medical in advance of the unnecessary cell search, and then spraying the inmate in the face while handcuffed when there was no active aggression by Mr. Leonard. [PSUMF 342-344]. Indeed, Mr. Katsaris opines on the existence of a motive to punish Mr. Leonard because of his behavior the night prior. [PSUMF 130]. Defendant's officer's behavior is admittedly a failure of the correctional mission. [PSUMF 247, 353]. Director Keen's adoption of Mr. Katsaris' finding that this was akin to watching a man hang himself is

appropriate. [PSUMF 333, 352]. This behavior is egregious and inexcusable, which is why Defendant caused the video of its officers watching this event to be deleted. [PSUMF 176, 177].

### C. Lack of Medical Care Post-Pepper Spray

This analysis turns on the same analysis as the pre-pepper spray medical care that was not provided. Mr. Leonard was not given a proper eyewash station. [PSUMF 141, 350]. The officer who was supposed to assist Mr. Leonard left within less than a minute of spraying him. [PSUMF 143, 145-147]. Mr. Leonard was not sedated or restrained, two tools that could have prevented this incident entirely. [PSUMF 178]. This is known because those tools would later be used to prevent further harm to Mr. Leonard after the damage was done. *Id*. Most damningly, Defendant's officers stood by and watched while Mr. Leonard gouged out his own eye <u>in a suicide prevention unit</u>. [PSUMF 195, 198, 199, 202, 353]. This is a man that Defendant had already determined was at risk <u>of killing himself</u>. [PSUMF 39, 41, 54, 55]. Defendant's officers simply did not care enough to do their job as <u>suicide prevention officers</u>. [PSUMF 352].

### VI.   *MONELL* LIABILITY ATTACHES TO DEFENDANT

In *Monell v. New York City Dept. of Social Servs.*, the United States Supreme Court held that municipalities and other local governmental units are "persons" subject to liability under 42 U.S.C. § 1983. 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611(1978). The Court concluded that a governmental unit may be liable under § 1983 only when its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell,* 436 U.S. at 694. The "official policy" requirement distinguishes acts of the municipality from acts of employees of the municipality, thereby limiting liability to action for which the municipality is actually responsible. *Id*. *Monell* liability arises in this case on multiple grounds: (1) post-incident ratification, (2) unconstitutional policies, (3) deliberately indifferent failure to train and supervise, and (4) unconstitutional unofficial customs.

## A. Defendant Ratified the Constitutional Violations

Nothing speaks to post-incident ratification better than the following e-mail written by Assistant Director Debbie Echele to Defendant's employees on 8/1/17 after the incident:

> "A huge "THANK YOU!" for your response and assistance with inmate Leonard on 7/22/17. I watched the video today since I was on vacation when this incident occurred. It was definitely something out of the ordinary and very bizarre, however, the teamwork displayed was great to see. Everyone did an exceptional job. … Again, thank you for a job well done!"

An incredibly clear message was sent by that e-mail: keep doing what you're doing. [PSUMF 242, 243]. The kind of behavior described in this memorandum and Mr. Leonard's statement of uncontroverted material facts is laudable. Everything was done perfectly. [PSUMF 238, 241-244, 248]. It should be repeated. [PSUMF 241, 245]. These employees should not fear being fired, which is what Mr. Katsaris recommended should happen. [PSUMF 215, 245, 246, 352]. An employee of Defendant's would be forgiven for thinking that he or she might even be *promoted* for causing a suicidal man to pull his eye out in front of him or her and then watching him while he did it. *Id*.

Under a *Monell* post-incident ratification claim, a municipality may be held liable for a constitutional violation where an authorized policymaker approved the subordinate's unconstitutional decision and the basis for it. *Lollie v. Johnson*, No. 14-CV-4784 SRN/HB, 2015 WL 3407931, at *7 (D. Minn. May 27, 2015). Defendant has testified and even previously answered that it did everything perfectly and would do nothing differently. [PSUMF 243]. Defendant's position is clear-cut. If this is not post-incident ratification, undersigned counsel does not know what is. The fact that Defendant has not even gotten around to changing policies that Defendant knows need to be changed further proves that it ratifies what happened here. [PSUMF 288-290].

