**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JAMIE LEONARD,** | ) | |
| | ) | |
| Mr. Leonard, | ) | |
| | ) | |
| v. | ) | Case No. 4:19-cv-00927-MTS |
| | ) | |
| **ST. CHARLES COUNTY, STEVEN** | ) | |
| **HARRIS, DONTE FISHER, LISA** | ) | |
| **BAKER,** and **THERESA MARTIN,** | ) | |
| | ) | |
| Defendants. | ) | |

---

**STATEMENT OF UNCONTROVERTED MATERIAL FACTS**
**IN SUPPORT OF**
**MR. LEONARD'S MOTION FOR SUMMARY JUDGMENT**

---

Thomas R. Applewhite, #64437MO
Steven A. Donner, #63789MO
**DONNER APPLEWHITE**
906 Olive Street, Suite 1110
St. Louis, Missouri 63101
Phone: (314) 293-3526
Facsimile: (888) 785-4461
Email: tom.applewhite@da-lawfirm.com
Email: steve.donner@da-lawfirm.com

CO-COUNSEL FOR MR. LEONARD

Gary K. Burger, #32460MO
**BURGER LAW, LLC**
500 N. Broadway, Suite 1860
St. Louis, Missouri 63102
Phone: (314) 542-2222
Facsimile: (314) 542-2229
Email: gary@burgerlaw.com

CO-COUNSEL FOR MR. LEONARD

# **TABLE OF CONTENTS**

| | | |
|---|---|---|
| I. | BACKGROUND | 1 |
| II. | MEDICAL INTAKE | 1 |
| III. | FAILURE TO RESPOND TO MEDICAL NEEDS | 5 |
| IV. | EXCESSIVE FORCE WITH PEPPER SPRAY | 11 |
| V. | LACK OF CARE AFTER PEPPER SPRAY | 20 |
| VI. | FAILURE TO INVESTIGATE AND DISCIPLINE | 33 |
| VII. | POLICY AND TRAINING DEFICIENCIES | 38 |
| VIII. | SELECTED EXPERT FINDINGS | 48 |

| SUMMARY JUDGMENT EXHIBITS LIST AS OF APRIL 30, 2021 | |
| :--- | :--- |
| *Jamie Leonard v. St. Charles County, et al.* | |
| Case Number: 4:19-cv-00927-MTS | |
| Honorable Matthew T. Schelp | |
| Plaintiff's Attorneys:  Thomas R. Applewhite, Steven A. Donner, Gary K. Burger | |
| Defendants' Attorneys:  Drew A. Heffner, Bryan E. Wise | |

| PLAINTIFF'S EXHIBITS | | |
| :--- | :--- | :--- |
| **EXH #** | **DESCRIPTION OF EXHIBIT** | **ORIGIN** |
| 1 | Declaration of Jamie Leonard | Plaintiff Jamie Leonard |
| 2 | Deposition Transcript Selections of Dr. Kumar Rao | Deposition |
| 3 | Deposition Transcript Selections of Dr. Linda Hunt | Deposition |
| 4 | SCCDOC Record of Arrest Form | Defendants' Bates 955 |
| 5 | Selections from "SCCDOC Initial Health Care Screening" | Defendants' Bates 960 and 963 |
| 6 | Report of Ken Katsaris | Expert Report |
| 7 | Deposition Transcript Selections of Lisa Baker | Deposition |
| 8 | Deposition Transcript Selections of Director Daniel Keen | Deposition |
| 9 | Declaration of Michelle Manoli | Michelle Manoli |
| 10 | Selections from "SCCDOC Inmate Health Progress Notes" | Defendants' Bates 280, 957-958 |
| 11 | Deposition Transcript Selections of Dr. Susan Lawrence | Deposition |
| 12 | Deposition Transcript Selections of Debbie Echele | Designee Deposition |
| 13 | Deposition Transcript Selections of Theresa Martin | Deposition |
| 14 | Deposition Transcript Selections of Shanicia Rogers | Designee Deposition |
| 15 | Deposition Transcript Selections of James Baumgartner | Designee Deposition |
| 16 | Selections from Standards for Medical Health Services in Correctional Facilities | NCCHC |
| 17 | Deposition Transcript Selections of Katie Garofalo | Deposition |
| 18 | SCCDOC Selected Shift Supervisor Reports | Defendants' Bates 283 and 408 |
| 19 | SCCDOC Selected Use of Force Reviews | Defendants' Bates 265-266 |
| 20 | SCCDOC Suicide Prevention Policy Selections | Defendants' Bates 884, 887 and 889 |
| 21 | SCCDOC Selected Incident Reports | Defendants' Bates 13, 268, 271, 272 and 276 |
| 22 | Deposition Transcript Selections of Ken Katsaris | Deposition |
| 23 | Report of Susan Lawrence, M.D. | Expert Report |
| 24a | Deposition of Donte Fisher on 8/23/19 | Deposition |
| 24b | Deposition of Donte Fisher on 2/11/20 | Deposition |
| 25a | Deposition of Steven Harris on 8/23/19 | Deposition |
| 25b | Deposition of Steven Harris on 2/5/20 | Deposition |
| 26 | Segregation Reports | Defendants' Bates 969-970 |
| 27 | Selections from SCCDOC's Use of Force Policy | Defendants' Bates 1226-1229 |
| 28 | Selections from SCCDOC's Use of O.C. Spray Policy | Defendants' Bates 27-28 |
| 29 | Deposition Transcript Selections of Michael McKee | Deposition |
| 30 | Deposition Transcript Selections of Donald Spiess | Deposition |
| 31 | Deposition Transcript Selections of Vincent Vaughn | Deposition |
| 32 | Selections from SCCDOC's Use of O.C. Spray Training | Defendants' Bates 300-302, 305, 307, 315-318, 320, 322, 326, 333, 354-355, 357, 362, 376 and 377 |
| 33a | Video of Plaintiff Being Pepper Sprayed in the Suicide Prevention Unit | Video from 7/22/17 at 645 Hours |
| 33b | Video of Plaintiff Gouging His Eye Out in the Suicide Prevention Unit | Video from 7/22/17 at 733 Hours |
| 34 | Selections from TJA Use of Force - Corrections | Defendant - Pgs. 4-5 |
| 35 | Selection from Medical Emergency Plan | Defendants' Bates 854 |
| 36 | Email from Debbie Echele Thanking Everyone for "a job well done" in handling Jamie Leonard's Situation | Defendants' Bates 415 |
| 37 | Incidents of Excessive Force, a Disregard for Inmate Medical Needs, a Lack of Discipline and a Lack of Investigation | Defendants' Bates 1506-1515, 1413-1417, 1377, 1422, 1419, 1408, 1534-1544, 1458, 1418, 1497-1505, 1411-1412, 1516-1533, 1358-1376, 1421, 1378, 1420 |
| 38 | Expert Disclosures | Rule 26(a)(2) Disclosures |

# I. BACKGROUND

1.      Plaintiff, Jamie Leonard, is a licensed Real Estate Broker.  *See* <u>Exhibit 1 – Leonard Decl., ¶ 4</u>.

2.      Mr. Leonard was diagnosed in 2015 with uveitis/iritis in his left eye which was caused by Reiter's syndrome. *See* <u>Exhibit 2 – Rao Depo., 13:1-4, 17:15 to 18:8, 53:4-12</u>; Exhibit 3 – <u>Hunt Depo., 14:21 to 15:10, 21:24 to 22:12</u>; Exhibit 1 – <u>Leonard Decl., ¶ 6</u>.

3.      Reiter's syndrome is a constellation of problems with arthritis and inflammation of various parts of the body, and one part of the body that can be affected is the eye. *See* <u>Exhibit 2 – Rao Depo., 12:21-25</u>; <u>Exhibit 3 – Hunt Depo., 13:25 to 14:8, 21:24 to 22:25</u>.

4.      Mr. Leonard has had a long history of Reiter's syndrome and started taking Simponi intermittently since July 2012 and Sulfasalazine since June 2009.  *See* <u>Exhibit 1 – Leonard Decl., ¶ 7</u>.

5.      Mr. Leonard's doctors prescribed him narcotics (Norco) and Indocin for pain as well as Xanax and Citalopram for anxiety.  *See* <u>Exhibit 1 – Leonard Decl., ¶ 8</u>.

6.      Mr. Leonard's doctors also prescribed Suboxone as a medication to wean Mr. Leonard off the pain narcotics that doctors prescribed to him.  *See* <u>Exhibit 1 – Leonard Decl., ¶ 9</u>.

7.      After Mr. Leonard experienced his first psychosis in 2016, he started receiving monthly psychiatric care at ABC Healthcare.  *See* <u>Exhibit 1 – Leonard Decl., ¶ 14,15</u>.

# II. MEDICAL INTAKE

8.      On July 19, 2017, Mr. Leonard was taken into custody by the Wentzville Police Department (hereinafter referred to as "Wentzville").  *See* <u>Answer from 4/29/21, ¶ 15 (ECF No. 91)</u>.

9.      On July 20, 2017, Mr. Leonard was transferred and booked into the St. Charles County Department of Corrections (hereinafter, the "St. Charles DOC") at 12:29 PM, and the St.

Charles DOC's "Record of Arrest" form clearly indicated Mr. Leonard had "mental health concerns" and/or was a "suicide risk." *See* <u>Answer from 4/29/21, ¶ 26 (ECF No. 91); Exhibit 4 – Defendants' Bates 955</u>.

10.     At the time of transfer, Mr. Leonard's doctors prescribed him Indocin, Sulfasalazine, and Simponi for Reiter's disease, Risperdal, Citalopram, Ritalin, Vyvanse and Suboxone for his psychiatric medications, including Celexa for my depression. *See* <u>Exhibit 1 – Leonard Decl., ¶ 17</u>.

11.     On July 20, 2017, St. Charles knew that Mr. Leonard had a mental health disorder, was seeing a psychiatrist and had prescriptions for Citalopram and Risperidone. *See* <u>Exhibit 5 – Defendants' Bates 960 and 963</u>.

12.     The St. Charles DOC was put on notice of Mr. Leonard's need for observation from the time of arrest and transfer. *See* <u>Exhibit 6 – Katsaris Report, p. 10; Exhibit 8 – Director Keen Depo., 50:13-16</u>.

13.     On July 20, 2017, Mr. Leonard's mother, Michele Manoli (hereinafter, "Michele"), contacted one or more of the medical staff employed by the St. Charles DOC (*the medical staff at the St. Charles DOC*, hereinafter, "Medical"), advised that Mr. Leonard had an eye condition, suffered from mental health issues and communicated Mr. Leonard's specific diagnosis to St. Charles' medical staff. *See* <u>Exhibit 7 – Baker Depo., 75:22 to 76:5, Answer from 4/29/21, ¶¶ 56 and 57 (ECF No. 91);</u> Exhibit 8 – <u>Director Keen Depo., 20:12-14</u>; <u>Exhibit 9 – Manoli Decl., ¶ 6</u>.

14.     Michele is a Registered Nurse for 31 years and has received training in trauma, psychiatric, sexual assault and crisis intervention. *See* <u>Exhibit 9 – Manoli Decl., ¶¶ 4 and 5</u>.

15.     At that time, Michele told Medical about Mr. Leonard's very bizarre behaviors, Reiter's syndrome, Iritis/Uveitis, his prescribed multiple medications, which could be found by

contacting Schnuck's Pharmacy. *See* <u>Answer from 4/29/21 ¶ 58 (ECF No. 91)</u>; <u>Exhibit 10 – Bates 957</u>; <u>Exhibit 9 – Manoli Decl., ¶ 7</u>.

16. Medical instructed Michele to call back in the morning and bring Mr. Leonard's medication to the St. Charles DOC so that the medication could be reviewed by Medical. *See* <u>Answer from 4/29/21, ¶ 61 (ECF No. 91)</u>; <u>Exhibit 9 – Manoli Decl., ¶ 8</u>.

17. On the morning of July 21, 2017, Michele contacted a nursing supervisor and explained that Mr. Leonard should have never been deemed fit for confinement due to his extremely bizarre behavior. *See* <u>Exhibit 9 – Manoli Decl., ¶ 9</u>.

18. Around 3:00 PM on July 21, 2017, Michele went to drop off Mr. Leonard's medications, including his non-expired eye medication. *See* <u>Exhibit 9 – Manoli Decl., ¶ 11</u>.

19. Upon doing so, Michele again provided an abnormal amount of notice to the St. Charles DOC as to what medications Mr. Leonard was taking, what pharmacy Mr. Leonard was using, Schnuck's, and who Mr. Leonard's rheumatologist was, which gave St. Charles' medical staff, including Defendant Martin, the opportunity to give Mr. Leonard adequate medical attention. *See* <u>Answer from 4/29/21, ¶ 58 (ECF No. 91)</u>; <u>Exhibit 10 – Bates 957</u>; <u>Exhibit 9 – Manoli Decl., ¶ 13</u>; <u>Exhibit 11 – Lawrence Depo., 34:24 to 35:15, 97:23 to 98:05</u>.

20. After Michele asked the nurse if she wanted her to explain how to administer the medications to Mr. Leonard, the nurse responded, no. *See* <u>Exhibit 9 – Manoli Decl., ¶¶ 14 and 15</u>.

21. When Michele dropped off Mr. Leonard's medication to Medical, the nurse who received the medication in Medical neglected to document the date that the medication was prescribed, expired, or picked up from the pharmacy. *See* <u>Exhibit 12 – Echele Depo., 94:07-12</u>; <u>Exhibit 13 – Martin Depo., 35:15-24</u>; <u>Answer from 4/29/21, ¶¶ 72 and 75 (ECF No. 91)</u>; <u>Exhibit 9 – Manoli Decl., ¶ 18</u>.

22.     The St. Charles DOC does not have any policy or procedures that provides guidance on what to do when medical information is received from an inmate himself, from the inmate's family or requests made by the inmate's family. *See* <u>Exhibit 14 – Rogers Depo., 28:09 to 32:08; Exhibit 15 – Baumgartner Depo., 24:14 to 25:23; 34:24 to 35:06</u>.

