**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JAMIE LEONARD**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:19-cv-00927-MTS |
| | ) | |
| **ST. CHARLES COUNTY, STEVEN** | ) | |
| **HARRIS, DONTE FISHER, LISA** | ) | |
| **BAKER,** and **THERESA MARTIN,** | ) | |
| | ) | |
| Defendants. | ) | |

---

**MEMORANDUM IN OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

---

Thomas R. Applewhite, #64437MO
Steven A. Donner, #63789MO
**DONNER APPLEWHITE**
906 Olive Street, Suite 1110
St. Louis, Missouri 63101
Phone: (314) 293-3526
Facsimile: (888) 785-4461
Email: tom.applewhite@da-lawfirm.com
Email: steve.donner@da-lawfirm.com

CO-COUNSEL FOR PLAINTIFF

Gary K. Burger, #32460MO
**BURGER LAW, LLC**
500 N. Broadway, Suite 1860
St. Louis, Missouri 63102
Phone: (314) 542-2222
Facsimile: (314) 542-2229
Email: gary@burgerlaw.com

CO-COUNSEL FOR PLAINTIFF

**TABLE OF CONTENTS**

I.   Frivolous Administrative Remedies Argument .................................................. 2

II.  The Law of Qualified Immunity .......................................................................... 3

    A.  Quraishi v. St. Charles County ................................................................... 4

    B.  Robison v. Clawson ..................................................................................... 5

    C.  Ramsey v. St. Charles County ..................................................................... 6

    D.  Smith v. St. Charles County ........................................................................ 7

    E.  Qandah v. St. Charles County ..................................................................... 9

    F.  Exact Medical Condition Need Not Be Known ........................................ 10

III. COUNT 1: OVERWHELMING EVIDENCE OF *MONELL* LIABILITY ............... 11

IV.  COUNT 2: EXCESSIVE FORCE – NO QUALIFIED IMMUNITY ....................... 12

    A.  Defendant Harris ....................................................................................... 13

    B.  Defendant Fisher ....................................................................................... 14

    C.  Defendant Martin ...................................................................................... 15

    D.  Defendant Baker ........................................................................................ 16

V.   COUNT 3: MEDICAL NEEDS – NO QUALIFIED IMMUNITY ......................... 16

    A.  Defendant Harris ....................................................................................... 17

    B.  Defendant Fisher ....................................................................................... 17

    C.  Defendant Martin ...................................................................................... 18

    D.  Defendant Baker ........................................................................................ 20

VI.  COUNT 4: CIVIL CONSPIRACY – JOINT AND SEVERAL LIABILITY ............ 21

    A.  Conspiracy to Deprive Mr. Leonard of His Constitutional Rights .......... 21

    B.  Overt Act in Furtherance of the Conspiracy ............................................ 22

    C.  Injury to Mr. Leonard ............................................................................... 23

VII. Conclusion ........................................................................................................... 23

**<u>TABLE OF AUTHORITIES</u>**

**Cases**                                                                          <u>Page Nos.</u>

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 247-248 (1986) .................................................................1

*Barton v. Taber, et al.*,
820 F.3d 958, 965-966 (8th Cir. 2016) ...............................10, 11, 17

*Chambers v. Pennycook*,
641 F.3d 898, 906 (8th Cir. 2011) ........................................................6

*Coker v. Ark. State Police*,
734 F.3d 838, 843 (8th Cir. 2013) ........................................................6

*Dadd v. Anoka County*,
827 F.3d 749, 755-56 (8th Cir. 2016) ..............................................7-10

*Dean v. Cty. of Gage, Neb.*,
807 F.3d 931, 939 (8th Cir. 2015) ......................................................21

*Doe v. Washington County*,
150 F.3d 920, 924 (8th Cir. 1998) ....................................................2, 3

*Gunter v. Morrison*,
497 F.3d 868, 873 (8th Cir. 2007) ......................................................21

*Johnson-El v. Schoemehl*,
878 F.2d 1043, 1055 (8th Cir. 1989) ............................................7, 9, 10

*McRaven v. Sanders,*
577 F.3d 974, 981 (8th Cir. 2009) .................................................10, 11

*Monell v. New York City Dept. of Social Servs.*,
436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ............1, 5, 11, 12

*Nerness v. Johnson*,
401 F.3d 874, 876 (8th Cir. 2005) ........................................................3

*Qandah v. St. Charles Cty., Missouri*, No. 4:20CV53 JCH,
2021 WL 808857 (E.D. Mo. Mar. 3, 2021) ....................................3, 9-10

*Quraishi v. St. Charles Cty., Missouri*,
986 F.3d 831 (8th Cir. 2021) ......................................................3-5, 10, 13

*Ramsey v. St. Charles Cty.*, No. 4:15-CV-00776 JAR,
2017 WL 2843574 (E.D. Mo. June 30, 2017) ................................ 3, 6, 7, 10, 16

*Robison v. Clawson*, No. 4:12-CV-2205 NAB,
2014 WL 1910284 (E.D. Mo. May 13, 2014) ................................ 3, 5, 6, 10

*Scott v. Harris*, 550 U.S. 372, 380,
127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) ................................ 8

*Simpson v. Wks.*,
570 F.2d 240, 242–43 (8th Cir. 1978) ................................ 21

*Small v. McCrystal*,
708 F.3d 997, 1010 (8th Cir. 2013) ................................ 21

*Smith v. Conway County, Ark.*,
759 F.3d 853, 860-61 (8th Cir. 2014) ................................ 8

*Smith v. St. Charles Cty.*, No. 4:18-CV-171 JCH,
2021 WL 253998 (E.D. Mo. Jan. 26, 2021) ................................ 3, 7-10

*Thompson v. Zimmerman*,
350 F.3d 734, 735 (8th Cir. 2003) ................................ 6

*Vaughn v. Gray,*
557 F.3d 904, 909 (8th Cir. 2009) ................................ 10

*Wertish v. Krueger*,
433 F.3d 1062, 1066–67 (8th Cir. 2006) ................................ 6

*White v. McKinley*,
519 F.3d 806, 814 (8th Cir. 2008) ................................ 21

**Statutes**

42 U.S.C. § 1997e(a) ................................ 2, 3

42 U.S.C. § 1983 ................................ 3, 12, 16, 21

**Constitution of the United States of America**

U.S. Const., amend. IV ................................ 4-5

U.S. Const., amend. VIII ................................ 8

U.S. Const., amend. XIV ................................ 5

The parties in this case have filed cross Motions for Summary Judgment. In response to Defendants' Motion for Summary Judgment, the facts set forth in the response of plaintiff Jamie Leonard (hereinafter, "Mr. Leonard" or "Plaintiff") to Defendants' Statement of Facts well meet Plaintiff's burden to show a genuine dispute of material facts exists warranting denial of Defendants' motion.[1] In actuality, the facts are so overwhelming in support of Plaintiff's claim that summary judgment for Plaintiff, detailed in Plaintiff's Summary Judgment pleadings (Docs. 99, 100, 101), against defendant St. Charles County (hereinafter, the "SCCDOC") is appropriate. But with such unassailable facts and argument presented, Plaintiff also now requests summary judgment against the individual Defendants as the nonmovant under FRCP 56(f)(1). At a minimum, Plaintiff has met his burden of showing significant material facts barring summary judgment for each of the Defendants in this case. *See Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). There is sufficient evidence favoring Plaintiff which would enable a jury to return a verdict, or, at the very least in the case of the SCCDOC, would justify summary judgment for Plaintiff in the first instance. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In this pleading, counsel for Mr. Leonard will not completely restate the arguments set forth in his Memorandum in Support of his Motion for Summary Judgment.[2] Instead, this