## B. Certain Policies Were Unconstitutional as Written

Defendant's employees have expressed many inconsistencies or misunderstandings about policy. [PSUMF 252, 255, 264, 265, 282, 285-288, 291-294, 298, 301, 302]. Somehow, there was ambiguity as to when they should intervene in a circumstance like when tearing an eye out. [PSUMF 203-206]. Defendant policy should require adequate custody staff in the suicide prevention unit to allow for custody staff to immediately intervene. [PSUMF 203]. Defendant's policy should state that staff are required to go into a cell of someone who could potentially cause harm to others as well as themselves immediately. [PSUMF 203, 204]. None of the policies talk about mental health or how things should be different for someone who is having psychological issues. [PSUMF 305, 308]. Assistant Director Echele admitted that the "if the situation allows" policy language stayed the same over time, but Director Crawford did not enforce it (although Director Keen eventually did). [PSUMF 288]. The statement "if the situation allows" in the current pepper spray policy makes the policy deficient and subject to subjective decision making. [PSUMF 285]. The statement "if the situation allows" gives authority without supervisory authorization, which is not the recognized, trained, and accepted procedure in facilities for a planned use of force. [PSUMF 286]. Due to a lack of training and unclear policies by St. Charles DOC, Defendant's officers did not know what "[i]f the situation allows" meant in July 2017. [PSUMF 287].

A "planned use of force" standard had already been implemented in the corrections industry for decades prior to the incident that is the subject of this lawsuit. [PSUMF 263]. In July 2017, Defendant did not have a formal, written "planned use of force policy" in place nor did it have any policy that provides guidance or discusses planned use of force. [PSUMF 264]. Defendant "use of force" policy is the only document used to determine if the use of force used on an inmate is appropriate, and this policy does not even mention or use the term "planned use of

force." [PSUMF 265]. Defendant claims to review the use of force policy annually, but it has not been updated since 2014. [PSUMF 266].

There are consequences to this type of ambiguity. [PSUMF 334-340]. Defendant admits that policies and training involving use of force should be consistent in order to prevent confusion as to what type of force to use, how to use a specific type of force, or what to do and for inmate safety. [PSUMF 267]. If there are practices but not written policies, Defendant is not sure how that practice is complied with day to day. [PSUMF 268]. Some of Defendant's officers would follow their training and some of Defendant's officers would follow the policy if the policy and the training are inconsistent. [PSUMF 269].

Importantly, the current pepper spray policy is unclear as to when Medical needs to be consulted and how to contact Medical prior to using pepper spray. [PSUMF 282]. Defendant instructs that there is no medical condition that should disqualify an inmate from the use of pepper spray. [PSUMF 277]. Defendant instructs that anyone could be pepper sprayed because pepper spray is a naturally occurring substance and there have not been any cases where medical conditions would prevent the use of pepper spray. [PSUMF 278]. Defendant does not instruct anything about the potential harm caused by pepper spray on an individual with medical conditions. [PSUMF 279]. Defendant does not know why its policy disqualifies inmates with certain medical conditions from pepper spray. [PSUMF 291]. Defendant instructs to check for medical conditions only after deployment. [PSUMF 280]. Director Keen claims that he is planning to change such policy to state that any subject has to be cleared prior to a planned use of pepper spray. [PSUMF 290]. Again, Director Keen has waited years and has not updated these policies. [PSUMF 289]. Somehow, his failure to change these policies is COVID's fault. [PSUMF 289].