23.     In order to properly verify medications brought in by a family member, the corrections facility should contact the appropriate pharmacy and the prescribing physician. *See* <u>Exhibit 16 – Standards for Medical Health Services, pp. 62 and 63; Exhibit 11 – Lawrence Depo., 37:2-10</u>.

24.     Medical did not check with Schnucks Pharmacy regarding Mr. Leonard's medications. *See* <u>Answer from 4/29/21, ¶ 68 (ECF No. 91); Exhibit 11 – Lawrence Depo., 35:16-23</u>.

25.     Schnuck's Pharmacy had the following prescriptions on file for Mr. Leonard: prednisolone acetate 1% eye drops (filled on 6/23/17); citalopram (filled on 6/27/17); Durezol 0.05% eye drops (filled 7/5/17); and Simponi (filled on 7/8/17). *See* <u>Answer from 4/29/21, ¶ 69 (ECF No. 91)</u>.

26.     On July 5, 2017, Dr. Kumar Rao had changed Mr. Leonard's prescriptions from prednisolone to Durezol because the inflammation of Mr. Leonard's eye was getting worse. *See* <u>Exhibit 1 – Leonard Decl., ¶ 10; Exhibit 2 – Rao Depo., 39:10-16, 39:23 to 40:3, 56:8-12</u>.

27.     No one from St. Charles County contacted Washington University or Dr. Rao to verify whether Durezol should be given to Mr. Leonard. *See* <u>Exhibit 2 – Rao Depo., 48:21 to 49:3</u>.

## III.  FAILURE TO RESPOND TO MEDICAL NEEDS

28.     The St. Charles DOC was deliberately indifferent to Mr. Leonard's medical needs when Medical knew about Mr. Leonard's diagnosis but failed to prescribe Mr. Leonard medications, including his eye medication for Reiter's syndrome, and take appropriate precautions to prevent injury to his eye. *See* <u>Exhibit 11 – Lawrence Depo., 30:11 to 31:24, 34:19-24</u>.

29.     The medications delivered by Michele were not administered to Mr. Leonard by Medical, nor did Medical administer any eye medication to Mr. Leonard when he was in custody. *See* <u>Answer from 4/29/21, ¶ 79 (ECF No. 91)</u>; <u>Exhibit 12 – Echele Depo., 97:4-5</u>.

30.     Durezol, the medication that Mr. Leonard was prescribed by Dr. Rao, was supposed to be put in his eye every two hours while awake, and not taking it would likely cause inflammation in his eye to return. *See* <u>Exhibit 1 – Leonard Decl., ¶ 11</u>; <u>Exhibit 2 – Rao Depo., 38:21 to 39:8</u>.

31.     Without the eye medication, Durezol, Mr. Leonard's symptoms would increase, such as blurriness, film over the eye, photophobia, light sensitivity, and seeing black stars and worms as well as the eventual possibility of losing an eye. *See* <u>Exhibit 1 – Leonard Decl., ¶ 12, 13</u>; <u>Exhibit 2 – Rao Depo., 40:10-22</u>.

32.     Medical also did not administer any psychiatric medication to Mr. Leonard in July 2017, and Mr. Leonard was abruptly taken off his Suboxone by Medical. *See* <u>Exhibit 12 – Echele Depo., 83:21 to 84:4; Answer from 4/29/21, ¶¶ 29 and 80</u>.

33.     Acute psychosis can be developed and worsened by abruptly removing a patient from Suboxone. *See* <u>Exhibit 11 – Lawrence Depo., 27:6-15</u>.

34.     Acute untreated psychosis is a serious medical condition and means psychosis that becomes dramatically worse over a very short period of time. *See* <u>Exhibit 11 – Lawrence Depo., 23:9-16, 26:23</u>.

35.     Mr. Leonard exhibited extremely bizarre and erratic behavior that indicated he had some type of mental issue on the evening of July 21, 2017 and the morning of July 22, 2017 prior to removing his eyeball from his eye socket on July 22, 2017. *See* <u>Exhibit 13 – Martin Depo., 36:14 to 37:22, 70:7-15</u>; <u>Exhibit 7 – Baker Depo., 40:21 to 41:2, 70:24-25</u>; <u>Exhibit 17 – Garofalo Depo., 37:15</u>; <u>Exhibit 6 – Katsaris Report, p. 11</u>; <u>Exhibit 8 – Director Keen Depo., 64:1-23</u>.

36.     Less than 10 hours before Mr. Leonard removed his eye on July 22, 2017, Defendant Martin observed that Mr. Leonard was not alert and oriented times three, was wide-eyed, looked confused, and could not remember directions that were given to him 30 seconds before. *See* <u>Exhibit 13 – Martin Depo., 39:1-6</u>; <u>Answer from 4/29/21, ¶ 40</u>; <u>Exhibit 10 – Bates 958</u>.

37.     At 1:05 am on July 22, 2017, Mr. Leonard attempted to choke himself by putting his hand down his throat due to his psychosis, at which point Medical was notified, and Defendant Martin, a nurse, responded.  *See* <u>Answer from 5/29/20 and 6/1/20, ¶ 82 (ECF No. 54 and 55)</u>; <u>Exhibit 18 – Bates 283</u>; <u>Director Keen Depo., 8:3 and 5-6, 64:1-6 and 65:6-19</u>; <u>Katsaris Report, pp. 9-10.</u>

38.     Defendant Martin observed that Mr. Leonard was yelling and blowing his nose so hard that it was causing his nose to bleed.  *See* <u>Answer from 4/29/21, ¶¶ 35 and 36 (ECF No. 91)</u>; <u>Exhibit 18 – Bates 283</u>.

39.     When Defendant Martin asked Mr. Leonard why he was behaving this way, Mr. Leonard stated: "I have to get my soul out because it is time for me to die."  *See* <u>Answer from 4/29/21, ¶ 37 (ECF No. 91)</u>; <u>Exhibit 10 – Defendants' Bates 280</u>.

40.     Mr. Leonard further gave incredibly bizarre explanations and stated, "This is what I am supposed to do." *See* <u>Exhibit 10 – Defendants' Bates 280 and 958</u>.

41.     Mr. Leonard told Defendant Martin that he "loved life and had everything to live for" but he was "supposed to die."  *See* Exhibit 10 – Defendants' Bates 280.

42.     Only a couple of hours later, Mr. Leonard kept pacing around his cell and acted in more self-harm by tugging on his genitals. *See* Exhibit 19 – Defendants' Bates 265, 266.

43.     The St. Charles DOC's Suicide Prevention Policy states consultation with the on-call Mental Health provider may be done at the discretion of the Medical Staff. *See* Exhibit 20 – Bates 887.

44.     Medical should have contacted a psychiatrist regarding Mr. Leonard's condition or using any medication including the sedative, Haldol. *See* Exhibit 8 – Director Keen Depo., 68:19 to 69:01, 70:4-10.

45.     Even though Medical knew that Mr. Leonard was acting psychotically, no one in Medical, asked for an order to get psychiatric medication or contacted a psychiatrist about Mr. Leonard's condition or any medication. *See* Exhibit 10 – Bates 280; Exhibit 13 – Martin Depo., 52:1-16; Exhibit 12 – Echele Depo., 73:01 to 75:01.

46.     Haldol was kept at the St. Charles Department of Corrections' clinic and could have been used had a psychiatrist been consulted by Defendant Martin or anyone else in Medical. *See* Answer from 4/29/21, ¶ 46 (ECF No. 91); Exhibit 12 – Echele Depo., 73:20-22; Exhibit 8 – Director Keen Depo., 69:14 to 70:10.

47.     Haldol is very commonly used for people who are acutely psychotic and who are in danger of harming themselves. *See* Exhibit 11 – Lawrence Depo., 29:19-24.

48.     Haldol would have been appropriate to have administered to Mr. Leonard because of his self-harming behavior as a result of his psychiatric illness, he expressed a desire to die, he

was not alert and oriented, he was wide eyed and confused, and he could not follow directions just given to him a few minutes previously. *See* <u>Exhibit 11 – Lawrence Depo., 55:5 to 55:22</u>.

49.     Mr. Leonard had done several things to harm himself by sticking his fingers in his nose, causing a nosebleed that required packing, pulling his genitals and other self-harming behaviors that could have been mitigated by providing Haldol early on in the process. *See* <u>Exhibit 11 – Lawrence Depo., 29:24 to 30:5</u>.

50.     Had Medical contacted a psychiatrist and used Haldol, the outcome regarding Mr. Leonard's eye would have been different. *See* <u>Exhibit 8 – Director Keen Depo., 68:18 to 69:3</u>.

51.     Haldol was effective on Mr. Leonard as shown by paramedics administering it to Mr. Leonard and it effectively sedating him. *See* <u>Exhibit 21 – Defendants' Bates 276</u>; <u>Exhibit 11 – Lawrence Depo., 54:7 to 55:4</u>.

52.     Medical was deliberately indifferent to Mr. Leonard's severe mental illness by: (a) failing to obtain a psychiatric consultation for Mr. Leonard, (b) failing to contract the facility's psychiatrist who was on call, (c) not sending Mr. Leonard to a hospital where he could have been seen by a psychiatrist, and (d) failing to provide psychiatric medication for Mr. Leonard. *See* <u>Exhibit 11 – Lawrence Depo., 24:13 to 25:19</u>.

53.     Defendant Martin and Medical Supervisor, Debbie Echele, jointly decided to transfer Mr. Leonard to the suicide prevention unit in the very early morning hours of July 22, 2017. *See* Exhibit 13 – <u>Martin Depo., 43:6-12</u>; <u>Answer from 4/29/21, ¶ 45 (ECF No. 91)</u>; <u>Exhibit 18 – Bates 283</u>; <u>Exhibit 10 – Bates 280</u>; <u>Exhibit 22 – Katsaris Depo., 24:4-8</u>.

54.     The Mr. Leonard was noted as a suicide or self-harm risk, which is why he was moved into the suicide prevention unit and placed on self-harm watch.  *See* <u>Exhibit 12 – Echele Depo., 67:13 to 68:14</u>; <u>Exhibit 13 – Martin Depo., 24:21-25</u>.

55.     The St. Charles DOC's Suicide Prevention Program Policy states that the suicide prevention unit is a housing unit designated to hold individuals considered to be at considerable risk for self-harm. *See* Exhibit 20 – Defendants' Bates 884.

56.     Indeed, most of the people who end up in Defendant's jail have mental health problem or a drug addiction problem. *See* Exhibit 8 – Director Keen Depo., 51:24 to 52:3.

57.     The St. Charles DOC's Suicide Prevention Program Policy states that suicide prevention units are to be operated in a manner so as to provide a greatly increased element of safety, by incorporating a combination of reduced stress, enhanced mental health counseling, close observation by staff, and a significantly reduced level of potential environmental hazards. *See* Exhibit 20 – Defendants' Bates 884.

58.     The St. Charles DOC's policy for "close observation" under the suicide prevention program is for those inmates who are potentially suicidal and is done to prevent the inmate hurting him or herself. *See* Exhibit 14 – Rogers Depo., 34:13 to 38:03; Exhibit 12 – Echele's Depo., 21:06 to 24:17.

59.     The St. Charles DOC's policy for "close observation" requires that close observation inmates are monitored by suicide prevention officers in 15-minute staggered shifts where the officer will monitor the inmate every 15 minutes, take notes and place these notes into the officer's daily log. *See* Exhibit 14 – Rogers Depo., 34:13 to 38:03; Exhibit 20 – Bates 889.

60.     While in the suicide prevention unit, the notes about Mr. Leonard move from 1:37 A.M. to 6:45 A.M. *See* Exhibit 10 – Bates 280; Exhibit 11 – Lawrence Depo., 58:2-8, 101:23 to 102:05; Exhibit 23 – Lawrence Report, p. 15.

61.     Because Mr. Leonard was on close observation in the suicide prevention unit in July 2017, Mr. Leonard was supposed to be checked on at least every 15 minutes. *See* Echele

Depo., 111:5-8; Exhibit 24a – Fisher Depo., 8/23/19, 29:19-20; 30:24-25, 31:11-13; Exhibit 24b – Fisher Depo., 2/11/20, 42:14-15, 83:25 to 84:2; Exhibit 25a – Harris Depo., 8/23/19, 62:14-21; Exhibit 25b – Harris Depo., 2/5/20, 105:17-19; Exhibit 14 – Rogers Depo., 36:6-10; 37:17-18.

62.     Within the suicide prevention unit, the only ways that a suicide prevention officer can be informed of a suicide prevention unit inmate's medical information is (1) through a segregation report or (2) through an oral or written report provided to the on-duty officers by the officers on the suicide prevention unit prior to a shift change. *See* Exhibit 24a – Fisher Depo., 8/23/19, 33:5 to 35:2, 38:15-19; Exhibit 15 – Baumgartner Depo., 28:13 to 29:19.

63.     In July 2017, a segregation report was written by Medical for each inmate in the suicide prevention unit that could be read by the suicide prevention officer monitoring the inmate. *See* Exhibit 24a – Fisher Depo., 8/23/19, 36:9 to 37:7, 41:22 to 42:1.

64.     The segregation report issued for Mr. Leonard at 1:37 am on July 22, 2017 was created prior to Mr. Leonard being pepper sprayed in July 2017. *See* Exhibit 26 – Defendants' Bates 970.

65.     The only note Defendant Martin made in the segregation report at 1:37 am was that Mr. Leonard made suicidal statements and would be on close observation until cleared by a Mental Health and Medical supervisor. *See* Exhibit 26 – Defendants' Bates 970.

66.     Even though Medical had knowledge of it, Mr. Leonard's segregation report did not comment on his eye condition, psychotic issues and whether he was disqualified from the use of pepper spray. *See* Exhibit 26 – Defendants' Bates 969-970; Martin Depo., 29:10-13, 34:10-14; Answer from 4/29/21, ¶ 84 (ECF No. 91).