---

[1] Mr. Leonard incorporates by reference his original Statement of Uncontroverted Material Facts (Doc. 101) as if fully set forth herein. Citations to his original Statement of Uncontroverted Material Facts herein are abbreviated as "PSUMF". Mr. Leonard also incorporates by reference his Statement of Additional Material Facts filed herewith in response to Defendants' Motion as if fully set forth herein. Citation to these additional facts are abbreviated as "SAMFP" so that the abbreviations are dissimilar in order to avoid confusion.

[2] Mr. Leonard incorporates herein by reference his Memorandum in Support of his Motion for Summary Judgment as to the SCCDOC and its *Monell* liability in this case. Doc. 100.

Memorandum largely focuses on the individual Defendants who were not the subject of Plaintiff's original Summary Judgment Motion and apprising the Court of binding authority completely rejecting Defendants' arguments and which Defendants ignore.

**ARGUMENT**

This brief starts where Defendants' Memorandum ends – with Defendants' frivolous administrative remedies argument. Afterwards, Plaintiff addresses Defendants' other arguments as raised in their Memorandum in Support of Defendants' Motion for Summary Judgment. Doc. 103. Plaintiff will not reiterate the facts stated in response to Defendants' Statement of Facts (Doc. 95),[3] but will reference them as necessary in the argument below.

### I. FRIVOLOUS ADMINISTRATIVE REMEDIES ARGUMENT

Defendants' argument that Mr. Leonard failed to exhaust administrative remedies prior to filing suit pursuant to the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) (hereinafter, the "PLRA") is frivolous and soundly rejected by longstanding precedent not even hinted at by Defendants. The PLRA "unambiguously applies to only those suits filed by prisoners." *Doe v. Washington County*, 150 F.3d 920, 924 (8th Cir. 1998). Like the plaintiff in *Doe*, Mr. Leonard was not a prisoner or detained when he filed this case, [SAMFP 44, 45], and was only detained from July 19, 2017 to July 22, 2017 [DSOF 1].[4] Mr. Leonard filed this case on April 16, 2019 [SAMFP 45], "and the PLRA therefore does not apply to his case." *Id*.

The PLRA's exhaustion requirement only applies to "person[s] incarcerated or detained ...." 42 U.S.C. § 1997e(h). Accordingly, the exhaustion requirement **does not apply to plaintiffs**

---

[3] Citations to Defendants' Statement of Facts herein are abbreviated as "DSOF".
[4] July 22, 2017 is the day: of the injury in this case; when Mr. Leonard was pepper sprayed and lost his eye; and when Defendants assert a "Inmate/Detainee Concern Form" should have been submitted.

**who file § 1983 claims after being released from incarceration**. *Doe*, 150 F.3d at 924 (8th Cir. 1998); accord *Nerness v. Johnson*, 401 F.3d 874, 876 (8th Cir. 2005). *Doe* notes (at 924):

> "The policy behind the PLRA was to deter suits by inmates who are very quick to litigate "simply because they have little to lose and everything to gain." 141 Con. Rec. S7524 (daily ed. May 25, 1995) (statement of Sen. Dole). The PLRA was designed to discourage the initiation of litigation by a certain class of individuals— prisoners—that is otherwise motivated to bring "frivolous complaints as a means of gaining a short sabbatical in the nearest Federal courthouse." 141 Con. Rec. S7526 (daily ed. May 25, 1995) (statement of Sen. Kyl). Congress therefore fully intended to distinguish between those who are "prisoners" when they decide whether to file a complaint and those who are not. Because Doe was not a prisoner when he filed this case, we find that the provisions of the PLRA are inapplicable."

Defendants' argument is completely rejected by the Eighth Circuit. Like the qualified immunity law in the next section, Defendants should have cited this clear precedent or advocated a change in the law rather than present this Court with such a legally untenable position.

## II.   THE LAW OF QUALIFIED IMMUNITY

Plaintiff's Memorandum in Support of his Motion for Summary Judgment cites numerous § 1983 decisions against St. Charles County that were defended by this same counsel.[5] Every single one of the cited cases found that at least one of St. Charles County's officers were not entitled to qualified immunity. Defendants cite zero contrary authority on qualified immunity, which is surprising in light of the nature of the qualified immunity analysis and these prior and current cases against St. Charles County. Defendants will get the last word in their Reply, which underscores the importance of forthrightly citing contrary authority to the Court. Therefore, the qualified immunity findings involving St. Charles County are now discussed below followed by additional applicable precedent.

---

[5] See *Quraishi v. St. Charles Cty., Missouri, et al.*, 986 F.3d 831 (8th Cir. 2021), *Robison v. Clawson*, No. 4:12-CV-2205 NAB, 2014 WL 1910284 (E.D. Mo. May 13, 2014), *Ramsey v. St. Charles Cty.*, No. 4:15-CV-00776 JAR, 2017 WL 2843574 (E.D. Mo. June 30, 2017), *Smith v. St. Charles Cty.*, Missouri, No. 4:18CV171 JCH, 2021 WL 253998 (E.D. Mo. Jan. 26, 2021), and *Qandah v. St. Charles Cty.*, Missouri, No. 4:20CV53 JCH, 2021 WL 808857 (E.D. Mo. Mar. 3, 2021).

**A. Quraishi v. St. Charles County**

In *Quraishi*, the Court found that Deputy Michael Anderson, a member of the St. Charles County Regional SWAT team, was not entitled to qualified immunity. *Quraishi v. St. Charles Cty., Missouri*, 986 F.3d 831, 837 (8th Cir. 2021). The Court noted that qualified immunity applies if an officer violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Id*. at 835. The Court noted that, in analyzing whether qualified immunity applies, "[a] two-step inquiry applies: (1) whether [the plaintiff has] alleged facts to show a violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged misconduct." *Id*. For a plaintiff to meet his burden:

> "[T]he contours of the right must be sufficiently clear that a reasonable official would [have understood] that what he is doing violates that right. The state of the law at the time of the alleged violation must give officials fair warning their conduct was unlawful. There must be precedent, controlling authority, or a robust consensus of cases of persuasive authority. There may also be the rare obvious case where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances."