As of February 26, 2020, Defendant does not have any policy, including use of force policy, that is focused on inmates with mental health issues. [PSUMF 305]. If someone threatens self-harm, whether psychotic or not, Defendant does not disqualify that inmate from being tased or pepper sprayed, even though that might make a suicidal inmate want to hurt himself or herself more. [PSUMF 306]. Defendant allows for an inmate having psychotic episodes to be pepper sprayed. [PSUMF 307]. The National Commission on Correctional Health Care ("NCCHC") sets nationally accepted standards of care for patients in jails and prisons. [PSUMF 309]. Debbie Echele's emphasized the importance of following such standards and trains her nurses and medical people to abide by the NCCHC standards. [PSUMF 310].

The 2015 NCCHC Standards that Debbie Echele reviewed in preparation for her deposition has three compliance indicators, and Defendant complied with none. [PSUMF 311]. According to the NCCHC's 2015 publication, "Standards for Mental Health Services in Correctional Facilities," (hereinafter, "NCCHC") essential compliance indicator MH-E-06 ("Emergency Services") states, "Mental health emergencies are appropriately managed." [PSUMF 312]. Compliance indicators include: 1) responsible mental health authority arranges for emergency mental health care 24 hours/day, 7 days/week; 2) A system is in place to facilitate access to patient mental health information in the event of mental health emergencies by designated staff when no mental health staff are on site; and 3) All aspects of the standard are addressed by written policy and defined procedures. [PSUMF 312].

The standard in the corrections industry is to have an on-call mental health professional 24/7. [PSUMF 313]. Defendant had no policy as to emergency psychiatric care at the time, as confirmed by Debbie Echele, and there was no psychiatrist hired to be on call more than two days per week. [PSUMF 314]. That makes sense, especially as Defendant does not even have a written

policy about providing medical care to inmates. [PSUMF 316]. By not having written policy and defined procedures for mental health emergencies, Defendant does not comply with the 2015 NCCHC Standards for Mental Health Services in Correctional Facilities yet again. [PSUMF 317].

Furthermore, according to the NCCHC's 2015 publication, "Standards for Mental Health Services in Correctional Facilities," essential compliance indicator MH-D-02 ("Medication Services") states that "Medication services are clinically appropriate and provided in a timely, safe, and sufficient manner." [PSUMF 318]. The NCCHC's 2015 publication further explains "Inmates entering the facility on verifiable prescription medication continue to receive the medication in a timely fashion as prescribed, or acceptable alternate medications are provided as clinically indicated. [PSUMF 319]. Regarding medications that cannot be verified, the NCCHC states, "Inmates entering the facility with a prescription that cannot be verified should be evaluated by facility health staff or mental health staff for the appropriateness of the prescription medication." [PSUMF 320]. The NCCHC states in regard to medication services, "All aspects of the standard are addressed by written policy and defined procedures. [PSUMF 321]. Defendant does not know if it has a policy to obtain medical information from where the inmate was transferred from. [PSUMF 322]. Defendant does not have a written policy about how Medical can or should convey necessary information to corrections officers or SPO's that are guarding, supervising and monitoring the inmates. [PSUMF 323].

## C. Deliberately Indifferent Failure to Train or Supervise

Defendant does not know why there is a difference in its training manuals and policy regarding the types of conditions to disqualify an inmate from pepper spray. [PSUMF 292]. Defendant has admitted in multiple Answers to the Complaint, including its most recent answer, that due to a lack of training and inconsistent policies by Defendant, Defendant's suicide prevention officers did not know when to use pepper spray. [PSUMF 293]. That admission makes

sense because Defendant does not have *any* use of force training or pepper spray training regarding inmates with mental health issues or who are in the suicide prevention unit. [PSUMF 305, 308].