67.     If Medical knew that Mr. Leonard had a serious eye condition, then that should have been conveyed to the officers handling Mr. Leonard in 2017. *See* Exhibit 8 – Director Keen

Depo., 20:12 to 21:02; Exhibit 17 – Garofalo Depo., 38:16-21; Exhibit 22 – Katsaris Depo., 26:6-14; Exhibit 11 – Lawrence Depo., 60:19-24; Exhibit 22 – Katsaris Report, p. 10.

68.     Medical was deliberately indifferent because Medical and Defendant Martin knew or should have known Mr. Leonard had acute psychosis and reactive arthritis with active uveitis and failed to document this on the Segregation Report. *See* Exhibit 11 – Lawrence Depo., 59:12-19.

69.     Corrections staff need to, at a minimum, have inmates flagged for medical review before use of force of any kind, especially the use of pepper spray, where there is the possibility of eye injury. *See* Exhibit 6 – Katsaris Report, p. 10.


IV.     **EXCESSIVE FORCE WITH PEPPER SPRAY**

70.     Suicide prevention officers are required to do cell searches every day at the change of each suicide prevention officer's shift per St. Charles' policy. *See* Exhibit 24a – Fisher Depo., 8/23/19, 17:10 to 18:2.

71.     The search on Mr. Leonard's cell in the Suicide Prevention Unit was unnecessary as Mr. Leonard had been in the cell less than the officer's shift and the cell had been searched prior to Mr. Leonard's arrival. *See* Exhibit 8 – Director Keen Depo., 65:21 to 66:01; Exhibit 22 – Katsaris Depo., 31:5-8.

72.     Defendant Fisher's shift was ending when the search of Mr. Leonard's cell was performed on July 22, 2017.  *See* Answer from 4/29/21, ¶ 107 (ECF No. 91).

73.     Defendant Fisher had a problem with Mr. Leonard on July 22, 2017 because he was acting strange by, among other things, walking around pacing floors, cussing, naked, standing on top of the bunk, and standing on the commode. *See* Exhibit 25a – Fisher Depo., 8/23/19, 21:7-13.

74.     During the shift change, Defendant Fisher (hereinafter, "Defendant Fisher") informed suicide prevention officer Kristian Scott (hereinafter, "SPO Scott") that Mr. Leonard was received to the unit and had continued to display erratic behavior by standing on his bunk nude, repeatedly flushing the toilet, shouting and banging his head on the door and walls. *See* Answer from 4/29/21, ¶ 55 (ECF No. 91); Exhibit 21 – Defendants' Bates 13 and 272.

75.     Defendant Fisher waited until he had two additional officers, including Defendant Steven Harris (hereinafter, "Defendant Harris"), to perform the search of Mr. Leonard's cell because of Mr. Leonard's disturbing behavior at the time. *See* Answer from 4/29/21, ¶ 108 (ECF No. 91); Exhibit 25a – Harris Depo., 8/23/19, 9:15-19.

76.     The use of Oleorsin Capsicum, also known as "O.C. spray" or "pepper spray", is a use of force. *See* Answer from 4/29/21, ¶¶ 98 and 100; Exhibit 25a – Harris Depo., 8/23/19, 9:17-20; Exhibit 27 – Defendants' Bates 1227; Exhibit 28 – Defendants' Bates 28.

77.     A planned use of force is when there is not an emergent situation, and there is enough time to plan an approach to an inmate. *See* Exhibit 12 – Echele Depo., 42:17 to 46:08; Exhibit 22 – Katsaris Report, p. 12; Exhibit 8 – Director Keen Depo., 64:1-23.

78.     Defendant Fisher had no time constraints or time deadlines in doing the cell search on July 22, 2017, other than he wanted to leave. *See* Exhibit 24b – Fisher Depo., 2/11/20, 27:8-22, 69:23-25.

79.     Defendant Fisher, Defendant Harris and SPO Scott had a meeting prior to entering Mr. Leonard's cell to discuss how to best approach the search of Mr. Leonard's cell. *See* Exhibit 25b – Harris Depo., 2/5/20, 38:18-23, 41:7-8; Exhibit 11 – Lawrence Depo., 64:02-04; Exhibit 24b – Fisher Depo., 2/11/20, 17:17-20.

80.     Defendant Fisher was the officer in charge of the briefing with SPO Scott and Defendant Harris prior to searching Mr. Leonard's cell on July 22, 2017. *See* Exhibit 24b – Fisher Depo., 2/11/20, 17:21-25.

81.     On July 22, 2017, Defendant Fisher instructed Defendant Harris to have his pepper spray unholstered, in his hand and ready to use on Mr. Leonard prior to entering Mr. Leonard's cell on the suicide prevention unit "as a precaution in case [Mr. Leonard] imploded" and "as [a] distraction" or "scare factor". *See* Answer from 4/29/21, ¶ 110 (ECF No. 91); Exhibit 24a – Fisher Depo., 8/23/19, 44:1-8, 14-16; Exhibit 24b – Fisher Depo., 2/11/20, 18:12-15, 19:4-12, 54:25 to 55:23; Exhibit 25a – Harris Depo., 8/23/19, 9:15-19, 9:24 to 10:1; Exhibit 25b – Harris Depo., 2/5/20, 39:11-15, 40:4-7, 41:9-11; Exhibit 21 – Bates 268; Exhibit 6 – Katsaris Report, p. 12; Exhibit 8 – Director Keen Depo., 64:1-23.

82.     Instructing Defendant Harris to have his pepper spray out during the meeting was a planned use of force. *See* Exhibit 8 – Director Keen Depo., 39:4-22, 41:13-15, 64:11-13, 64:20-23; Exhibit 6 – Katsaris Depo., 32:7-9.

83.     Defendant Fisher did not have authority to tell an officer to take their pepper spray out. *See* Exhibit 8 – Director Keen Depo., 38:1-6, 38:19-22, 41:19-21.

84.     Per St. Charles DOC procedures, any "planned use of force" must be authorized by a supervisor. *See* Exhibit 6 – Katsaris Report, p. 12; Exhibit 8 – Director Keen Depo., 64:1-23.

85.     Although they had the time to do so and because Mr. Leonard was not an immediate threat to himself or others, Defendant Harris, SPO Scott, and Defendant Fisher did not consult their supervisor, Lisa Baker (hereinafter, "Defendant Baker"), or Medical regarding the planned use of force. *See* Exhibit 8 – Director Keen Depo., 38:7-9; 41:16-18, 64:1-23; Exhibit 24b – Fisher

Depo., 2/11/20, 28:1-5; Exhibit 25b – Harris Depo., 2/5/20, 67:3-6; Exhibit 7 – Baker Depo., 24:14-15, 25:24 to 26:3; Exhibit 6 – Katsaris Report, pp. 11-13.

86.     It is St. Charles DOC's policy that the only time that Medical is required to be contacted is when there is a planned use of force, especially with the use of pepper spray. *See* Answer from 4/29/21, ¶ 90 (ECF No. 91); Exhibit 29 – McKee Depo., 20:7-13; Exhibit 14 – Rogers Depo., 28:09 to 32:08; Exhibit 30 – Spiess Depo., 21:02-25; Exhibit 31 – Vaughn Depo., 20:8-13, 29:10 to 30:02; Exhibit 17 – Garofalo Depo., 54:11-15.

87.     It is St. Charles DOC's policy that Medical should be contacted, if the situation allows, before the use of pepper spray to determine if the inmate can be sprayed. *See* Exhibit 14 – Rogers Depo., 24:13 to 27:06; Exhibit 28 – Defendants' Bates 28; Exhibit 6 – Katsaris Report, p. 12; Exhibit 8 – Director Keen Depo., 64:1-23, 81:4 to 82:1.

88.     The situation allowed for officers to contact medical prior to the use of pepper spray as Mr. Leonard was not an immediate threat. *See* Exhibit 8 – Director Keen Depo., 82:2-4.

89.     Prior to entering of Mr. Leonard's cell to conduct a cell search, no one contacted Medical or any supervisor to see if the Mr. Leonard could have been pepper sprayed, and no one provided officers with necessary medical information.  *See* Exhibit 13 – Martin Depo., 29:24 to 30:1, 30:7-10; Answer from 5/29/20 and 6/1/20, ¶ 95 (ECF No. 54 and 55); Exhibit 8 – Director Keen Depo. 41:13-15, 42:4-11, 64:1-6, 65:6-19; Exhibit 6 – Katsaris Report, pp. 9-10.

90.     Defendant Fisher would not have ordered the use of pepper spray on Mr. Leonard on July 22, 2017 had he known about Mr. Leonard's eye condition. *See* Exhibit 24a – Fisher Depo., 8/23/19, 37:22-25, 38:9-14; Exhibit 24b – Fisher Depo., 2/11/20, 35:7-11, 80:15-18; Answer from 4/29/21, ¶ 118 (ECF No. 91).

91.     Any of St. Charles DOC's nurses can provide information about whether pepper spray can be used on a particular inmate. *See* Exhibit 17 – Garofalo Depo., 54:25 to 55:10.

92.     On July 22, 2017, St. Charles' medical department was within 80 to 100 feet of Mr. Leonard's cell in St. Charles' suicide prevention unit. *See* Exhibit 13 – Martin Depo., 76:4-10; Harris Depo., 2/5/20, 98:11-16.

93.     The staff on Medical have radios, and those staff automatically hear any medical call that goes out and are obligated to respond. *See* Exhibit 25b – Harris Depo., 2/5/20, 93:1-7.

94.     It is the St. Charles DOC's policy that if an officer has knowledge of an inmate's respiratory condition, heart condition or is allergic, then the officer cannot use pepper spray on that inmate.  *See* Exhibit 30 – Spiess Depo., 45:11-25; Exhibit 28 – Defendants' Bates 28.

95.     The St. Charles DOC's training materials and policy state that an inmate should be sprayed in the eyes with pepper spray. *See* Exhibit 17 – Garofalo Depo., 52:4-6; Exhibit 28 – Defendants' Bates 28; Exhibit 32 – Defendants' Bates 333 and 376.

96.     The St. Charles DOC's training materials state pepper spray is designed to effect the eye and includes immediate inflammation of the blood vessels, mucous membrane. *See* Exhibit 32 – Defendants' Bates 300 and 322.

97.     The chemical composition of pepper spray could injure Mr. Leonard's eye even if deployed at the recommended distance due to Mr. Leonard's pre-existing eye condition. *See* Exhibit 32 – Defendants' Bates 315-318; Exhibit 11 – Lawrence Depo., 66:08-17.

98.     Mr. Leonard's eye disease contraindicated the use of pepper spray. *See* Exhibit 6 – Katsaris Report, p. 12; Exhibit 3 – Hunt Depo., 29:14-23, 36:17 to 37:3; Exhibit 11 – Lawrence Depo., 47:12-18, 47:22-24, 113:12-14, 114:13-16; Exhibit 8 – Director Keen Depo., 64:1-23.

99.     The St. Charles DOC knew that Mr. Leonard had Reiter's syndrome before he was sprayed with pepper spray. *See* Exhibit 12 – Echele Depo., 120:24 to 121:03.

100.    Had a St. Charles DOC employee asked Defendant Martin if pepper spray should have been used on Mr. Leonard, Defendant Martin would have told that employee not to use pepper spray on Mr. Leonard on July 22, 2017 because of Mr. Leonard's Reiter's Syndrome. *See* Exhibit 13 – Martin Depo., 30:11-14, 31:22-25; Exhibit 11 – Lawrence Depo., 45:6-11; Exhibit 6 – Katsaris Report, p. 12; Exhibit 8 – Director Keen Depo., 64:1-23.

101.    It was apparent to all officers involved with Mr. Leonard's cell search, staff, and Medical that Mr. Leonard was going through a mental health episode. *See* Exhibit 8 – Director Keen Depo., 56:12-25, 64:1-23; Exhibit 22 – Katsaris Depo., 30:2-14; Exhibit 6 – Katsaris Report, p. 11; Exhibit 11 – Lawrence Depo., 92:03-08.

102.    It is not appropriate to use pepper spray on someone who is going through a mental health episode. *See* Exhibit 8 – Director Keen Depo., 57:1-4; Exhibit 22 – Katsaris Depo., 36:16-21.

103.    The St. Charles DOC's own training states that the psychological effects of using pepper spray include fear, anxiety, possible panic, and hyperventilation. *See* Exhibit 32 – Defendants' Bates 326.

104.    One of the contributing factors to in-custody death syndrome, or dying in custody after being pepper-sprayed, is being in a state of extreme mental and psychological excitement, which is what was happening with Mr. Leonard. *See* Lawrence Depo., 53:6-12; Exhibit 32 – Defendants' Bates 307.

105.     The officers had many indications of Mr. Leonard not following directions prior to entering the cell. *See* Exhibit 8 – Director Keen Depo., 58:23 to 59:01; Exhibit 22 – Katsaris Depo., 49:23 to 50:3.

106.     The officers should have anticipated that Mr. Leonard would have problems obeying simple directions. *See* Exhibit 8 – Director Keen Depo., 59:6-14.

107.     Defendant Fisher, Defendant Harris and SPO Scott entered Mr. Leonard's cell at approximately 6:40 am in the suicide prevention unit to perform the aforementioned search of Mr. Leonard's cell with pepper spray unholstered and ready to use.  *See* Answer from 4/29/21, ¶ 124; Exhibit 25b – Harris Depo., 2/5/20, 50:6-15.

108.     Pepper spray should not have been readied for use prior to entering Mr. Leonard's cell. *See* Exhibit 8 – Director Keen Depo., 37:21-25 and 41:19-21.

109.     Mr. Leonard was handcuffed by Defendant Fisher before the cell was searched. *See* Exhibit 24a – Fisher Depo., 8/23/19, 46:8-13; Exhibit 21 – Defendants' Bates 13 and 268.