*Id*. (citations and internal quotation marks omitted).

The Court found that Anderson did not have arguable probable cause because there was video of "a peaceful scene interrupted by rubber bullets and tear-gas." *Id*. at 836. In so ruling, the Court ruled that "a government official is [not] immune if a superior instructs him to engage in unconstitutional conduct", i.e. even if his sergeant told him to deploy the tear-gas. *Id*. at 837. The Court then went on to find that qualified immunity did not apply because there was an obvious violation of the plaintiffs' First Amendment rights if the plaintiffs in that case were believed by reasonable jurors. *Id*. at 838-839.

The Eighth Circuit Court reaffirmed older law stating that the "use of pepper spray to arrest an unarmed, compliant suspect can be excessive force." *Quraishi* at 840. In that case, the Court did find that the Fourth Amendment did not apply due to lack of notice that the officer's conduct

was not constitutional under the Fourth Amendment, because "the reporters' freedom to move was not terminated or restricted" and there was no "precedent, controlling authority or robust consensus of cases of persuasive authority" to show tear-gassing was a seizure. *Id.* (internal quotations omitted). As further outlined in Plaintiff's Memorandum in Support of Summary Judgment and *infra*, there was no need to enter the cell of a mentally-unwell Mr. Leonard in a suicide prevention unit at all at that time, much less with pepper spray at the ready, and then pepper spray this handcuffed man inches from his face. [PSUMF 9, 11, 35, 53, 71, 81-85, 101-104, 107-109, 117, 124-126, 263-273, 299-308, 344, 345, 349, 351]. Furthermore, as Plaintiff showed in his Memorandum in Support of Summary Judgment, much authority aids Plaintiff's claims, and <u>there are multiple recent cases against the SCCDOC in which the SCCDOC's summary judgment attempts on qualified immunity were defeated</u>, which are now discussed.

### B. Robison v. Clawson

Plaintiff's Memorandum in Support of his Motion for Summary Judgment notes that the *Robison* case did not discuss *Monell* liability but addressed differences between an arrestee and a pretrial detainee. Defendants admit in their briefing that Mr. Leonard was at least a pretrial detainee.[6] As to qualified immunity, the Court found that the SCCDOC's Corporal Clawson was not entitled to qualified immunity for use of excessive force. *Robison v. Clawson*, No. 4:12-CV-2205 NAB, 2014 WL 1910284, at *5 (E.D. Mo. May 13, 2014). The Court noted that "[t]he constitutional right to be free from excessive force is clearly established and the test is whether the amount of force used was objectively reasonable." *Id*. Finding against Corporal Clawson, the Court noted:

---

[6] Once again, Plaintiff does not concede that he does not qualify as an arrestee in the "legal twilight zone" between arrestee and pretrial detainee under the Fourteenth Amendment. As set forth at length in Plaintiff's Memorandum in Support of his Motion for Summary Judgment, the facts are just so overwhelmingly in Plaintiff's favor in light of the SCCDOC's damning admissions that it does not matter.

"Viewed in the light most favorable to Robison, Corporal Clawson's conduct was not objectively reasonable. At the point when Corporal Clawson allegedly struck her, Robison had merely refused medical treatment and was not otherwise resisting or provoking Corporal Clawson. See *Coker v. Ark. State Police*, 734 F.3d 838, 843 (8th Cir.2013) (reversing grant of qualified immunity; concluding reasonable jury could find that force used was excessive where plaintiff's evidence was that officer struck plaintiff with metal flashlight after plaintiff was already on the ground and complying with officer's demands); *Thompson v. Zimmerman*, 350 F.3d 734, 735 (8th Cir.2003) (reversing summary judgment in excessive force claim based on qualified immunity where arrestee testified he was sitting in an unthreatening posture when jailors beat him). Nor is there any indication that Robison was "passively resistant." *Wertish v. Krueger*, 433 F.3d 1062, 1066–67 (8th Cir.2006). In addition, while Robison's injuries could be considered de minimis, that no longer forecloses her claim. *Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir.2011)."

*Id*. at *6.

Here, each individual Defendant knew or should have known that Mr. Leonard was in the midst a severe mental health crisis while detained with the SCCDOC. [PSUMF 9, 11-13, 35-42, 54, 55, 61, 73, 74, 101, 161, 309-317, 322-324 and SAMFP 11]. Similar to the use of force against Ms. Robison, who had only refused medical treatment and was not resisting or provoking Corporal Clawson, Mr. Leonard kneeled naked in his suicide prevention cell as Defendants organized, without any justification, a planned use of force with OC spray against him. [PSUMF 53, 55, 57, 71, 75, 78, 79-85, 101-102, 107-110, 113, 117, 130, 263-276, 289, 290, 305-308, 333-337, 344, 348, 349, 351 and SAMFP 28].

## C. Ramsey v. St. Charles County

In *Ramsey*, the Court found that former SCCDOC Director Larry Crawford was not entitled to qualified immunity. The Court found that his actions constituted excessive force as he allowed a mentally unwell Ms. Ramsey to be restrained on a table naked for up to two weeks with alleged pepper spraying while restrained. *Ramsey v. St. Charles Cty.*, No. 4:15-CV-00776 JAR, 2017 WL 2843574, at *4-5 (E.D. Mo. June 30, 2017).

Notably, Director Crawford was the SCCDOC Director at the time that Mr. Leonard was confined at the SCCDOC. [PSUMF 288]. The individual Defendants in this case, like Director Crawford, not only allowed, but actually participated in the excessive force to be used against Mr. Leonard. [PSUMF 75-85, 101-122, 130, 230-233, 237, 246, 256-259, 263-273, 334-337, 348, 349, 351, 353 and SAMFP 4-6, 15-20, 23, 28, 32].

While it is true that Director Crawford was allowed qualified immunity as to Ms. Ramsey's claim of inadequate medical care, that grant of qualified immunity was provided because of extensive evidence of adequate medical care provided when the excessive use of force was removed from the equation. *Id*. at *6. That contrasts with Mr. Leonard's situation where there were incredible failures as to medical care, such as not administering needed psychiatric or eye medications, helpful sedatives, any restraint whatsoever before and during the time that he was ripping out his eye, intervention during such self-harm in the suicide prevention unit, proper decontamination of pepper spray, and more. [PSUMF 9, 11-13, 15, 18-21, 24, 27-34, 43-46, 48-52, 59-61, 66, 68, 89, 98-100, 131-152, 155-160, 162, 166-168, 178-193, 195-199, 210-215, 221, 227-232, 245-252, 259, 273-275, 309-330, 338-343, 350-353 and SAMFP 10, 29-31, 36-43].