To further illustrate the disconnect between training materials and policies, Officer Garofalo believed at her deposition that Defendant's training materials permit pregnant inmates to be sprayed even though St. Charles DOC's official training materials prohibit such conduct. [PSUMF 294]. Defendant's pepper spray trainers and written policies instruct that a pregnant woman can be pepper sprayed. [PSUMF 295]. As another example of the disconnect, as of July 22, 2017, Katie Garofalo had not been taught that inmates could suffer harm from pepper spray use as a result of pre-existing eye conditions. [PSUMF 296]. Defendant's policy allows for an inmate with a serious eye condition, no matter how severe, to be sprayed with pepper spray. [PSUMF 297]. Defendant also claims it does not know if an inmate should be sprayed with pepper spray in the eyes if an inmate has a serious eye condition. [PSUMF 298]. Furthermore, the distances in the pepper spray policy are different from the distances in the pepper spray training materials, and Defendant does not know why there is a difference in distances between its training materials and its policy. [PSUMF 301]. Using pepper spray at a distance of less than three feet can be harmful and cause the hydraulic needle effect, splash back, weapon retention, and needlepointing, which is essentially tattooing an inmate with the pepper spray. [PSUMF 126, 303]. Mr. Leonard was sprayed at less than that distance. [PSUMF 124]. No worries, though: Defendant also stated that it does not believe an inmate would be harmed if an inmate were shot with pepper spray closer than the minimum distance and has stated that if pepper spray was utilized one inch away from the eyeball of an inmate, there would be no harm at all to the inmate. [PSUMF 304].

As to how closely to watch an inmate, according to Defendant's policy, the only difference as to whether an inmate is categorized under "close observation" or "constant observation" is if

the inmate has actually made a suicide attempt. [PSUMF 329]. Defendant does not know if it has a policy that describes how to actually monitor an inmate on close observation. [PSUMF 328]. During "constant observation", the officer assigned to monitor the inmate is required to maintain direct site of an inmate and watch them constantly. [PSUMF 330]. Constant observation would have saved Mr. Leonard [PSUMF 330], assuming that the officers would have known to properly intervene. [PSUMF 203, 325-327].

### D. Unconstitutional Unofficial Customs

Sadly, multiple incidents were revealed in discovery that demonstrated how Defendant routinely uses excessive force and disregards inmates' medical needs. [PSUMF 259]. Given the review of Defendant's ratification, policies and training situation, that makes depressing sense. [PSUMF 241, 246, 248, 346-348, 350, 353]. After all, most of Defendant's medical practices and procedures are not written. [PSUMF 315-317, 323]. The cell checks every change of shift in the suicide prevention unit is but one example of an unconstitutional custom in a suicide prevention unit. [PSUMF 70, 71]. Ultimately, like the other categories of *Monell* liability, Defendant has already admitted that its unofficial customs caused the harm to Mr. Leonard through its expert and leader, Director Keen, and other pleadings. [PSUMF 288, 293, 325, 333, 337, 340, 351-353]. Hopefully, for the sake of anyone in St. Charles County who has a son, daughter, brother, sister or other significant other, Defendant will get around to changing those policies when COVID is over.

## VII. CONCLUSION

For the reasons set forth herein, there are no genuine issues of material fact that the entry of summary judgment for Plaintiff, Plaintiff respectfully requests that his Motion for Summary Judgment be granted, and that the issue of damages be submitted to a jury.

Date: April 30, 2021

Respectfully submitted by,

**DONNER APPLEWHITE,**
**ATTORNEYS AT LAW**

**BURGER LAW, LLC**

By: */s/ Thomas R. Applewhite*

Thomas R. Applewhite, #64437MO
Steven A. Donner, #63789MO
906 Olive Street, Suite 1110
St. Louis, Missouri 63101
Phone:   (314) 293-3526
Fax:       (888) 785-4461
Email:    tom.applewhite@da-lawfirm.com
             steve.donner@da-lawfirm.com

By: */s/ Gary K. Burger*

Gary K. Burger, #32460MO
500 N. Broadway, Suite 1860
St. Louis, Missouri 63102
Phone:   (314) 542-2222
Fax:       (314) 542-2229
Email:    gary@burgerlaw.com

*Co-Counsel for Plaintiff*

*Co-Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I certify on April 30, 2021 that a true and correct copy of the above and foregoing document was filed with the Clerk of Court, which sent a copy to all counsel of record.

*/s/ Thomas R. Applewhite*