110.     Mr. Leonard was compliant with the cell search until Defendant Fisher told Mr. Leonard that he would be sprayed with pepper spray if he moved. *See* Exhibit 25a – Harris Depo., 8/23/19, 10:15-22; Exhibit 25b – Harris Depo., 2/5/20, 34:4-22; Exhibit 21 – Defendants' Bates 268.

111.     Right after Defendant Harris told Mr. Leonard that if he moved, he would be sprayed with pepper spray, Mr. Leonard rose to his feet and moved. *See* Exhibit 25a – Harris Depo., 8/23/19, 10:23-24.

112.     Defendant Harris believed Mr. Leonard was not walking towards the officers, but around them.  *See* Answer from 4/29/21, ¶ 125 (ECF No. 91).

113.     Mr. Leonard was not taking an aggressive action towards any officer and was not a "serious physical threat." *See* <u>Exhibit 25b – Harris Depo., 2/5/20, 51:18-22, 53:9-11, 76:16-25;</u> <u>Exhibit 8 – Director Keen Depo., 59:2-10, 64:1-23</u>; <u>Exhibit 22 – Katsaris Depo., 48:21-24;</u> <u>Exhibit 6 – Katsaris Report, p. 11</u>.

114.     The level of resistance required to use pepper spray on an inmate nationally and by St. Charles DOC policy is "active aggression," which is "physical actions of attempting to assault others. This would include attempting to hit, kick, spit, swinging or throwing objects, and such that could harm or injure anyone within striking distance." *See* <u>Exhibit 28 – Defendants' Bates 27;</u> <u>Exhibit 6 – Katsaris Report, p. 11</u>; <u>Exhibit 8 – Director Keen Depo., 64:1-23</u>.

115.     Per St. Charles DOC policy, pepper spray may only be used if it is required to defend oneself or another from infliction of serious injury or death. *See* <u>Exhibit 24b – Fisher Depo., 2/11/20, 71:19-23, 72:14-19</u>; <u>Exhibit 6 – Katsaris Report, p. 13</u>; <u>Exhibit 8 – Director Keen Depo., 64:1-23</u>; <u>Exhibit 32 – Defendants' Bates 305</u>.

116.     Mr. Leonard was pepper sprayed for not following directions during a cell search in the Suicide Prevention Unit. *See* <u>Exhibit 8 – Director Keen Depo., 58:2-5</u>.

117.     Defendant Harris pepper sprayed Mr. Leonard in the face while Mr. Leonard was handcuffed.  *See* <u>Answer from 4/29/21, ¶ 126</u>; <u>Exhibit 21 – Defendants' Bates 268</u>.

118.     Pepper spray should not be used on a handcuffed person. *See* <u>Exhibit 8 – Director Keen Depo., 37:8-10, 15-17, 42:12-14, 57:05-09</u>; <u>Exhibit 22 – Katsaris Depo., 52:6-11</u>.

119.     Per St. Charles DOC's Use of Force Policy, an unnecessary force is "a force which a reasonable and prudent person would agree is not necessary in defense of one's self or another from infliction of serious injury or death." *See* <u>Exhibit 27 – Defendants' Bates 1226</u>.

120.     The use of force by Defendant Harris was incorrect and should not have happened. *See* Exhibit 8 – Director Keen Depo., 64:1-23, 71:14-16; Exhibit 6 – Katsaris Report, pp. 11, 13.

121.     The use of force against Mr. Leonard did not comport with St. Charles DOC's official policy nor the generally recognized, trained, and accepted procedures of the use of pepper spray. *See* Exhibit 6 – Katsaris Report, p. 11; Exhibit 8 – Director Keen Depo., 64:1-23.

122.     The level of force used on Mr. Leonard exceeded the force authorized by policy and nationally accepted practices. *See* Exhibit 6 – Katsaris Report, p. 13; Exhibit 8 – Director Keen Depo., 64:1-23.

123.     St. Charles DOC pepper spray policy states "Once the decision has been made to use pepper spray, it must be used in accordance with the product instructions and training techniques." Exhibit 28 – Defendants' Bates 28.

124.     Defendant Harris inappropriately deployed pepper spray on Mr. Leonard about 12 to 18 inches from Mr. Leonard's face. *See* Exhibit 6 – Katsaris Report, pp. 11, 13; Exhibit 8 – Director Keen Depo., 64:1-23; Exhibit 33a – Video from 7/22/17 at 645 Hours.

125.     St Charles DOC training states minimum deployment distance is 3 feet. *See* Exhibit 32 – Defendants' Bates 333, 377.

126.     Distance restrictions are in place to protect inmates from the hydraulic need effect, which occurs when propellent pressure drives spray particles into the soft tissue and small punctures in a person's eye, risking injury to the eyes. *See* Exhibit 25a – Harris Depo., 8/23/19, 46:21 to 47:1; Exhibit 23 – Lawrence Report, p. 23; Exhibit 11 – Lawrence Depo., 64:22 to 65:04.

127.     Mr. Leonard is more likely to suffer from a needling injury because of his pre-existing uveitis. *See* Exhibit 11 – Lawrence Depo., 66:01-14, 66:24 to 67:07; Exhibit 23 – Lawrence Report, p. 20.

128. Mr. Leonard immediately fell to the ground after pepper spray was administered. *See* Answer from 4/29/21, ¶ 133 (ECF No. 91); Exhibit 21 – Defendants' Bates 268; Exhibit 25b – Harris Depo., 2/5/20, 33:8-10, 35:6-7.

129. No contraband was ever discovered in Mr. Leonard's cell despite multiple subsequent cell searches. *See* Answer from 4/29/21, ¶ 135 (ECF No. 91).

130. The cell search and the planned use of pepper spray was being used as a punishment against Mr. Leonard by Defendant Harris and Defendant Fisher for Mr. Leonard's behavior during Defendant Fisher's shift. *See* Exhibit 22 – Katsaris Depo., 40:13-16.


## V. LACK OF CARE AFTER PEPPER SPRAY

131. Per St. Charles DOC policy, the OC Administrative Warning should be given to the inmate as soon as feasibly possible after contamination in order to determine if any potential health threats exist. *See* Exhibit 34 – TJA Use of Force Corrections, pp. 4-5.

132. An officer is supposed to ask an inmate if there are any potential health threats to the inmate after spraying an inmate with pepper spray. *See* Exhibit 24b – Fisher Depo, 2/11/20, 83:17-21, 84:17 to 85:5.

133. An officer is supposed to determine if serious medical condition requiring emergency services exist after being sprayed. *See* Exhibit 32 – Defendants' Bates 354.

134. After Mr. Leonard was sprayed with pepper spray, Defendants did not give Mr. Leonard the recommended official pepper spray administrative warning. *See* Exhibit 24b – Fisher Depo, 2/11/20, 85:15-17.

135.    As of February 11, 2020, St. Charles did not give the official pepper spray administrative warning to inmates who had just been pepper sprayed. *See* <u>Exhibit 24b – Fisher Depo, 2/11/20, 84:17 to 85:14</u>.

136.    After Mr. Leonard was sprayed with pepper spray by Defendant Harris in the Suicide Prevention Unit, no one asked Mr. Leonard if he was going to hurt himself. *See* <u>Exhibit 24b – Fisher Depo, 2/11/20, 44:18-21, 44:22-23, 84:9-16</u>.

137.    Per St. Charles DOC training, after an inmate has been sprayed the officer is to monitor the subject and verbally reassure them that the pain they are experiencing is temporary. *See* <u>Exhibit 32 – Defendants' Bates 301</u>.

138.    An inmate going through a mental health episode requires different care after being sprayed with pepper spray. *See* <u>Exhibit 8 – Director Keen Depo., 57:10-15</u>; <u>Lawrence Depo., 72:05-07</u>.

139.    An inmate who cannot follow directions requires different care after being pepper sprayed. *See* <u>Exhibit 8 – Director Keen Depo., 57:21-24</u>.

140.    Mr. Leonard could not follow directions at the time of pepper spray and after. *See* <u>Exhibit 8 – Director Keen Depo., 57:25 to 58:01</u>; <u>Exhibit 11 – Lawrence Depo., 73:11-19</u>.

141.    Mr. Leonard was not assisted with decontamination nor brought to an "eye wash station" utilized with medical assistance. *See* <u>Exhibit 6 – Katsaris Report, pp. 13, 14</u>; <u>Exhibit 8 – Director Keen Depo., 64:1-23</u>; <u>Answer from 4/29/21, ¶ 146 (ECF No. 91)</u>.

142.    St. Charles DOC's policy requires the officer who pepper sprayed the inmate to be responsible for the aftercare of the inmate and the documentation of the aftercare of the inmate. *See* <u>Exhibit 24b – Fisher Depo, 2/11/20, 40:18-22</u>; <u>Exhibit 32 – Defendants' Bates 301</u>.

143.     As the officer who sprayed Mr. Leonard in the eyes with pepper spray, Defendant

Harris was responsible for the aftercare and documentation of the aftercare of Mr. Leonard. *See*

Answer from 4/29/21, ¶ 140 (ECF No. 91); Exhibit 23 – Lawrence Report, p. 21; Exhibit 11 –

Lawrence Depo., 70:03-7, 104:17-22; Exhibit 8 – Director Keen Depo., 64:1-23.

144.     The decontamination process includes removing the subject from the contaminated

area, using copious amounts of cool water into open eyes and stroking the eyes.  *See* Exhibit 32 –

Defendants' Bates 355, Exhibit 14 – Rogers Depo., 32:16 to 34:04; Exhibit 11 – Lawrence Depo.,

71:20 to 72:05.

145.     It is inappropriate for an officer to spend less than a minute in aftercare and then

not communicate to another officer or hand a person off to another officer to ensure that aftercare

is completed. *See* Exhibit 24b – Fisher Depo, 2/11/20, 41:3-8.

146.     The extent of Defendant Harris' aftercare for Mr. Leonard lasted for approximately

one minute after he pepper sprayed Mr. Leonard in the face on July 22, 2017. *See* Exhibit 25b –

Harris Depo., 2/5/20, 81:10-11, 16-21, 82:4-5; Exhibit 23 – Lawrence Report, p. 21; Exhibit 11 –

Lawrence Depo., 70:8-10, 15-17.

147.     As a result of leaving one minute after Mr. Leonard started to rinse out his eyes,

Defendant Harris was unable to document how long and how well Mr. Leonard washed out his

eyes.  *See* Answer from 4/29/21, ¶ 145 (ECF No. 91); Exhibit 25b – Harris Depo., 2/5/20, 82:6-8;

Exhibit 23 – Lawrence Report, p. 21; Exhibit 11 – Lawrence Depo., 70:15-19, 71:12-15.

148.     Defendant Harris does not even mention Mr. Leonard's aftercare treatment in his

incident report other than moving Mr. Leonard to cell 1. *See* Exhibit 21 – Defendants' Bates 268.

149.     After Defendant Harris departed from Mr. Leonard on July 22, 2017, he left SPO Scott in charge of Mr. Leonard's pepper spray aftercare. *See* <u>Exhibit 25b – Harris Depo., 2/5/20, 85:4-17</u>.

150.     St. Charles DOC's policy requires the officer who pepper sprayed the inmate to document who provided the aftercare if the spraying officer cannot provide the aftercare and hands off that aftercare duty to another officer. *See* <u>Exhibit 24b – Fisher Depo, 2/11/20, 40:23 to 41:2</u>; <u>Exhibit 32 – Defendants' Bates 301</u>.

151.     Defendant Harris did not document that he left SPO Scott in charge of Mr. Leonard's pepper spray aftercare in violation of St. Charles DOC's policy. *See* <u>Exhibit 25b – Harris Depo., 2/5/20, 85:22-24, 90:14-25</u>.

152.     Defendant Fisher and Defendant Harris' actions including the plan of an unauthorized use of force, the deployment of pepper spray, a lack of proper medical intervention, and the lack of the use of an eye wash station were escalating causation toward the final injurious actions taken by Mr. Leonard himself resulting in the loss of one of his eyes. *See* <u>Exhibit 6 – Katsaris Report, p. 14</u>; <u>Exhibit 8 – Director Keen Depo., 64:1-23</u>.

153.     After inspecting Mr. Leonard's cell, Defendant Baker directed the transferring of Mr. Leonard to a new cell.  *See* <u>Answer from 4/29/21, ¶ 137 (ECF No. 91)</u>; <u>Exhibit 21 – Defendants' Bates 268</u>; <u>Exhibit 21 – Defendants' Bates 13</u>.

154.     On-duty nurse Defendant Martin then inspected Mr. Leonard and directed the washing out of Mr. Leonard's eyes with water.  *See* <u>Answer from 4/29/21, ¶ 139 (ECF No. 91)</u>; <u>Exhibit 10 – Defendants' Bates 280</u>; <u>Exhibit 6 – Katsaris Report, p. 13</u>; <u>Exhibit 8 – Director Keen Depo., 64:1-23</u>.

155.    Defendant Martin asked that Mr. Leonard be given a shower after Mr. Leonard was pepper sprayed but before Mr. Leonard removed his eyeball from his eye socket on July 22, 2017. *See* Exhibit 13 – Martin Depo., 46:16-18.

156.    The St. Charles DOC would not allow Mr. Leonard to be given a shower because the officers considered Mr. Leonard too volatile for a shower. *See* Exhibit 13 – Martin Depo., 46:16-18.

157.    Mr. Leonard should have been moved to the shower to be decontaminated. *See* Exhibit 8 – Director Keen Depo., 40:1-3, 74:18-24.

158.    Defendant Martin then asked that Mr. Leonard be brought to St. Charles' medical department, and he needed to be monitored after Mr. Leonard was pepper sprayed but before Mr. Leonard removed his eyeball from his eye socket on July 22, 2017. *See* Exhibit 13 – Martin Depo., 46:18-20 and 48:22 to 49:4.