### D. Smith v. St. Charles County

In *Smith*, Judge Hamilton found that neither Officer Graebner nor Officer Gillet were entitled to qualified immunity. *Smith v. St. Charles Cty., Missouri*, No. 4:18CV171 JCH, 2021 WL 253998, at *5-6 (E.D. Mo. Jan. 26, 2021). As to Officer Graebner, the Court stated:

> "Upon consideration of the foregoing, the Court finds a genuine issue of material fact remains with respect to whether Defendant Graebner exhibited deliberate indifference to Plaintiff's serious medical need. In other words, the Court finds a reasonable factfinder could conclude Graebner knew of, but deliberately disregarded, a serious medical need when he allegedly ignored Plaintiff's requests for medical assistance. See *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1055 (8th Cir. 1989) (citations omitted) ("Delay in the provision of treatment or in providing examinations can violate inmates' rights when the inmates' ailments are medically

serious or painful in nature."); see also *Dadd v. Anoka County*, 827 F.3d 749, 755-56 (8th Cir. 2016)."

*Id.* at *5.

As outlined in Plaintiff's Memorandum in Support of his Motion for Summary Judgment, Mr. Leonard's medical needs were likewise ignored. [PSUMF 9, 11-13, 15, 18-21, 28-42, 44-46, 48-52, 59-61, 68, 89, 97-104, 132, 133, 136, 140, 141, 146, 152, 155-162, 166-168, 170, 178-193-199, 210-215, 219, 228-232, 243, 246-252, 259, 309-330, 333-340, 343, 344, 345, 351 and SAMFP 29-31, 36-43]. As to Officer Gillet, the Court found:

> "Viewing the facts in the light most favorable to Plaintiff, the Court finds a genuine issue of material fact remains with respect to whether Defendant Gillet utilized excessive force during the incident in question. If Plaintiff's version of events is to be believed, Gillet threw or tackled him to the ground in a violent takedown maneuver, slamming Plaintiff's head into a metal stool in the process, even though Plaintiff was attempting to comply with orders and was backing up with his arms in the air. The Court finds a reasonable jury could conclude that Plaintiff was in compliance with the correctional officers' orders, and posed no threat to the safety and security of the institution when he was assaulted. *Smith v. Conway County, Ark.*, 759 F.3d 853, 860-61 (8th Cir. 2014). "Accepting this version of facts, which is not blatantly contradicted by the record, *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007), then any use of force against [Plaintiff] would be gratuitous and a violation of the [Eighth] Amendment." Id."

*Id.* at *6.

The excessive use of force against Mr. Leonard is analogous to this case as outlined in Plaintiff's Memorandum in Support of his Motion for Summary Judgment. Here, this Court should find that as Mr. Leonard was in his cell, kneeling and handcuffed, "a reasonable jury could conclude that Plaintiff was in compliance with the correctional officers' orders, and posed no threat to the safety and security of the institution when he was assaulted." *Id.* and [PSUMF 53, 57, 105-109, 113-122, 130, 272, 342, 344, 349 and SAMFP 24, 28].

### E. Qandah v. St. Charles County

In *Qandah*, as in *Smith*, Judge Hamilton found that neither of the two individual officers who were sued – neither Officer Cast nor Officer McKee – were entitled to summary judgment on the issue of qualified immunity. *Qandah v. St. Charles Cty.*, Missouri, No. 4:20CV53 JCH, 2021 WL 808857, at *5-6 (E.D. Mo. Mar. 3, 2021). As to Officer Cast, the Court said:

> "Viewing the facts in the light most favorable to Plaintiff, the Court finds a genuine issue of material fact remains with respect to whether Defendant Cast exhibited deliberate indifference to a substantial risk of serious harm to Plaintiff. If Plaintiff's version of events is to be believed, Defendant Cast knew that inmates regarded Plaintiff as a snitch, and that inmates identified as snitches were at risk of attacks by other inmates. Cast nevertheless allowed inmate Ballinger to access Plaintiff's cell, despite his knowledge that it violated SCCJ policy for an officer to open one inmate's cell at the request of another inmate, or to allow an inmate to enter the cell of another inmate. While Cast testified to a different version of events during his deposition, this discrepancy merely raises a fact question inappropriate for determination on summary judgment. The Court finds a reasonable jury could credit Plaintiff's account, and conclude that Cast exhibited deliberate indifference to Plaintiff's safety. Thus, because Plaintiff has raised a genuine issue of material fact about whether Defendant Cast violated a constitutional right, Defendants' Motion for Summary Judgment on the issue of qualified immunity must be denied."

*Id*. at *5.

Defendants acted with deliberate indifference to Mr. Leonard's safety when they unnecessarily entered his cell in the suicide prevention unit after preparing to use force without any consultation with Medical. [PSUMF 71, 77-93, 97-104, 107, 342, 343 and SAMFP 10, 11]. Officers continued this deliberate indifference when they stood idly by and watched Mr. Leonard rip out his eye over the course of minutes. [PSUMF 182-193, 195-199, 207-217, 338, 342, 352 and SAMFP 39-43]. As to Officer McKee, the same officer who admits that no investigation took place in Mr. Leonard's case [PSUMF 230-237, 245, 253-256, 353], the Court stated:

> "Upon consideration of the foregoing, the Court finds a genuine issue of material fact remains with respect to whether Defendant McKee exhibited deliberate indifference to Plaintiff's serious medical need. In other words, the Court finds a reasonable factfinder could conclude McKee knew of, but deliberately disregarded, a serious medical need when he allegedly ignored Plaintiff's requests for medical

assistance. See *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1055 (8th Cir. 1989) (citations omitted) ("Delay in the provision of treatment or in providing examinations can violate inmates' rights when the inmates' ailments are medically serious or painful in nature."); see also *Dadd v. Anoka County*, 827 F.3d 749, 755-56 (8th Cir. 2016). Defendants' Motion for Summary Judgment on Count II of Plaintiff's First Amended Complaint will therefore be denied."

*Id*. at *6.

Here, Plaintiff's psychosis and eye condition were allowed to worsen without needed medical care despite being known and obvious to each of the individual Defendants and others at SCCDOC in this case (in the case of the psychosis) and having been brought to the attention of Medical at SCCDOC and Defendant Martin (in the case of the eye condition). [PSUMF 9, 11-13, 15, 18-21, 26-42, 44-52, 54, 62-68, 74, 98-104, 127, 138-141, 146, 147, 152, 155-159, 161, 166-168, 178, 179, 182-199, 337-342, 350-352 and SAMFP 11, 29, 30, 36-43].

These undisclosed cases of *Quraishi, Robison, Ramsey, Smith* and *Qandah* confirm the impropriety of qualified immunity. This is clearly an institution that does not respect the rights of the American citizens that it detains, and it is being called to answer for that again and again.