159.    The St. Charles DOC would not allow Mr. Leonard to be brought to St. Charles' medical department because the St. Charles DOC considered Mr. Leonard too volatile to be brought to the St. Charles DOC's medical department. *See* Exhibit 13 – Martin Depo., 46:18-20; Exhibit 11 – Lawrence Depo., 71:06-08.

160.    After Mr. Leonard was pepper sprayed and subsequently transferred to his new cell in the suicide prevention unit, no restraints were used on Mr. Leonard immediately prior to Mr. Leonard's self-harm event.   *See* Answer from 4/29/21, ¶ 138 (ECF No. 91); Exhibit 21 – Defendants' Bates 268; Exhibit 21 – Defendants' Bates 13.

161.    Prior to Mr. Leonard removing his eyeball from his eye socket on July 22, 2017, Defendant Martin knew that Mr. Leonard had a significant risk of self-harm. *See* Exhibit 13 – Martin Depo., 21:17-19.

162. Defendant Martin was able to request that Haldol be administered to Mr. Leonard on July 21, 2017 or July 22, 2017 prior to Mr. Leonard attempting to remove his eyeball from his eye socket, but she never did so. *See* Exhibit 13 – Martin Depo., 52:1-16, 57:18-21, 58:11-14, 61:4; Exhibit 11 – Lawrence Depo., 94:4-8.

163. Per St. Charles DOC's policy, emergency services should be called if "significant relief" is not achieved after 45 minutes from the time that an inmate is pepper sprayed. *See* Exhibit 17 – Garofalo Depo., 55:23 to 56:10; Exhibit 32 – Defendants' Bates 355 and 378; Exhibit 14 – Rogers Depo., 32:16 to 34:04.

164. While the St. Charles DOC has stated that there is no definition for "significant relief", the St. Charles DOC has defined significant relief as the ability to see without significant burning. *See* Exhibit 14 – Rogers Depo., 32:16 to 34:04; Exhibit 30 – Spiess Depo., 36:11 to 41:02.

165. As of February 26, 2020, whether "significant relief" had been achieved was accomplished by looking at the pepper sprayed inmate or talking to the pepper sprayed inmate to determine if the inmate was still complaining of burning in his or her eyes. *See* Exhibit 17 – Garofalo Depo., 55:23 to 56:10.

166. At 6:45 am on July 22, 2017, Defendant Martin thought about how the pepper spray might affect Mr. Leonard's eye in light of Mr. Leonard's Reiter's Syndrome. *See* Exhibit 13 – Martin Depo., 47:22 to 48:1, 48:11-15.

167. After her initial exam, Defendant Martin did not do any follow-up care to ensure that the instruction she gave Mr. Leonard to rise his eyes with water had assuaged or alleviated any of his eye irritation. *See* Exhibit 13 – Martin Depo., 48:16-21, 49:5-14, 67:2-8, 67:24 to 68:7.

168. The only treatment that Mr. Leonard received from the St. Charles DOC's employees after Mr. Leonard was pepper sprayed and before he self-injured his eye was that he was moved from one cell to another, and Defendant Martin came to see him. *See* Exhibit 17 – Garofalo Depo., 56:11-21.

169. It is the St. Charles DOC's policy to monitor the sprayed inmate for at least two hours once pepper spray is used because the inmate may have a reaction or some other medical difficulties or extreme eye irritation in response to the pepper spray. *See* Exhibit 34 – TJA Use of Force Corrections, p. p. 4; Exhibit 32 – Defendants' Bates 355; Exhibit 14 – Rogers Depo., 32:16 to 34:04; Exhibit 24b – Fisher Depo, 2/11/20, 83:4-12; Exhibit 7 – Baker Depo., 44:5-8, 44:12-13, 55:14-16.

170. Mr. Leonard had eye irritation after he was pepper sprayed on July 22, 2017. *See* Exhibit 13 – Martin Depo., 30:18-20, 32:10-14.

171. Officers do not know who is required to monitor the inmate once pepper sprayed and have different answers as to whether it is the officer assigned to the housing unit, the shift supervisor and/or Medical. *See* Exhibit 14 – Rogers Depo., 32:16 to 34:04; Exhibit 31 – Vaughn Depo., 27:11 to 28:08; Exhibit 30 – Spiess Depo., 36:11 to 41:02.

172. The St. Charles DOC's policy does not define or provide guidance on what monitoring an inmate means. *See* Exhibit 14 – Rogers Depo., 32:16 to 34:04; Exhibit 30 – Spiess Depo., 36:11 to 41:02.

173. The St. Charles DOC does not have any policies or procedures with respect to escorting an inmate to and using the eye wash station or monitoring the inmate once the inmate has been pepper sprayed. *See* Exhibit 30 – Spiess Depo., 036:11 to 041:02.

174.    There was a video camera watching the outside of Mr. Leonard's cell in the suicide prevention unit on July 22, 2017. *See* Exhibit 25b – Harris Depo., 2/5/20, 100:11-18.

175.    Employees of St. Charles would have been watching the video camera outside of and inside of Mr. Leonard's cell in the suicide prevention unit on July 22, 2017. *See* Exhibit 25b – Harris Depo., 2/5/20, 100:19-21.

176.    St. Charles lost some of the July 22, 2017 video of the events leading to Mr. Leonard's eye being damaged. *See* Exhibit 13 – Martin Depo., 24:5-7.

177.    The aforementioned destroyed video has been permanently deleted and cannot be recovered. *See* Answer from 4/29/21, ¶ 168 (ECF No. 91).

178.    At this point, Mr. Leonard was still alone in his new cell unrestrained, without sedation and without any psychiatric medications. *See* Answer from 4/29/21, ¶ 157 (ECF No. 91).

179.    The pepper spray was still in Mr. Leonard's eye and was affecting Mr. Leonard when Mr. Leonard damaged his eye. *See* Exhibit 7 – Baker Depo., 56:10-15.

180.    When contaminated with pepper spray, a subject should not rub their eyes, and officers should instruct pepper sprayed inmates accordingly. *See* Exhibit 32 – Defendants' Bates 301; Exhibit 32 – Defendants' Bates 357.

181.    Prior to Mr. Leonard removing his eyeball from his eye socket on July 22, 2017, Mr. Leonard was rubbing his eye strongly. *See* Exhibit 13 – Martin Depo., 32:20-25.

182.    Mr. Leonard began yelling loudly in his cell. *See* Answer from 4/29/21, ¶ 148 (ECF No. 91).

183.    Defendant Baker stated that Mr. Leonard was clawing at his eye because of the pepper spray. *See* Answer from 4/29/21, ¶ 154 (ECF No. 91).

184.     The video camera inside Mr. Leonard's cell shows Mr. Leonard gouging at his eyes in frustration and pain. *See* Exhibit 6 – Katsaris Report, p. 13; Exhibit 8 – Director Keen Depo., 64:1-23; Exhibit 33b – Video from 7/22/17 at 733 Hours.

185.     Mr. Leonard injured his eye because of the pepper spray use. *See* Exhibit 7 – Baker Depo., 55:5-6 and Exhibit 6 – Katsaris Report, P. 9, 14; Exhibit 8 – Director Keen Depo., 64:1-23.

186.     From the video inside the cell, Mr. Leonard can be seen pacing around, occasionally bending over to wash his face and eyes with water for about 4 minutes and 40 seconds. *See* Exhibit 23 – Lawrence Report, p. 23; Exhibit 33b – Video from 7/22/17 at 733 Hours.

187.     After 4 minutes and 40 seconds in the video, Mr. Leonard can be seen clawing at his left eye with his left hand. *See* Exhibit 23 – Lawrence Report, p. 23; Exhibit 33b – Video from 7/22/17 at 733 Hours.

188.     Mr. Leonard persisted to vigorously tear at his eye until 7 minutes and 3 seconds, when he falls on the floor and immediately resumes digging at his eye. *See* Exhibit 23 – Lawrence Report, p. 23; Exhibit 33b – Video from 7/22/17 at 733 Hours.

189.     At 7 minutes 21 seconds, blood can be seen on the floor near Mr. Leonard's face. *See* Exhibit 23 – Lawrence Report, p. 23; Exhibit 33b – Video from 7/22/17 at 733 Hours.

190.     At 8 minutes 32 seconds a larger amount of blood in seen on the floor in a different location in the cell which Mr. Leonard is still scraping at his eye. *See* Exhibit 23 – Lawrence Report, p. 23; Exhibit 33b – Video from 7/22/17 at 733 Hours.

191.     A 9 minutes 3 seconds a large pool of blood and tissue is seen on another area of the cell floor. *See* Exhibit 23 – Lawrence Report, p. 23; Exhibit 33b – Video from 7/22/17 at 733 Hours.

192.    The cell video shows that Mr. Leonard fell to the floor, turned over, was gouging at his eye, and blood was visible on the floor. *See* <u>Exhibit 6 – Katsaris Report, p. 14</u>; <u>Exhibit 8 – Director Keen Depo., 64:1-23</u>; <u>Exhibit 33b – Video from 7/22/17 at 733 Hours</u>.

193.    No officer made an entry to the cell from the time Mr. Leonard was standing at the sink, to turning and gouging, to falling, rolling, and bleeding. *See* <u>Exhibit 6 – Katsaris Report, p. 14</u>; <u>Exhibit 8 – Director Keen Depo., 64:1-23</u>; <u>Exhibit 33b – Video from 7/22/17 at 733 Hours</u>.

194.    You are able to see into each of the cells from anywhere in the suicide prevention unit. *See* <u>Exhibit 24a – Fisher Depo., 8/23/19, 30:16-18</u>.

195.    The officers simply watched Mr. Leonard in agony and pain gouge his own eye out. *See* <u>Exhibit 6 – Katsaris Report, p. 14</u>; <u>Exhibit 13 – Martin Depo., 17:10-14, 15:13-17</u>; <u>Exhibit 7 – Baker Depo., 41:16-20, 18-23, 41:24 to 42:42</u>; <u>Exhibit 12 – Echele Depo., 90:01 to 90:06</u>; <u>Exhibit 8 – Director Keen Depo., 64:1-23.</u>

196.    Suicide Prevention Officer Kristian Scott was at the door outside of Mr. Leonard's cell while Mr. Leonard was injuring himself, and Defendant Baker walked up to SPO Scott while Mr. Leonard was injuring himself. *See* <u>Exhibit 7 – Baker Depo., 41:24 to 42:42</u>.

197.    Defendant Baker was across the hall from Mr. Leonard's cell when he was injuring himself. *See* <u>Exhibit 7 – Baker Depo., 41:16-20</u>.

198.    SPO Scott monitored Mr. Leonard, through a window, pulling on his eye before the Mr. Leonard pulled it out. *See* <u>Exhibit 12 – Echele Depo., 90:1-6</u>.

199.    No one tried to restrain Mr. Leonard, prevent Mr. Leonard from hurting himself, or stop Mr. Leonard from removing his eyeball from his eye socket on July 22, 2017 in the suicide prevention unit. *See* <u>Exhibit 13 – Martin Depo., 15:2-7, 16:20-21, 18:17, 19:1</u>; <u>Exhibit 6 – Katsaris Report, p. 14</u>; <u>Exhibit 8 – Director Keen Depo., 64:1-23</u>.

200. A medical emergency call was made because Mr. Leonard was attempting to pull his eye out. *See* Harris Depo., 8/23/19, 63:11-17; Exhibit 21 – Defendants' Bates 271; Exhibit 18 – Defendants' Bates 408.

201. Defendant Baker went into the hall outside of Mr. Leonard's cell while Mr. Leonard was injuring himself because a medical emergency was called. *See* Exhibit 7 – Baker Depo., 41:18-23; Exhibit 6 – Katsaris Report, p. 14; Exhibit 8 – Director Keen Depo., 64:1-23.

202. SPO Scott and Defendant Baker waited outside of Mr. Leonard's cell for additional officers to respond while Mr. Leonard was injuring himself. *See* Exhibit 7 – Baker Depo., 42:7-8.

203. The St. Charles DOC's Medical Emergency Policy states immediately after the staff member has made the emergency broadcast on the two-way radio, the Corrections staff will immediately begin CPR and/or first aid, until the arrival of the medical staff and/or relief staff. *See* Exhibit 35 – Defendants' Bates 854.

204. The St. Charles DOC's Medical Emergency Policy notes that corrections officers will not enter any cells or holdovers without appropriate backup. *See* Exhibit 35 – Defendants' Bates 854.

205. The St. Charles DOC's Medical Emergency Policy does not define "appropriate backup". *See* Exhibit 35 – Defendants' Bates 854.

206. Defendant Baker believed that the St. Charles DOC's policy stated that no one was allowed to intervene to prevent Mr. Leonard from damaging his eye until at least three officers were present. *See* Exhibit 7 – Baker Depo., 19:15 to 20:4.

207. Defendant Baker waited for at least three officers to be present before entering Mr. Leonard's cell. *See* Exhibit 7 – Baker Depo., 42:8-10, 15-18.

208.	It took four to five minutes for Mr. Leonard to pop his eyeball out of his eye socket on July 22, 2017. *See* Exhibit 13 – Martin Depo., 14:25 to 15:1; Answer from 4/29/21, ¶ 160 (ECF No. 91).

209.	By the time that the other officers and Defendant Baker entered Mr. Leonard's cell, Mr. Leonard had already injured his eye. *See* Exhibit 7 – Baker Depo., 42:13-14.

210.	There were enough officers present to ensure officer safety to immediately intervene and prevent Mr. Leonard from damaging his eye. *See* Exhibit 8 – Director Keen Depo., 49:22-25; Exhibit 22 – Katsaris Depo., 62:15 to 63:24.

211.	The officers' lack of proper intervention to Mr. Leonard's action was unjustified and too slow. *See* Exhibit 6 – Katsaris Report, p. 14; Exhibit 8 – Director Keen Depo., 50:9-12, 64:1-23.

212.	As of June 3, 2020, Defendant Martin does not know why none of St. Charles' employees had tried to prevent Mr. Leonard from self-harming his eye during the time that Mr. Leonard was attempting to self-harm his eye in her presence. *See* Exhibit 13 – Martin Depo., 15:19-21.