### F. Exact Medical Condition Need Not Be Known

Finally, Plaintiff directs this Court to *Barton v. Taber, et al.*, 820 F.3d 958, 965-966 (8th Cir. 2016), when considering the exact extent to which the individual Defendants actually needed to know of Mr. Leonard's medical condition. In *Barton*, the Eighth Circuit found that a pretrial detainee's right to medical care was well-established and there was no qualified immunity for its denial when the inmate died due to a heart condition that was unknown to the officer. ("[T]he complaint was not required to allege that Owens knew of Barton's heart condition, only that Barton showed obvious signs of an objectively serious medical need.") Many cases were compiled in the decision, such as *Vaughn v. Gray,* 557 F.3d 904, 909 (8th Cir.2009) (denying qualified immunity to officers claiming they thought a prisoner's vomiting "was caused by the ingestion of shampoo")

and *McRaven v. Sanders,* 577 F.3d 974, 981 (8th Cir. 2009) (denying qualified immunity where an inmate exhibited symptoms of severe intoxication and overdose). *Barton* at 965. Mr. Leonard's medical needs were obvious to the Defendants. [PSUMF 9, 11-13, 15, 18, 19, 28, 35-42, 45, 48, 49, 54, 66, 68, 74, 98, 99, 101, 161, 166, 182-199, 342, 350-353 and SAMFP 11, 29, 30, 42].

## III.    COUNT 1: OVERWHELMING EVIDENCE OF *MONELL* LIABILITY

Before addressing qualified immunity, however, Plaintiff has presented overwhelming evidence that his constitutional rights were violated by SCCDOC through a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers per *Monell v. Department of Social Services*, 436 U.S. 658 (1978). See Docs. 99, 100, 101. Defendants' position is that this one incident does not show that there were unconstitutional policies, custom or inadequate training. Their argument is disconnected from, and does not even begin to address, the overwhelming evidence in this case. See Doc. 101. <u>Defendants completely ignore that their acting Director and non-retained expert for this case testified that their conduct violated appropriate correctional practices as asserted by Plaintiff and his expert and were, thus, unconstitutional.</u> [PSUMF 247, 254-256, 269-273, 284-287, 333-335, 342, 347, 348]. Director Keen established that the policies were so bad that they must be changed but were not, even years later. [PSUMF 282, 285, 287-290, 342]. Not only did Defendants know of prior correctional officer misconduct causing injury to detainees and fail to take action, they did not even investigate the instant case. [PSUMF 231-237, 245, 253, 254, 256-259, 342]. Instead, they ratified and praised the individual Defendants for their unconstitutional conduct. [PSUMF 238-248, 342, 346, 353]. Defendants' conduct is *so* bad, Keen would have inquired of intentional retaliation by Defendants Harris and Fisher against Mr. Leonard for Leonard's grossly aberrant behavior the night before. [PSUMF 236, 237, 342]. This is not a close call, summary judgment for SCCDOC should be denied and summary judgment for Plaintiff should be granted.

Again, *Monell* liability arises in this case on multiple grounds: (1) post-incident ratification, (2) unconstitutional policies, (3) deliberately indifferent failure to train and supervise, and (4) unconstitutional unofficial customs. The unconstitutional practices of SCCDOC is likely the reason for many other and similar claims against the SCCDOC. Defendants' assertion that its policies are just fine and there have been no other claims is simply false. See Docs. 100 (section III), 101. Plaintiff established that, at the time of the incident, policies were not enforced and training was not performed. Director Keen agrees that it is a "fair assumption" that there was "obviously" a "problem with adhering [to] policy" before he took over as Director of SCCDOC. [PSUMF 270]. Director Keen had to "get back to policies" and train all officers on the "appropriateness of the use of force", including Suicide Prevention Officer Donte Fisher (hereinafter, "Fisher") and Officer Steven Harris (hereinafter, "Harris"). [PSUMF 272]. In an incredible admission, Director Keen testified that after the instant incident, he had to make changes to get the SCCDOC "in line to make sure we're following what a planned use of force is and we're making sure we're calling [Defendant's] medical department prior to any use of force." [PSUMF 273].

## IV.    COUNT 2: EXCESSIVE FORCE – NO QUALIFIED IMMUNITY

Defendants Harris, Fisher, Baker and Martin are not entitled to qualified immunity from Plaintiff's 42 U.S.C. § 1983 excessive force claims. Plaintiff cannot and does not recite every painstaking fact demonstrating these individual Defendants' failures, because then this brief would exceed fifty pages. Instead, factual summaries are given with citations, *infra*. For each individual Defendant, it was sufficiently clear that a reasonable official would have understood that what he or she did violated Mr. Leonard's rights at the time and that this planned use of pepper spray

against Mr. Leonard was objectively unreasonable. For each of the below examples, recall that the unnecessary cell search should never have happened in the first place. [PSUMF 71].

### A. Defendant Harris

Defendant Harris actually performed the use of force on Mr. Leonard. [PSUMF 117]. When Defendant Harris pepper sprayed Mr. Leonard, Mr. Leonard was handcuffed, which is well-known to be objectively unreasonable in the corrections industry. [PSUMF 117, 118]. He pepper sprayed Mr. Leonard approximately one foot from his face, which he knew could effectively tattoo an inmate's eye with pepper and other irritation particles. [PSUMF 124-126, 303, 344, 345]. The video of the cell shows that Defendant Harris could never have put at least three feet of distance between the pepper spray canister and Mr. Leonard. [PSUMF 124-126, 303, 344, 345].[7] To that point, a variety of other use of force methods were available to trained martial artist Defendant Harris, including the lesser use of force of pressure point control tactics, but Defendant Fisher said to use pepper spray, so Defendant Harris readied his pepper spray. [PSUMF 80-82, 107, 348 and SAMFP 15, 16, 17, 18, 19, 20, 27 32].[8] Somehow, presumably through a lack of study, Defendant Harris wrongly believed that pepper spray was considered a lesser use of force than pressure point control tactics as late as February 5, 2020. [SAMFP 21].

Defendant Harris understood that he was not supposed to immediately rush into conflict with a mentally unwell inmate if the inmate was not a danger to himself or others. [SAMFP 23]. He was even trained to have more patience with inmates who are schizophrenic, might be suicidal or have strange behavior given that people under the influence of drugs and people with mental health conditions are two of the four statistically high-risk groups that jails hold. [PSUMF 56 and

---

[7] Defendants' counsel promised to provide the dimensions of Mr. Leonard's cell to Plaintiff's counsel, but Defendants' counsel did not provide that information to Plaintiff's counsel as promised.

[8] As discussed, *supra*, the fact that Defendant Harris was instructed to pepper spray Plaintiff does not in any way shield Defendant Harris from liability. *Quraishi* at 837.