213.	Defendants were deliberately indifferent when they failed to continuously monitor Mr. Leonard after he was pepper-sprayed and intervene immediately to prevent him from self-enucleating his left eye. *See* Exhibit 11 – Lawrence Depo., 77:10-21.

214.	The failure of intervention by St. Charles DOC with Mr. Leonard is the most egregious failure in a medical/physical crisis ever reviewed by expert Ken Katsaris. *See* Exhibit 6 – Katsaris Report, p. 14; Exhibit 8 – Director Keen Depo., 64:1-23.

215.	Officers should be terminated for this kind of omission. *See* Exhibit 6 – Katsaris Report, p. 15; Exhibit 8 – Director Keen Depo., 64:1-23.

216.     When Defendant Martin arrived after the emergency call, Mr. Leonard was in his cell with the door open with a St. Charles DOC employee guarding the door to Mr. Leonard's cell. *See* Exhibit 13 – Martin Depo., 14:14-18.

217.     There were at least four or five St. Charles DOC employees in the hall outside of Mr. Leonard's cell. *See* Exhibit 13 – Martin Depo., 15:13-18; Exhibit 6 – Katsaris Report, p. 14; Exhibit 8 – Director Keen Depo., 64:1-23.

218.     Defendant Martin observed Mr. Leonard's eye out of its socket and hanging on by tissue on July 22, 2017. *See* Exhibit 13 – Martin Depo., 12:9-13; Exhibit 10 – Defendants' Bates 280.

219.     Mr. Leonard had been pepper sprayed roughly 45 minutes before removing his eyeball from his eye socket on July 22, 2017. *See* Exhibit 13 – Martin Depo., 14:1-7.

220.     After Mr. Leonard removed his eyeball from his eye socket on July 22, 2017, Defendant Martin got a couple of four by fours, wet it with saline, opened Mr. Leonard's eye socket, set Mr. Leonard's eyeball back into his eye socket to the extent possible, and then covered Mr. Leonard's damaged eye with saline and some gauze. *See* Exhibit 13 – Martin Depo., 11:23 to 12:4.

221.     Mr. Leonard was provided with Haldol for the first time on July 22, 2017 by the EMTs. *See* Exhibit 13 – Martin Depo., 51:15-17; Exhibit 10 – Defendants' Bates 280.

222.     After 1-2 minutes of Haldol injection by emergency medical services, Mr. Leonard was relaxed, quiet, and non-combative. *See* Exhibit 10 – Defendants' Bates 280.

223.     Mr. Leonard was then transported to SSM Health St. Joseph Hospital in St. Charles, Missouri that same day.  *See* Answer from 5/29/20 and 6/1/20, ¶ 126 (ECF No. 54 and 55); Exhibit

8 – Director Keen Depo., 8:3 and 5-6, 64:1-6 and 65:6-19; Exhibit 6 – Katsaris Report, pp. 9-10; Exhibit 18 – Defendants' Bates 408.

224.     Mr. Leonard was first sent to St. Joseph's Hospital in response to his self-harm event in July 2017. *See* Exhibit 13 – Martin Depo., 66:6-12; Exhibit 18 – Defendants' Bates 408.

225.     After St. Joseph's Hospital, Mr. Leonard was sent to Saint Louis University Hospital in July 2017 because St. Joseph's could not adequately handle the trauma from Mr. Leonard's self-harm event. *See* Exhibit 13 – Martin Depo., 66:6-12.

226.     Mr. Leonard was then transported to Saint Louis University Hospital that same day. *See* Answer from 4/29/21, ¶ 174 (ECF No. 91); Exhibit 18 – Defendants' Bates 408.

227.     On August 9, 2017, Dr. Rao determined after doing an examination of Mr. Leonard that the eye was blind and that he could not do anything to improve the situation; so the eye blindness was a permanent condition, and Mr. Leonard eventual arranged for surgical removal. *See* Exhibit 2 – Rao Depo., 32:20-22, 33:16 to 34:13, 47:24 to 48:1, 48:8-13.


## VI.     FAILURE TO INVESTIGATE AND DISCIPLINE

228.     St. Charles DOC Lieutenant Michael McKee (hereinafter, "Lt. McKee") spoke to Michele after the pepper spray and stated that they did not have Mr. Leonard's medical issues documented.  *See* Exhibit 9 – Manoli Decl., ¶ 23; Answer from 4/29/21, ¶¶ 177 and 178 (ECF No. 91).

229.     Lieutenant McKee further stated to Michele that Mr. Leonard should never have been pepper sprayed if he had an eye problem.  *See* Exhibit 9 – Manoli Decl., ¶ 24; Answer from 4/29/21, ¶ 180 (ECF No. 91).

230.	As of February 12, 2021, according to Lieutenant McKee, the following abusive behaviors warrant disciplinary action: (a) excessive use of force, (b) denying medical care, and (c) delaying psychiatric treatment or discipline.  *See* Answer from 4/29/21, ¶ 181 (ECF No. 91).

231.	No action has been taken by the Department of Corrections to take responsibility in any way for what happened to Mr. Leonard on July 22, 2017. *See* Exhibit 8 – Director Keen Depo., 88:25 to 89:04.

232.	St. Charles DOC did not even conduct an investigation regarding the events and use of force that led to Mr. Leonard's eye injury on July 22, 2017.  *See* Exhibit 8 – Director Keen Depo., 23:25 to 24:02, 24:12-24, 41:7-8; Answer from 4/29/21, ¶ 191 (ECF No. 91); Exhibit 13 – Martin Depo., 22:9-13; Exhibit 7 – Baker Depo., 12:10-12; Exhibit 29 – McKee Depo., 022:01 to 022:15.

233.	Defendant Harris was never interviewed in conjunction with any investigation into the use of force on Mr. Leonard on July 22, 2017. *See* Exhibit 25b – Harris Depo., 2/5/20, 68:11 to 69:15.

234.	Lieutenant McKee simply determined that an investigation should not have even been conducted regarding Mr. Leonard.  *See* Exhibit 29 – McKee Depo., 22:01 to 22:15.

235.	An investigation should have been conducted into how the incident with Plaintiff occurred and why. *See* Exhibit 8 - Director Keen Depo., 40:11-18.

236.	The current Director of Corrections, Director Daniel Keen (hereinafter, "Director Keen"), would have generated an investigation into the situation turning it over to the internal affairs officer in order to immediately question the individuals involved including their motives. *See* Exhibit 8 – Director Keen Depo., 40:14-18, 63:6-8.

237.     Director Keen would have investigated if Defendant Harris and Defendant Fisher were taking revenge against Plaintiff due to Plaintiff's conduct the evening of July 22, 2017. *See* Exhibit 8 – Director Keen Depo., 73:25 to 74:6.

238.     Defendant Baker's report was not critical of any of the officer's actions and found the use of force appropriate. *See* Exhibit 19 – Defendants' Bates 265.

239.     Lieutenant McKee stated on the Use of Force Review that "Staff's use of pepper spray was appropriate to situation." *See* Exhibit 19 – Defendants' Bates 265.

240.     Captain Vincent Vaughn (hereinafter "Captain Vaughn") stated on the Use of Force Review, "I concur with both Sgt. Baker and Lt. McKee." *See* Exhibit 19 – Defendants' Bates 265.

241.     The officer's actions against Mr. Leonard were ratified by each level of authority in the St. Charles DOC. *See* Exhibit 6 – Katsaris Report, p. 12; Exhibit 11 – Lawrence Depo., 99:25 to 100:02; Exhibit 8 – Director Keen Depo., 64:1-23.

242.     Assistant Director for the Department of Corrections, Debbie Echele, even commended the actions of the officers immediately after the incident with Mr. Leonard by sending an email that stated, "A huge "THANK YOU!" for your response and assistance with inmate Leonard on 7/22/17….the teamwork displayed was great to see.  Everyone did an exceptional job." The email ended by saying, "Again, thank you for a job well done!" *See* Exhibit 12 – Echele Depo., 98:12 to 98:15; Exhibit 36 – Defendants' Bates 415.

243.     Despite Mr. Leonard losing his eye in 2017, the St. Charles DOC and its directors believed the use of force on Mr. Leonard was entirely appropriate and thought that its employees did a "great job" in handling Mr. Leonard that day, and would not do anything differently today. *See* Answer from 5/29/20 and 6/1/20, ¶ 58 (ECF No. 54 and 55).

244.    Captain Vaughn, Suicide Prevention Coordinator Coleman, and Lieutenant McKee believed actions against Mr. Leonard were a justified use of force. *See* Exhibit 8 – Director Keen Depo., 24:04-11.

245.    The St. Charles DOC did not counsel or discipline any employee and there were no negative consequences as a result of the events that lead to Mr. Leonard's eye injury on July 22, 2017. *See* Exhibit 25a – Harris Depo., 8/23/19, 30:13-15; Exhibit 25b – Harris Depo., 2/5/20, 94:10 to 95:1; Exhibit 7 – Baker Depo., 56:9-11; Answer from 4/29/21, ¶ 192 (ECF No. 91).

246.    The lack of discipline ratifies the use of disproportionate unjustified and against policy force and the failure to intervene in the serious self-harm actions of Mr. Leonard while officers watched. *See* Exhibit 6 – Katsaris Report, p. 15; Exhibit 8 – Director Keen Depo., 64:1-23.

247.    To allow Mr. Leonard to harm himself without drastic discipline imposed on officers is a total disregard of the correctional mission, especially as Mr. Leonard was in the suicide prevention unit. *See* Exhibit 6 – Katsaris Report, p. 15; Exhibit 8 – Director Keen Depo., 64:1-23.

248.    As the St. Charles DOC did not find that policy or procedures were violated in relation to actions taken against Mr. Leonard in July 2017, the actions were ratified by the St. Charles DOC. *See* Exhibit 6 – Katsaris Report, p. 15; Exhibit 8 – Director Keen Depo., 64:1-23.

249.    The St. Charles DOC does not have any written policies regarding the auditing of nurses or other staff on Medical.  *See* Exhibit 12 – Echele Depo., 21:06 to 24:17.

250.    During the time that Mr. Leonard was an inmate, Medical did not even have to fill out an incident report.  *See* Exhibit 12 – Echele Depo., 21:06 to 25:01.

251. Since the time that Mr. Leonard was an inmate, the St. Charles DOC has a new policy and form requiring nurses to document a serious injury with an incident report. *See* <u>Exhibit 12 – Echele Depo., 21:06 to 25:01, 26:17 to 27:14</u>.

252. Even though the St. Charles DOC required officers to notify medical staff before the use of force for a planned event, it was never a practice until after Mr. Leonard was an inmate. *See* <u>Exhibit 12 – Echele Depo., 27:20 to 32:13</u>.

253. During the time that Mr. Leonard was an inmate, the St. Charles DOC did not have internal affairs review any use of force actions or complaints. *See* <u>Exhibit 31 – Vaughn Depo., 22:16 to 23:05</u>.

254. The St. Charles DOC does not have any written policy and procedures on conducting internal investigations. *See* <u>Exhibit 29 – McKee Depo., 16:13 to 17:04</u>

255. The St. Charles DOC does not know how officers are monitored to ensure compliance with the use of pepper spray. *See* <u>Exhibit 30 – Spiess Depo., 22:08 to 22:24</u>.

256. Best correctional practices include investigating use of force incidents in order for officers to learn from potential mistakes or potential policy violations ensuring staff are properly trained and policies are changed. *See* <u>Exhibit 8 – Director Keen Depo., 61:14-21</u>.

257. Defendant Harris has had prior disciplinary actions, including disciplinary actions for violations of the use of force policy as well as another inappropriate pepper spray incident in 2020. *See* <u>Exhibit 31 – Vaughn Depo., 54:04 to 55:05</u>; <u>Exhibit 34</u>.

258. Lieutenant McKee has stated that there have been two or three other incidents where he investigated a case where an inmate had been inappropriately pepper sprayed. *See* <u>Exhibit 29 – McKee Depo., 19:17 to 20:03</u>.

259.    In fact, the St. Charles DOC has had at least 16 incidents of excessive force and inadequate medical care since 2016. *See* <u>Exhibit 37 - Defendants' Bates 1506-1515, 1413-1417, 1377, 1422, 1419, 1408, 1534-1544, 1458, 1418, 1497-1505, 1411-1412, 1516-1533, 1358-1376, 1421, 1378, 1420</u>.

260.    Since the time that Mr. Leonard was an inmate, two changes in St. Charles DOC's policies could have changed what happened with Mr. Leonard. *See* <u>Exhibit 12 – Echele Depo., 35:16 to 36:03</u>.

261.    Since the time that Mr. Leonard was an inmate, there is now a written CERT team policy. *See* <u>Exhibit 12 – Echele Depo., 47:18 to 48:07</u>.

262.    Since the time that Mr. Leonard was an inmate, officers focus more on planned use of force and communication with medical. *See* <u>Exhibit 12 – Echele Depo., 071:19 to 076:02</u>.

## VII.    POLICY AND TRAINING DEFICIENCIES

263.    A "planned use of force" standard had already been implemented in the corrections industry for decades prior to the incident that is the subject of this lawsuit.  *See* <u>Answer from 4/29/21, ¶ 89 (ECF No. 91)</u>

264.    In July 2017, the St. Charles DOC did not have a formal, written "planned use of force policy" in place nor did it have any policy that provides guidance or discusses planned use of force.  *See* <u>Exhibit 14 – Rogers Depo., 28:09 to 32:08; Answer from 4/29/21, ¶ 91 (ECF No. 91)</u>.

265.    The St. Charles DOC "use of force" policy is the only document used to determine if the use of force used on an inmate is appropriate, and this policy does not even mention or use the term "planned use of force." *See* <u>Exhibit 27 – Defendants' Bates 1226-1229</u>; <u>Exhibit 8 – Director Keen Depo., 80:24 to 81:01</u>; <u>Exhibit 29 – McKee Depo., 20:19 to 21:08</u>.