SAMFP 24, 26]. Indeed, for a planned use of force, Defendant Fisher taught Defendant Harris that he was supposed to get medical information on the inmate prior to using pepper spray. [SAMFP 10]. Although he was supposed to check with Medical in advance of using pepper spray, he did not do so. [PSUMF 87-89, 343]. Damningly, it is clear that Defendant Harris sprayed Mr. Leonard in the face to prevent him from exiting his cell, not to prevent himself from being attacked. [SAMFP 28]. As Director Keen agrees, the use of force was entirely uncalled for by Mr. Leonard's resistance (ignoring the fact that the cell search at that time should not have happened in the first place). [PSUMF 112-122, 139, 271, 290, 342, 344]. Director Keen thinks it incredible that the circumstances of the pepper spray use without authorization even occurred. [PSUMF 83-85, 342-349]. Defendant Harris has not learned his lesson, denying his bad conduct in this case and then pepper spraying an innocent inmate in 2020. [PSUMF 245, 247, 257-259]. And he should be immune? What message does that send to Defendant Harris – and our community – if he is?

## B. Defendant Fisher

Defendant Fisher organized and directed the planned use of force against Mr. Leonard. [PSUMF 79, 80, 348]. Defendant Fisher instructed Defendant Harris to have his pepper spray unholstered, in his hand and ready to use on Mr. Leonard prior to entering Mr. Leonard's cell on the suicide prevention unit "as a precaution in case [Mr. Leonard] imploded" and "as [a] distraction" or "scare factor". [PSUMF 81]. Mr. Katsaris and Director Keen surmised it may have been done to retaliate against Mr. Leonard for his conduct the night before. [PSUMF 237]. Defendant Fisher was not allowed to authorize this use of force by policy; instead, he was supposed to contact Defendant Baker, who was the person who had the authority to authorize the use of pepper spray on Mr. Leonard. [PSUMF 82-84, 346-348]. Although they had the time to do so and because Mr. Leonard was not an immediate threat to himself or others, Defendant Fisher (and Defendant Harris for that matter) did not consult Defendant Baker or consult Medical regarding

the planned use of force. [PSUMF 85, 229, 252, 263-274, 277-293, 334-337, 343, 346-348]. Like Defendant Harris, Defendant Fisher understood that there were other means that could have been employed to avoid the use of pepper spray. [SAMFP 4, 5, 6, 7, 8, 9]. Indeed, he could and should have avoided the cell search entirely, having already known that no threats were contained within Mr. Leonard's cell as a result of a cell search prior to Mr. Leonard being placed in the cell, and being able to easily monitor Mr. Leonard's cell as one of only five cells on the suicide prevention unit. [PSUMF 194 and SAMFP 13, 14].

### C. Defendant Martin

Given Mr. Leonard's medical conditions, Nurse Martin believed that Mr. Leonard should not have been allowed to have been pepper sprayed. [PSUMF 98, 100, 342]. She would have known that pepper spray causes, for approximately 30-45 minutes, a "painful burning sensation in the eyes, involuntary eye closure, profound tearing, visual impairment, and protracted redness; and psychological effects, such as fear, anxiety and possible panic." [SAMFP 1]. She knew there was a risk of injury in using pepper spray on Mr. Leonard given his medical condition even at the recommended distance. [PSUMF 97-103]. Despite this belief, Nurse Martin completely failed to convey that pepper spray should not be used against Mr. Leonard as a result of (a) acute psychosis and (b) uveitis/iritis. [PSUMF 65-68, 90, 100-101, 161, 342]. The way that she could have communicated with the suicide prevention officers – segregation reports – completely omitted mention of Mr. Leonard's eye condition, psychotic issues and whether he was disqualified from the use of pepper spray despite Medical having knowledge of these medical conditions. [PSUMF 62-68, 342]. As an on-duty nurse, this information should have been conveyed via segregation report or other means – such as when she visited Mr. Leonard mere hours before the incident when he threatened self-harm and wanted to die. [PSUMF 62-68]. Had she done that, Defendant Fisher

would not have ordered the use of pepper spray on Mr. Leonard and no injury would have occurred. [PSUMF 90].

### D. Defendant Baker

Defendant Baker was supposed to be supervising this entire occurrence. [PSUMF 84, 85, 171, 323, 342, 348]. Despite being *the* person who could authorize the use of pepper spray, Defendant Baker completely failed to supervise this entire, awful use of force situation. [PSUMF 84, 85, 171, 323, 348]. Abdicating her duty to authorize force to Defendant Harris in violation of policy (which resulted in severe permanent injury) does not concern Defendant Baker – she continues to approve of what her officers did to Mr. Leonard to date. [PSUMF 238, 245, 342, 346, 348]. Furthermore, even though cell searches on every shift change were completely unwarranted and harmful in the suicide prevention unit, Defendant Baker approved and oversaw this practice. [PSUMF 70, 71]. If Director Crawford did not have qualified immunity in *Ramsey* (at *4-5), then Defendant Baker does not get qualified immunity here.

## V.    COUNT 3: MEDICAL NEEDS – NO QUALIFIED IMMUNITY

Likewise, Defendants Harris, Fisher, Baker and Martin are not entitled to qualified immunity from Plaintiff's 42 U.S.C. § 1983 claims of deliberate indifference to his medical needs. For each individual Defendant, it was sufficiently clear that a reasonable official would have understood that what he or she did violated Mr. Leonard's rights, each of the individual Defendants knew of at least Mr. Leonard's psychosis if not his eye condition, and each of these individual Defendants deliberately disregarded the aforementioned serious medical conditions of Mr. Leonard (acute psychosis and uveitis/iritis as discussed more at length in Plaintiff's Memorandum in Support of his Motion for Summary Judgment).

## A. Defendant Harris

Defendant Harris knows that spraying an inmate entrusted to his care in the face with pepper spray affects their mucous membranes so inmates feel a burning sensation on their lips, through their nostrils, and their eyes, and any sensitive portion of their skin will start to burn. [SAMFP 22]. Defendant Harris knew that spraying an inmate in the face can affect that inmate's eyes for up to two hours. [SAMFP 29]. As the person who sprayed Mr. Leonard, Defendant Harris was required to ensure Mr. Leonard's eyes were washed out appropriately. [PSUMF 142, 143, 342]. Mr. Leonard was still attempting to wash the pepper spray out his eyes in a sink instead of an eye wash station when Defendant Harris left him behind. [PSUMF 145-147, 350-352 and SAMFP 30]. He did not even bother to document that he left Kristian Scott in charge of Mr. Leonard's pepper spray aftercare in violation of St. Charles' policy. [PSUMF 147-151 and SAMFP 31]. Defendant Harris obviously just did not care about Mr. Leonard's aftercare, which contributed to Mr. Leonard pulling out his eye. [PSUMF 148, 152, 350-352].

## B. Defendant Fisher

It is St. Charles DOC's policy that the only time that Medical is required to be contacted is when there is a planned use of force, especially with the use of pepper spray. Defendant Fisher understood this policy and knew he was supposed to get medical information on an inmate before using pepper spray. [PSUMF 85-89, 91-93, 343 and SAMFP 10]. Although he had the time to do so, Defendant Fisher (and Defendant Harris for that matter) did not consult Medical regarding the planned use of force. [PSUMF 85, 88, 89]. It is undisputed that it would have taken less than one minute for Defendant Fisher to have learned about Mr. Leonard's eye condition and his mental health issues had he not already known about them. [SAMFP 3].