266.    The St. Charles DOC claims to review the use of force policy annually but it has not been updated since 2014.  *See* <u>Exhibit 27 – Defendants' Bates 1226-1229</u>; <u>Exhibit 14 – Rogers Depo., 15:09 to 15:13</u>; <u>Exhibit 30 – Spiess Depo., 16:14 to 17:11</u>.

267.    Policies and training involving use of force should be consistent in order to prevent confusion as to what type of force to use, how to use a specific type of force, or what to do and for inmate safety. *See* <u>Exhibit 17 – Garofalo Depo., 40:21 to 41:4-6, 51:16-18</u>; <u>Exhibit 30 – Spiess Depo., 17:15 to 18:11, 19:22 to 20:08</u>.

268.    If there are practices but not written policies, the St. Charles DOC is not sure how that practice is complied with day to day. *See* <u>Exhibit 12 – Echele Depo., 79:09 to 82:03</u>.

269.    Some St. Charles DOC officers would follow their training and some St. Charles DOC officers would follow the policy if the policy and the training are inconsistent. *See* <u>Exhibit 17 – Garofalo Depo., 41:14-21</u>.

270.    It is a "fair assumption" that there was "obviously" a "problem with adhering [to] policy before Director Keen took over as Director of Defendant. *See* <u>Exhibit 8 – Director Keen Depo., 71:24 to 72:2</u>.

271.    If the standards were complied with at the time that Plaintiff was confined in July 2017, "[m]ore likely than not, this [harm to Plaintiff's eye] would have been avoided." *See* <u>Exhibit 8 – Director Keen Depo., 43:1-20</u>.

272.    When he became Director of Defendant, Director Keen had to "get back to policies" and train all officers on the "appropriateness of the use of force", including Suicide Prevention Officer Donte Fisher (hereinafter, "Fisher") and Officer Steven Harris (hereinafter, "Harris"). *See See* <u>Exhibit 8 – Director Keen Depo., 71:17-21</u>.

273.     For example, since Director Keen began his tenure on May 23, 2018 as the "head" or "top officer" of the St. Charles County DOC, he had to make changes to get Defendant "in line to make sure we're following what a planned use of force is and we're making sure we're calling [Defendant's] medical department prior to any use of force." *See* Exhibit 8 – Director Keen Depo., 22:23-25, 44:5-9, 45:1-6.

274.     Defendant now has medical approve a pepper spray use of force such as the one that was inflicted upon Mr. Leonard in advance and has medical staff present for such a use of force. *See* Exhibit 8 – Director Keen Depo., 79:19 to 80:3.

275.     Defendant now has medical and mental health providers counsel an inmate in the Suicide Prevention Unit prior to a use of force. *See* Exhibit 8 – Director Keen Depo., 44:8-22.

276.     Since the events with Mr. Leonard, the lesson plan related to use of force has been updated to ensure that it covers everything in the policy. *See* Exhibit 14 – Rogers Depo., 16:18 to 18:23.

277.     The St. Charles DOC instructs that there is no medical condition that should disqualify an inmate from the use of pepper spray. *See* Exhibit 30 – Spiess Depo., 26:08 to 30:19.

278.     The St. Charles DOC instructs that anyone could be pepper sprayed because pepper spray is a naturally occurring substance and there have not been any cases where medical conditions would prevent the use of pepper spray.  *See* Exhibit 30 – Spiess Depo., 26:08 to 30:19.

279.     The St. Charles DOC does not instruct anything about the potential harm caused by pepper spray on an individual with medical conditions.  *See* Exhibit 30 – Spiess Depo., 26:08 to 30:19.

280.     The St. Charles DOC instructs to check for medical conditions only after deployment. *See* Exhibit 32 – Defendants' Bates 354.

281.     It is understood at the correctional officer level that using pepper spray on an inmate who has a medical condition clearly could possibly harm the inmate. *See* <u>Exhibit 17 – Garofalo Depo., 50:2-11</u>.

282.     The current pepper spray policy is unclear as to when Medical needs to be consulted and how to contact Medical prior to using pepper spray. *See* <u>Exhibit 8 – Director Keen Depo., 82:9-12</u>; <u>Exhibit 14 – Rogers Depo., 28:09 to 32:08</u>.

283.     Current policy states the shift supervisor is supposed to contact Medical to inquire of health conditions of the inmate. *See* <u>Exhibit 8 – Director Keen Depo., 82:5-8</u>.

284.     In July 2017, the St. Charles DOC required the jail's staff supervisor to contact medical staff to determine if an inmate had conditions that would be adverse to the use of pepper spray "[i]f the situation allows." *See* <u>Answer from 4/29/21, ¶ 85 (ECF No. 91)</u>; <u>Exhibit 28 – Defendants' Bates 28</u>.

285.     The statement "if the situation allows" in the current pepper spray policy makes the policy deficient and subject to subjective decision making. *See* <u>Exhibit 6 – Katsaris Report, p. 12</u>; <u>Exhibit 8 – Director Keen Depo., 64:1-23</u>.

286.     The statement "if the situation allows" gives authority without supervisory authorization, which is not the recognized, trained, and accepted procedure in detention facilities for a planned use of force. *See* <u>Exhibit 6 – Katsaris Report, p. 12</u>; <u>Exhibit 8 – Director Keen Depo., 64:1-23</u>.

287.     Due to a lack of training and unclear policies by St. Charles DOC, the St. Charles DOC's suicide prevention officers did not know what "[i]f the situation allows" meant in July 2017. *See* <u>Exhibit 6 – Katsaris Report, p. 12</u>; <u>Exhibit 8 – Director Keen Depo., 64:1-23</u>.

288.     Furthermore, the "if the situation allows" policy language has not changed since 2017; it was simply not enforced by Director Crawford, but was enforced when Director Keen took over as Director in May 23, 2018. Exhibit 12 – Echele Depo., 48:13-25; Exhibit 8 – Director Keen Depo., 23:1-6, 44:1-14.

289.     No changes have been made to the use of force and pepper spray policies in the St. Charles County DOC because of Covid. *See* Exhibit 8 – Director Keen Depo., 45:10-15; 47:2-8; 89:5-7.

290.     Director Keen claims that he is planning to change the pepper spray policy to state that any subject has to be cleared prior to a planned use of pepper spray. *See* Exhibit 8 – Director Keen Depo., 82:15-17.

291.     The St. Charles DOC does not know why its policy disqualifies inmates with certain medical conditions from the use of pepper spray.  *See* Exhibit 14 – Rogers Depo., 24:13 to 27:06; Exhibit 30 – Spiess Depo., 026:08 to 30:19.

292.     The St. Charles DOC does not know why there is a difference in its training manuals and policy regarding the types of conditions to disqualify an inmate from pepper spray. *See* Exhibit 14 – Rogers Depo., 24:13 to 30:19.

293.     Due to a lack of training and inconsistent policies by St. Charles DOC, the St. Charles DOC's suicide prevention officers did not know when to use pepper spray. *See* Answer from 4/29/21, ¶ 87 (ECF No. 91).

294.     As an example of the disconnect between training materials and policies, Officer Garofalo believed that the St. Charles DOC's training materials permit pregnant inmates to be sprayed even though St. Charles DOC's official training materials prohibit such conduct. *See*

Exhibit 17 – Garofalo Depo., 51:10-12; Exhibit 14 – Rogers Depo., 26:05 to 26:08; Exhibit 32 – Defendants' Bates 302.

295. The St. Charles DOC's pepper spray trainers and written policies instruct that a pregnant woman can be pepper sprayed. *See* Exhibit 14 – Rogers Depo., 026:05 – 26:08; Exhibit 30 – Spiess Depo., 26:08 to 30:19.

296. As another example of the disconnect, as of July 22, 2017, Katie Garofalo had not been taught that inmates could suffer harm from pepper spray use as a result of pre-existing eye conditions. *See* Exhibit 17 – Garofalo Depo., 50:14-17.

297. The St. Charles DOC policy allows for an inmate with a serious eye condition, no matter how severe, to be sprayed with pepper spray. *See* Exhibit 30 – Spiess Depo., 26:08 to 30:19; Exhibit 12 – Echele Depo., 61:01 to 62:01.

298. The St. Charles DOC also claims it does not know if an inmate should be sprayed with pepper spray in the eyes if an inmate has a serious eye condition. *See* Exhibit 14 – Rogers Depo., 27:12 to 28:06.

299. As another example of the disconnect, the St. Charles DOC policy states that pepper spray shall be used at a distance between 3 – 15 feet. *See* Exhibit 14 – Rogers Depo., 22:10 to 24:04; Exhibit 32 – Defendants' Bates 320.

300. The St. Charles DOC policy states that pepper spray shall be used at a distance of not to exceed six feet with a minimum distance of four feet. *See* Exhibit 14 – Rogers Depo., 20:11 to 21:19, Exhibit 28 – Defendants' Bates 28; Exhibit 6 – Katsaris Report, p. 11; Exhibit 8 – Director Keen Depo., 64:1-23.

301. The distances in the pepper spray policy are different from the distances in the pepper spray training materials, and the St. Charles DOC does not know why there is a difference

in distances between its training materials and its policy. *See* Exhibit 17 – Garofalo Depo., 38:25 to 39:3, 47:15-19, 47:23 to 48:21; Exhibit 14 – Rogers Depo., 23:8-10; Exhibit 30 – Spiess Depo., 23:20 to 025:05.

302.　　Having different distances at which pepper spray may be used in St. Charles' policy and St. Charles' training materials could lead to confusion or improper use. *See* Exhibit 17 – Garofalo Depo., 48:25 to 49:5.

303.　　Using pepper spray at a distance of less than three feet can be harmful and cause the hydraulic needle effect, splash back, weapon retention, and needlepointing, which is essentially tattooing an inmate with the pepper spray. *See* Exhibit 24a – Fisher Depo., 8/23/19, 8:23 to 9:3, 13:1-13; Exhibit 32 – Defendants' Bates 362; Exhibit 25a – Harris Depo., 8/23/19, 46:19-20; Exhibit 30 – Spiess Depo., 25:10 to 25:25.

304.　　Yet, the St. Charles DOC also stated that it does not believe an inmate would be harmed if an inmate were shot with pepper spray closer than the minimum distance and has stated that if pepper spray was utilized one inch away from the eyeball of an inmate, there would be no harm at all to the inmate. *See* Exhibit 14 – Rogers Depo., 20:11 to 21:19.

305.　　As of February 26, 2020, the St. Charles DOC does not have any policy, including use of force policy, that is focused on inmates with mental health issues. *See* Exhibit 30 – Spiess Depo., 13:13 to 13:16; 14:10 to 14:12.

306.　　If someone threatens self-harm, whether psychotic or not, the St. Charles DOC does not disqualify that inmate from being tased or pepper sprayed, even though that might make a suicidal inmate want to hurt himself or herself more. *See* Exhibit 12 – Echele Depo., 85:01 to 85:25.

307.     The St. Charles DOC allows for an inmate having psychotic episodes to be pepper sprayed.  *See* Exhibit 12 – Echele Depo., 61:01 to 62:01.

308.     The St. Charles DOC does not have any use of force training or pepper spray training regarding inmates with mental health issues or who are in the suicide prevention unit.  *See* Exhibit 30 – Spiess Depo., 16:14 to 17:11; Exhibit 17 – Garofalo Depo., 44:23-25; 45:1-2.

309.     The National Commission on Correctional Health Care ("NCCHC") sets nationally accepted standards of care for patients in jails and prisons. *See* Exhibit 12 – Echele Depo., 15:1-7; Exhibit 23 – Lawrence Report, p. 24.

310.     Debbie Echele's emphasized the importance of following such standards and trains her nurses and medical people to abide by the NCCHC standards.  *See* Exhibit 12 – Echele Depo., 15:6-13.

311.     The 2015 NCCHC Standards for Mental Health Services in Correctional Facilities that Debbie Echele reviewed in preparation for her deposition on behalf of the St. Charles DOC has three compliance indicators, none of which the facility complied with. *See* Exhibit 11 – Lawrence Depo., 56:17-23.

312.     According to the NCCHC's 2015 publication, "Standards for Mental Health Services in Correctional Facilities," (hereinafter, "NCCHC") essential compliance indicator MH-E-06 ("Emergency Services") states, "Mental health emergencies are appropriately managed." Compliance indicators include: 1) responsible mental health authority arranges for emergency mental health care 24 hours/day, 7 days/week; 2) A system is in place to facilitate access to patient mental health information in the event of mental health emergencies by designated staff when no mental health staff are on site; and 3) All aspects of the standard are addressed by written policy and defined procedures. *See* NCCHC, p. 85 and Exhibit 23 – Lawrence Report, pp. 24-25.

313.    The standard in the corrections industry is to have an on-call mental health professional 24/7. *See* NCCHC, p. 85;  Exhibit 11 – Lawrence Depo., 56:14-16.

314.    The St. Charles DOC had no policy as to emergency psychiatric care at the time, as confirmed by Debbie Echele, and there was no psychiatrist hired to be on call more than two days per week. *See* Exhibit 12 – Echele Depo., 75:1 to 76; Exhibit 11 – Lawrence Depo., 55:23 to 56:13; Exhibit 8 – Keen Depo., 66:18 to 68:03.

315.    Most of the St. Charles DOC's medical practices and procedures are not written. *See* Exhibit 12 – Echele Depo., 13:7-10 and 17:11.

316.    The St. Charles DOC does not have a written policy about providing medical care to inmates.  *See* Exhibit 12 – Echele Depo., 77:22 to 79:07.

317.    By not having written policy and defined procedures for mental health emergencies, the St. Charles DOC does not comply with the 2015 NCCHC Standards for Mental Health Services in Correctional Facilities. *See* Exhibit 16 – NCCHC, p. 85; Exhibit 11 – Lawrence Depo., 56:20 to 57:07.