That said, Defendant Fisher and the other officers did know that Mr. Leonard was at least significantly mentally unwell, even if they did not know Mr. Leonard's exact medical condition –

similar to *Barton* at 965-966. [PSUMF 54, 61, 74, 101, 342, 348]. At Defendant Fisher's briefing with Officer Scott and Defendant Harris prior to searching Mr. Leonard's cell on July 22, 2017, Defendant Fisher informed them that Mr. Leonard had been acting strange and that they might need to be cautious in dealing with Mr. Leonard before they entered the cell for searches. [PSUMF 74, 79 and SAMFP 11]. Defendant Fisher had a problem with Mr. Leonard on July 22, 2017 before his planned use of force meeting because Mr. Leonard was acting strange: pacing, yelling, cussing, naked, standing on top of the bunk, and standing on the commode. [PSUMF 73]. During the shift change, Defendant Fisher noted that Mr. Leonard had continued to display erratic behavior by standing on his bunk nude, repeatedly flushing the toilet, shouting and banging his head on the door and walls. [PSUMF 74]. Defendant Fisher even claims that these disturbing behaviors were the impetus for having additional officers ready for a planned use of force during this completely unnecessary cell search. [PSUMF 75, 78, 237, 342].

### C. Defendant Martin

Defendant Martin had easy access to information regarding Mr. Leonard's extreme mental health situation, his eye disorder that would have precluded the use of pepper spray, his suicidal ideation, self-harm actions, and his need for medication. [PSUMF 9, 11-13, 15, 18-21, 28-42, 44-46, 48-52, 65, 66, 68, 98-100, 101, 158, 161, 342, 349]. After all, she was one of the people who decided to place Mr. Leonard on the suicide prevention unit. [PSUMF 53]. She did not bother, however, to note any of the health conditions that would have prevented Mr. Leonard from being pepper sprayed for the suicide prevention officers to read. [PSUMF 62-68]. So little did Defendant Martin care that she actually allowed Mr. Leonard to not receive *any* of his medications, causing or at least worsening his acute psychosis. [PSUMF 28, 29, 32-42, 45-49, 52]. She could have had him restrained or administered Haldol to him, which was in stock at the jail, but she just did not bother to call the on-duty psychiatrist. [PSUMF 44-52, 160-162]. The fact that Mr. Leonard was

easily sedated with Haldol by paramedics *after* he tore out his eye shows that this form of medicine would have helped. [PSUMF 51, 221, 222].

All of that said, she had another opportunity to prevent this tragedy from happening in this suicide prevention unit after Mr. Leonard was sprayed; in addition to correcting her failures described above, she simply could have ensured that Mr. Leonard was placed in a shower or brought to an actual eye wash station. [PSUMF 141, 167, 168, 342, 350]. She did not do any of these things. [PSUMF 141, 167, 168, 342, 350]. She just let him be left alone in a cell without medicines, without an actual eyewash station or real method of rinsing out his eyes, without restraints and without sedation. [PSUMF 160-162, 166-168, 178, 342, 350 and SAMFP 37]. Between 6:45 am on July 22, 2017 and when Defendant Martin arrived when Mr. Leonard was attempting to remove his eyeball from his eye socket, Defendant Martin had not even asked any SCCDOC employee whether Mr. Leonard's eye irritation from being pepper sprayed had improved, worsened, or stayed the same. [PSUMF 170, 179 and SAMFP 36].

The best and smartest practice in a suicide prevention unit is do no harm. After they failed this by pepper spraying the handcuffed Mr. Leonard, they must attempt to stop suicide or self-harm attempts by an inmate as quickly as possible, even if medical staff are not yet present. [SAMFP 38]. When Defendant Martin was called to respond to Mr. Leonard attempting to claw out his eye, there were at least four or five St. Charles employees in the hall outside of Mr. Leonard's cell watching and not intervening. [PSUMF 194-198, 217, 246, 342, 352, 353 and SAMFP 39-42]. From the time Defendant Martin arrived to respond to Mr. Leonard attempting to injure his eye and prior to Mr. Leonard actually removing his eyeball from his eye socket, no one attempted to constrain Mr. Leonard or tried to prevent Mr. Leonard from hurting himself. [PSUMF 199, 342, 352, 353 and SAMFP 40]. It was surprising to Defendant Martin that St. Charles'

employees had not tried to prevent Mr. Leonard from ripping out his eye. [PSUMF 212, 342, 352, 353 and SAMFP 41]. The St. Charles employees present at the time that she was coming down the hall to Mr. Leonard's cell to respond were watching Mr. Leonard's self-harm attempt through the window of Mr. Leonard's cell door in the suicide prevention unit. [PSUMF 194-198 and SAMFP 42]. Defendant Martin believed that a sufficient number of SCCDOC employees were present during Mr. Leonard's self-harm attempt on July 22, 2017 to have safely entered Mr. Leonard's cell prior to Mr. Leonard removing his eyeball from his eye socket. [PSUMF 210 and SAMFP 43]. This is not the suicide prevention unit that any of us want our loved ones to be in if they are mentally unwell. This was no different than watching an inmate try to hang himself. [PSUMF 352]. This is not constitutional in this country and no immunity should be granted.

### D. Defendant Baker

Defendant Baker was sitting just across the hall from Mr. Leonard's cell while he was tearing his eye out. [PSUMF 197]. Like her other subordinates, Defendant Baker made no effort to prevent Mr. Leonard from tearing his eye out. [PSUMF 199 and SAMFP 2]. She was supposed to be ensuring that Mr. Leonard was regularly being checked upon and protected from self-harm, which was easy with only five cells in the suicide prevention unit that could easily be viewed. [PSUMF 169, 194 and SAMFP 14]. At least she manages consistently – she did not bother to have Mr. Leonard's eyes decontaminated either. [PSUMF 141, 342, 350]. She let Defendant Harris leave instead of having him oversee the decontamination in violation of policy. [PSUMF 144-152, 342]. She was just an absent manager in one of the most important jobs a person can oversee – suicide and self-harm prevention. She oversaw the most egregious failure in a medical/physical crisis ever reviewed by one of the nation's top experts, Ken Katsaris. [PSUMF 214, 352]. Director Keen, the SCCDOC's non-retained expert and current Director, endorsed that opinion by Mr. Katsaris. [PSUMF 214, 333].

As to each of these individual Defendants, again note that Director Keen made numerous other admissions of the policy and constitutional violations by Defendants as outlined in Docs. 99, 100 and 101, which need not be repeated here. He clearly does not care to change policy anytime soon. [PSUMF 282, 285, 287-290]. That is why we have Courts, and Plaintiff needs this Court to make a statement that American citizens – especially pretrial detainees – still have their constitutional rights.