318.    According to the NCCHC's 2015 publication, "Standards for Mental Health Services in Correctional Facilities," essential compliance indicator MH-D-02 ("Medication Services") states, "Medication services are clinically appropriate and provided in a timely, safe, and sufficient manner." *See* Exhibit 16 – NCCHC, p. 62.

319.    The NCCHC's 2015 publication further explains "Inmates entering the facility on verifiable prescription medication continue to receive the medication in a timely fashion as prescribed, or acceptable alternate medications are provided as clinically indicated. *See* Exhibit 16 – NCCHC, p. 62.

320. Regarding medications that cannot be verified, the NCCHC states, "Inmates entering the facility with a prescription that cannot be verified should be evaluated by facility health staff or mental health staff for the appropriateness of the prescription medication." *See* Exhibit 16 – NCCHC, p. 62.

321. The NCCHC states in regard to medication services, "All aspects of the standard are addressed by written policy and defined procedures. *See* Exhibit 16 – NCCHC, p. 62.

322. The St. Charles DOC does not know if it has a policy to obtain medical information from where the inmate was transferred from. *See* Exhibit 14 – Rogers Depo., 28:09 to 32:08.

323. The St. Charles DOC does not have a written policy about how Medical can or should convey necessary information to corrections officers or SPO's that are guarding, supervising and monitoring the inmates. *See* Exhibit 12 – Echele Depo., 79:09 to 82:03.

324. The St. Charles DOC only follows guidelines from NCCHC on suicide prevention, medical emergency, taking someone to the hospital, and emergency medicine. *See* Exhibit 12 – Echele Depo., 91:13 to 91:19.

325. The St. Charles DOC was deliberately indifferent when it failed to develop appropriate policies and provide clear training to custody staff as to their duty to intervene immediately to protect an inmate from self-harm. *See* Exhibit 11 – Lawrence Depo., 82:20 to 83:02.

326. The St. Charles DOC policy should require adequate custody staff in the suicide prevention unit to allow for custody staff to immediately intervene. *See* Exhibit 11 – Lawrence Depo., 83:06-12, 83:22 to 84:02.

327. The St. Charles DOC policy should state that staff are required to go into a cell of someone who could potentially cause harm to others as well as themselves immediately. *See* Exhibit 11 – Lawrence Depo., 83:15-18.

328. The St. Charles DOC does not know if it has a policy that describes how to actually monitor an inmate on close observation. *See* Exhibit 14 – Rogers Depo., 36:11 to 36:25.

329. According to the St. Charles DOC's policy, the only difference as to whether an inmate is categorized under "close observation" or "constant observation" is if the inmate has actually made a suicide attempt. *See* Exhibit 14 – Rogers Depo., 38:07 to 40:18.

330. During "constant observation", the officer assigned to monitor the inmate is required to maintain direct site of an inmate and watch them constantly. *See* Exhibit 14 – Rogers Depo., 38:07 to 40:18.

## VIII. SELECTED EXPERT FINDINGS

331. Mr. Leonard produced the following experts in this case for the purpose of demonstrating liability: (1) W. Ken Katsaris, an accomplished law enforcement, corrections and security consultant and trainer who primarily testifies for the defense, and (2) Susan Lawrence, MD, a medical physician with significant correctional facility experience. *See* Exhibit 38 – Expert Disclosures; Exhibit 22 – Katsaris Depo., 18:7-21; Exhibit 6 – Katsaris Report; Exhibit 23 – Lawrence Report.

332. Defendant then named Director Keen as its "non-retained" expert in response to Mr. Katsaris and Dr. Lawrence. *See* Exhibit 38 – Expert Disclosures.

333. Director Keen agreed with Ken Katsaris' Expert Report, which includes the below selected findings. *See* Exhibit 8 – Director Keen Depo., 8:3, 5-6; 64:1-24; 65:6-19.

334. "This file of materials is very representative of serious deviations of below recognized, trained, and accepted detention facility practices." Exhibit 6 – Katsaris Report, p. 8.

335. "These practices were not accidental or simple mistakes, but rather deviations from clear policy statements, below acceptable training for implementation of policy, and clearly deviations below the recognized, trained, and accepted practices for providing the proper care, custody and control of prisoners." *See* Exhibit 6 – Katsaris Report, p. 8.

336. "[T]he corrections officers of the St. Charles County Department of Corrections (SCCDOC) involved with Plaintiff Jamie Leonard (Leonard) did not follow the SCCDOC Policies and Procedures, and that the policies of the SCCDOC were deficient in clarity and specific guidance." *See* Exhibit 6 – Katsaris Report, p. 8.

337. "These deviations, in addition to a clear lack of training, were the direct cause of Leonard's injuries." *See* Exhibit 6 – Katsaris Report, p. 8.

338. "[T]his deviation was followed by the inconceivable omission of the officers['] failure to intervene, as Leonard gouged out his own eye." *See* Exhibit 6 – Katsaris Report, p. 9.

339. "The irritation and contamination by the OC Restraint Spray was not properly addressed by the officers or medical staff." *See* Exhibit 6 – Katsaris Report, p. 9.

340. "The eye injury from the use of OC Restraint Spray, and the subsequent gouging out of Leonard's eye was preventable." *See* Exhibit 6 – Katsaris Report, p. 9.

341. "I have sufficient experience to know what the recognized and accepted interface procedures are, and should be, between the medical staff, and the corrections staff, to opine on the communications procedures required for the constitutional implementation of care, custody, and control of prisoners in a detention center, and that was a failure in this case." *See* Exhibit 6 – Katsaris Report, p. 9.

342.     "After carefully reviewing the Second Amended Complaint filed in this case, I fully agree with the entirety of the assertions by the Plaintiff[']s attorneys of record on this file.  After a review of paragraphs nine (9) through one hundred twenty five (125), I find it compelling to incorporate these factual assertions as part of this report and my opinions. While somewhat duplicative at times, the assertions of fact are consistent with the materials I reviewed in Attachment "A", are accurate and supported by records, and testimony." *See* <u>Exhibit 6 – Katsaris Report, p. 9-10</u>.

343.     "Prior to the beginning of the cell search and use of OC Chemical Restraint Spray on Leonard, I can find no excuse for not involving a medical staff person since a cell search was not an emergency." *See* <u>Exhibit 6 – Katsaris Report, p. 11</u>.

344.     "The use of force against Leonard as a result of attempting to perform a cell search, did not comport with the SCCDOC policy nor the generally recognized, trained, and accepted procedures on the use of OC Chemical Restraint. The level of resistance required nationally and by SCCDOC Policy is "active aggression." My review of the cell video does not indicate this required level of resistance by Leonard. He was not cooperative, but not combative or attempting to harm the officers. And, there were three officers to control a handcuffed-behind-the-back Leonard. Not only was the entry into the cell for a cell search not appropriate, but the use of OC Spray was not justified by Leonard's level of resistance. Nor was Leonard a "serious physical threat."" *See* <u>Exhibit 6 – Katsaris Report, p. 11</u>.

345.     "Furthermore, the SCCDOC Policy prohibits OC Spray to be deployed closer than four (4) feet. My view of the cell video shows the application began at about 12-18 inches from Leonard's face. The SCCDOC training clearly indicates the potential of eye injury if applied closer

than three (3) feet. And, in this case, Leonard already suffered from an eye disease which totally contraindicated the use of OC Spray." *See* <u>Exhibit 6 – Katsaris Report, p. 11-12</u>.

346. "Baker testified that if she was contacted, she would have consulted medical before authorizing the use of OC Spray. But, even knowing this compromise of policy, as the reviewing authority, Baker was required to write a report on the incident in which Baker was not critical of any of the officer's actions, and found the use of force appropriate as their conduct was also ratified by each higher level of authority in the SCCDOC." *See* <u>Exhibit 6 – Katsaris Report, p. 12</u>.

347. "Either Baker did not know, or was not trained appropriately, on the policy, or the confusing statement in the policy "if the situation allows," did not provide the guidance necessary for use of OC Spray. I believe this statement makes the policy deficient and subject to subjective decision making. The statement actually gives authority without supervisory authorization, which is not the recognized, trained, and accepted procedure in detention facilities for a planned use of force." *See* <u>Exhibit 6 – Katsaris Report, p. 12</u>.

348. "It is also recognized by SCCDOC Procedures, as testified to by officers that any "planned use of force" must be authorized by a supervisor. It is my opinion that the meeting (briefing) prior to attempting Leonard's cell search, participated in by Corrections Officers Donte Fisher (Fisher), Steven Harris (Harris), and Scott, directed by Fisher, met the requirements of a "planned" use of force. Fisher alerted Harris and Scott about the bizarre behavior of Leonard during the night, and as a result had sufficient belief to tell Harris to be ready to use the OC Chemical Restraint Spray. There is no other way to define this assessment by Fisher other than a "plan" to use force. Therefore, the need for supervisory approval was necessary, but not sought or even thought about. This is significant because it accrues to my opinion of the deficient policy, and

deficient training on the use of force requirements by SCCDOC as well as the recognized, trained and accepted procedures throughout the nation." *See* Exhibit 6 – Katsaris Report, p. 12-13.

349. "The use of OC Spray was not only contraindicated for the reasons in my opinions above, but the use of the OC Spray was totally not called for by Leonard's resistance. The spray was also inappropriately deployed. For all of the reasons cited, the use of the OC Spray exceeded the test of the actions of the prudent officer assessing the need for a control agent reserved, by policy, for "inmates who pose a serious physical threat to staff or inmates." Leonard did not attempt to "hit, kick, spit, swing, or throw objects that could potentially harm or injure anyone within striking distance" (Policy, Use of OC Spray, SCCDOC, and ACA Standards cited in the Policy). It is my opinion that the force used on Leonard exceeded the force authorized by policy and nationally accepted practices." *See* Exhibit 6 – Katsaris Report, p. 13.

350. "A further violation of SCCDOC Policy occurred when Martin did not supervise the decontamination process, and Fisher, Harris, and Scott simply moved Leonard to another cell, took off his handcuffs, and directed him to use the sink in the cell to decontaminate himself of the OC Spray that was directed at his eyes, and from a very close injurious distance. The use of the cell sink, not an "eye wash station," as directed in policy, began the painful process of Leonard gouging at his eyes, in obvious frustration and pain, as can be seen, and verified, by the cell video. Again, a violation of the OC Spray Policy. And, in addition, the violation of medical directions of SCCDOC for Martin who was required to provide medical assistance for decontamination." *See* Exhibit 6 – Katsaris Report, p. 13.

351. "Each and every one of the actions by Fisher, and Harris, to plan and deploy an unauthorized use of force, vis-a-vis the deployment of OC Spray - combined with the lack of proper medical intervention, and the lack of the use of an eye wash station - was an escalating

causation toward the final injurious actions taken by Leonard against himself, without intervention, which resulted in the loss of one of his eyes." *See* Exhibit 6 – Katsaris Report, p. 14.

352.    "While Leonard did gouge his own eye out, he did so while officers simply watched Leonard's agony and pain, which is so abundantly clear from the cell video. While the officers watched Leonard gouging at his eye, they did call medical, and Martin did rush back to the cell. The officers['] lack of proper intervention to Leonard's actions is totally unjustified. As I earlier opined, Leonard should have been assisted with decontamination, and an "eye wash station," utilized with medical assistance. Neither was afforded to Leonard. Martin testified that when she arrived at Leonard's second cell, after the OC Spray use, four to five officers were in the hall outside of the cell. She testified no one, in her opinion, tried to stop Leonard. However, it is not necessary to rely on Martin's opinion, the cell video confirms that Leonard fell to the floor, turned over, was gouging at his eye, and blood was visible on the floor. No officer made an entry from the time Leonard was standing at the sink, to turning and gouging, to falling, rolling, and bleeding. This failure of intervention is the most egregious failure to intervene in a medical/physical crisis, in a detention center, that I have ever reviewed or seen. It was obvious Leonard needed to be helped, and stopped from self-injury. I can only compare this lack of intervention to the possible scenario where an inmate, on suicide watch, is watched and monitored by corrections officers while he/she ties a noose, puts it around their neck, and attempts suicide by hanging before the officers intervene. Obviously, that is a comparable scenario, in my opinion. Officers would, and should, be terminated for that kind of omission. There was not even discipline for the officers in Leonard's case." *See* Exhibit 6 – Katsaris Report, p. 14-15. (emphasis added).

353.    "The lack of discipline, or even finding any violations of policy, is simply ratification of the use of disproportionate unjustified, and against policy force, and failing to

intervene in a serious injurious compromise Leonard was doing to himself while an officer(s) watched. And, he was classified as a "special watch" inmate, and in a cell in the "special observation unit." It is incredible that the circumstances of the OC Spray without authorization even occurred. I find it is a total disregard of the correctional mission, especially for the unit Leonard was in, to just let him harm himself without drastic discipline imposed on the officers. In this case the SCCDOC didn't even find that policy or procedures were violated. This is proof of "ratification," in my opinion." *See* <u>Exhibit 6 – Katsaris Report, p. 15</u>.

Date: April 30, 2021                                        Respectfully submitted by,

**DONNER APPLEWHITE,**                     **BURGER LAW, LLC**
**ATTORNEYS AT LAW**

By:  */s/ Steven A. Donner*                     By:  */s/ Gary K. Burger*
Steven A. Donner, #63789MO                     Gary K. Burger, #32460MO
Thomas R. Applewhite, #64437MO                 500 N. Broadway, Suite 1860
906 Olive Street, Suite 1110                   St. Louis, Missouri 63102
St. Louis, Missouri 63101                      Phone:   (314) 542-2222
Phone:   (314) 293-3526                        Fax:       (314) 542-2229
Fax:       (888) 785-4461                       Email:    gary@burgerlaw.com
Email:    tom.applewhite@da-lawfirm.com
              steve.donner@da-lawfirm.com       *Co-Counsel for Plaintiff*

*Co-Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2021, the foregoing was filed utilizing this Court's ECF system, which will distribute an electronic version of the foregoing to all counsel of record.

*/s/ Steven A. Donner*