## VI.     COUNT 4: CIVIL CONSPIRACY – JOINT AND SEVERAL LIABILITY

While Plaintiff has attempted to parse out the analysis as to each individual Defendant, the entire point of a civil conspiracy count is that the co-conspirators are held jointly and severally liable for the result in which they participated. *Simpson v. Wks.*, 570 F.2d 240, 242–43 (8th Cir. 1978). "To prove a 42 U.S.C. § 1983 conspiracy claim, a plaintiff must show: (1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff." *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008). See also *Gunter v. Morrison*, 497 F.3d 868, 873 (8th Cir. 2007); *Dean v. Cty. of Gage, Neb.*, 807 F.3d 931, 939 (8th Cir. 2015); and *Small v. McCrystal*, 708 F.3d 997, 1010 (8th Cir. 2013). Furthermore, a court's finding that a constitutional violation can be proven also serves to defeat a qualified immunity defense at the summary judgment stage for the conspiracy claim. *Id.*

### A.  Conspiracy to Deprive Mr. Leonard of His Constitutional Rights

In this case, there was literally a meeting about the planned use of force in question that involved Defendant Harris and Defendant Fisher. [PSUMF 79-81, 342, 348, 349]. Defendant Martin's assent to this conspiracy to deny Mr. Leonard his rights involved her complete lack of interest in Mr. Leonard's proper medical care after the planned use of force as described *supra*. Defendant Baker's complete lack of interest in either the use of force or Mr. Leonard's medical

care was obvious when she surveyed the situation and just left the situation untouched so that it could grow out of control. [PSUMF 58-61, 82-108, 117-122, 130-160, 168-170, 342, 348, 349]. Finally, the complete whitewashing of the events here: no investigation, a cursory use of force review that day ratifying all conduct of the Defendants which has gone unchanged, and then a follow-up e-mail thanking <u>all</u> of the participants "for a job well done!" demonstrates that the entire SCCDOC system was more than perfectly fine with the individual Defendants' behavior. [PSUMF 242, 243, 342]. Finally, the "inconceivable" destruction of video evidence in this case that would have highlighted wrongdoing is part and parcel with the aforementioned whitewashing. See Doc. 97, Renewed Motion for Sanctions, pp. 4-6.

### B. Overt Act in Furtherance of the Conspiracy

Each of the individual Defendants contributed to this conspiracy as set forth *supra*. <u>Any</u> of these individual Defendants could have stopped their unlawful actions to ensure that Mr. Leonard's constitutional rights were upheld. As set forth, *supra*, Defendant Harris could have not pepper sprayed Mr. Leonard in his Reiter's syndrome eye or at least abided by decontamination policies and training. [PSUMF 2, 81-100, 105-128, 131-152, 342, 351]. Defendant Fisher could have simply not ordered this planned use of pepper spray or conducted the cell entry differently. [PSUMF 73-90, 109-130, 342]. He, too, could have seen to the proper decontamination of Mr. Leonard's eye. [PSUMF 131-142, 152, 155-158, 168-170, 342, 351]. Defendant Martin could have given Mr. Leonard his medications, sedated him, had him restrained, informed the officers of his medical conditions, or ensured that Mr. Leonard's eye was properly decontaminated. [PSUMF 2-7, 10-13, 15, 24-34, 43-52, 62-69, 90, 99, 136, 138-141, 144-146, 154-170, 178, 179, 342, 350-353]. Defendant Baker could have shown the slightest interest in the suicide prevention unit to ensure that the other individual Defendants were behaving constitutionally and not hurting their charges, had Mr. Leonard's eye decontaminated after the use of pepper spray, or, at a minimum,

not literally sat by while Mr. Leonard tore his eye out in her suicide prevention unit and then ratified all her officers' conduct in her use of force review completed before Mr. Leonard was even done being treated at the hospital for the injury. [PSUMF 54-61, 73-104, 107-128, 130-160, 167, 168, 182-195, 195-217, 223, 338, 342, 350-353 and SAMFP 39-43].

### C.  Injury to Mr. Leonard

This is a rare case wherein Mr. Leonard's injuries have been directly tied to the Defendants' failures by completely unchallenged experts, one of whom was endorsed by Defendants' "non-retained" expert, Director Keen. [PSUMF 332, 333, 337, 342, 351]. As a result, the expert consensus is that Mr. Leonard would not have lost his eye had these individual Defendants not deprived him of his constitutional rights. [PSUMF 50, 337, 340, 342, 351]. There were so many opportunities for this result to be avoided, but the individual Defendants failed at every turn. [PSUMF 9-13, 15-21, 24-29, 32-35, 43-52, 58-61, 64-69, 71, 81-93, 98-106, 117-127, 131-137, 141-152, 155-162, 166-168, 174-177, 182-185, 193-199, 202-215, 217, 221-227, 247, 250, 252, 255, 256, 263-273, 281-288, 291-308, 312-330, 334-341, 342-353].

### VII.  CONCLUSION

The scope of the Defendants' constitutional deprivations in this case caused "a total disregard of the correctional mission" – especially given that Defendants were charged with preventing harm to Mr. Leonard on a suicide prevention unit. [PSUMF 247, 342-353]. The individual Defendants show no ounce of remorse. [PSUMF 231, 232, 238, 242, 243, 245, 246, 352, 353]. Instead, they assert their conduct was proper and filed a meritless Motion for Summary Judgment, which includes a frivolous claim of administrative exhaustion and none of the many contrary cases to their position. The only way to stop Defendants is a ruling making them take responsibility for their actions. The American public, including the people of St. Charles County,

deserve better from their government, which is why Mr. Leonard and every American citizen has the right to make constitutional claims. This Court is the last bulwark against tyranny.

For the reasons set forth herein, Plaintiff respectfully requests that Defendants' Motion for Summary Judgment be DENIED and summary judgment GRANTED for plaintiff against the individual Defendants as the nonmovant under FRCP 56(f)(1).

Date:   May 20, 2021

Respectfully submitted by,

**DONNER APPLEWHITE,**
**ATTORNEYS AT LAW**

**BURGER LAW, LLC**

By:  /s/ Thomas R. Applewhite
　　Thomas R. Applewhite, #64437MO
　　Steven A. Donner, #63789MO
　　906 Olive Street, Suite 1110
　　St. Louis, Missouri 63101
　　Phone:　(314) 293-3526
　　Fax:　　(888) 785-4461
　　Email:　tom.applewhite@da-lawfirm.com
　　　　　　steve.donner@da-lawfirm.com

*Co-Counsel for Plaintiff*

By:  /s/ Gary K. Burger
　　Gary K. Burger, #32460MO
　　500 N. Broadway, Suite 1860
　　St. Louis, Missouri 63102
　　Phone:　(314) 542-2222
　　Fax:　　(314) 542-2229
　　Email:　gary@burgerlaw.com

*Co-Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I certify on May 20, 2021 that a true and correct copy of the above and foregoing document was filed with the Clerk of Court, which sent a copy to all counsel of record.

/s/ Thomas R. Applewhite