# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | | |
|---|---|---|
| **JAMIE LEONARD**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:19-cv-00927-MTS |
| | ) | |
| **ST. CHARLES COUNTY, STEVEN HARRIS, DONTE FISHER, LISA BAKER,** and **THERESA MARTIN,** | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## REPLY BRIEF IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

COMES NOW plaintiff, Jamie Leonard (hereinafter "Plaintiff"), and submits this Reply Brief in Support of his Motion for Summary Judgment.

**I.    Defendant's Response simply ignores that Director Daniel Keen admitted Plaintiff's case to this Court.**

Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment (hereinafter, "Defendant's Response") states: "[The] St. Charles County Charter vests legislative powers … in the Director of the Department of Corrections." Doc. 111, p. 4. Other than underscoring his testimony constitutes binding admissions of Defendant and the importance of Defendant's Director Daniel Keen's opinions*, not one sentence of Defendant's Response addresses the many ways that Defendant's Director admitted liability and causation in this case*. There is no discussion of it and no distinguishing Director Keen's admissions or other defense at all. The closest Defendant gets to addressing these admissions is an "Objection as this is not a statement of fact but the conclusions of Mr. Keen[.]" and the like in Defendant's Response to

Plaintiff's Statement of Material Uncontroverted Facts[1]. [DRPF 44, 71, 102, 108, 113, 118, 120-122, 152, 157, 185, 211, 213, 215, 241, 270-271, 282]. Defendant asserts the sworn testimony of its very top official is "irrelevant." Director Keen is also endorsed as an expert by Defendant in this case – its only expert on liability issues. [DRPF 332-333]. Defendant's objections are not well taken as Director Keen did admit facts and liability in this case. FRE 801(d)(2) makes statements of a party opponent admissible – whether those statements are fact or opinion. Defendant's objections are really that Director Keen's opinions are harmful, and those party opponent and expert admissions are on such stable ground that Defendant cannot substantively attack or distinguish them.

Admissions of a party opponent are evidence. For example, in Plaintiff's settlement agreement with former defendant Katie Garofalo, her statements are to be treated as admissions of a party opponent in this case. Exhibit 40 – Settlement Agreement with Katie Garofalo, p. 2. The Agreement states, in relevant part: "Plaintiff's counsel and [Defendant's counsel] stipulate by their signatures below that, during any trial in the Litigation between Plaintiff and [Defendant]: (1) Defendant's [Katie Garofalo's] written discovery responses, deposition testimony, and other statements shall be considered admissions of a party opponent[.]" Exhibit 40, p. 2.[2] If Corporal Garofalo's statements qualify as admissions of a party opponent, then certainly the statements under oath of the Director of the Department of Corrections, in whom legislative powers are vested and whom Defendant has designated as its own expert, also qualify as admissions of a party opponent. Director Keen's testimony meets all requirements of FRE 801(d)(2).

---

[1] Reference to Defendant's Response to Plaintiff's Statement of Material Uncontroverted Facts (Doc. 110) herein is abbreviated as "DRPF".

[2] Despite these promises, Defendant also now is trying to claim that Corporal Garofalo's statements are merely her conclusions and not evidence in this case [DRPF 267, 294, 296, 302], hence the need to bring forth this settlement agreement into the record.

Defendant did not challenge Plaintiff's experts under *Daubert* because it could not do so. Director Keen was *intended* to rebut Plaintiff's retained experts, and he agreed with them. The silence of Defendant's Response as to this matter speaks volumes. Director Keen's testimony is overwhelming evidence of Defendant's liability – a proposition Defendant does not contradict (or even mention).

II. **Defendant's Response ignores much of Plaintiff's case against it for deliberate indifference to Plaintiff's serious medical needs.**

Continuing with that tact, Defendant also chose to not respond to Plaintiff's case against it for deliberate indifference to Plaintiff's serious medical needs. The only arguments in the ***entire*** Response that address Plaintiff's arguments in this regard are:

> "Plaintiff has nothing more than hyperbole to support his claim that … failure to provide adequate medical care was so pervasive and rampant within the St. Charles County Department of Corrections as to constitute an unofficial custom. What Plaintiff points to, in support of his claim, is merely the unsupported allegation of other inmates attempting to bring suit against St. Charles County. As examples of excessive use of force or failure to provide adequate medical care, Plaintiff points to Smith v. St. Charles County and Quandah v. St. Charles County--both of these matters are currently on appeal before the Eighth Circuit Court of Appeals; Ramsey v. St. Charles County, which was settled, with no admission of guilt by either party; and Potter v. Echele, in which St. Charles County currently has a motion for summary judgment pending. Additionally, Plaintiff relies on the unsupported grievances of inmates, as well as one use of force in which there was not a finding that excessive use of force was administered." Defendant's Response, Doc. 111, pp. 9-10.

Neither the Response nor Memorandum in Support of Defendants' Motion for Summary Judgment (Doc. 103) really even discuss (a) the failure to note Plaintiff's medical unfitness to be pepper sprayed, (b) the failure to administer Haldol injections, (c) the failure to timely contact a psychiatrist, (d) the failure to administer Plaintiff his psychiatric medications, (e) the failure to administer Plaintiff his eye medication, (f) the failure to administer Plaintiff his Suboxone, (g) the failure to otherwise restrain Plaintiff in his cell before his eye was torn out, (h) the failure to decontaminate Plaintiff's eye post-pepper spray, and (i) the failure to intervene while Plaintiff was

3

actively tearing out his eye over the course of minutes while Defendant's staff just watched it. Defendant has had the opportunity to explain itself, and it has failed to do so with facts or law. This underscores the strength of Plaintiff's Motion.

**III.      Plaintiff has produced significant evidence that St. Charles County has adopted many unconstitutional customs.**

Defendant exaggerates Plaintiff's evidence of custom as "hyperbole." In truth, Defendant engaged in an obvious and intentional minimization of the evidence in this case, such as ignoring the fact that Director Keen essentially admitted Plaintiff's case as set forth extensively in the entire first one-third of Plaintiff's Memorandum in Support of his Motion for Summary Judgment. Defendant further minimizes the evidence against it by claiming that Plaintiff merely has brought forth unsupported allegations of other inmates attempting to bring suit against St. Charles County. However, there is no genuine dispute to the great weight of evidence supporting this presented by Plaintiff or the uncontroverted testimony of Plaintiff's expert and Director Keen. Defendant identified numerous instances of excessive force and deliberate disregard of inmates' serious medical needs even outside of those cases of formal litigation, with parallels to the instant case. For example:[3]

A.      **Attacked by an Officer While Handcuffed**. On February 28, 2019, an inmate complained that Defendant's correctional officer "used excessive force during my takedown and got a cheap shot off after I was in cuffs." Defendant's only reply to this was "Unfortunately, there are no cameras in the shower to prove your accusation." Exhibit 37, Defendant's Bates 1377. Here, Defendant admits that Plaintiff was pepper sprayed while wearing handcuffs. [DRPF 117]. Director Keen admits that pepper spray should not be used on a handcuffed person (i.e. unconstitutional), but Defendant implies this should be disregarded. [DRPF 118].

---

[3] Each of the below examples come directly from Exhibit 37, which are Defendant's records.

**B.     Beaten and Told to Express Gratitude for Free Inadequate Medical Care**. On January 29, 2017, an inmate complained he was refused emergency medical care on January 27, 2017. The inmate stated that the "officers caused [him] to hit his head on the toilet, reinjured [his] left shoulder, and slam[med] me on my back when the[y] aggressively carried me to the cell F-POD 2. [P]lus, [I] had been maced. Nurse never responded to check on me on the shift [I] got injured on." Defendant's Nurse Debbie Echele told him that he should "cooperate with security procedures" next time and should be grateful because "Federal inmates to get charged $10 co-pay for the doctor but you get medications for free." Exhibit 37, Defendant's Bates 1422. Macing without medical care is what caused Plaintiff's injury here.

**C.     Allergic to Pepper Spray and Medical Does Not Care**. On July 8, 2018, an inmate complained, "[P]lease assist[.] [I] think [I] may be allergic to [pepper spray]. [M]y right [tonsil] is swelling after exposure to [pepper spray] in my pod. [T]his is the 2nd time since [I've] been here so [I] think the spray is the trigger." Nurse Debbie Echele merely stated in response, "You will need to be seen for Nurse Sick Call if you experience a "swollen tonsil" after "pepper spray" is used. Notify Medical if this happens again. Thank you." The quotation marks by Nurse Echele indicate that she was mocking the inmate's pepper spray allergy. Exhibit 37, Defendant's Bates 1408.

**D.     A Nurse Inmate Treated Worse Than a Dog**. On December 25, 2018, one inmate complained, "[I] have been a nurse for 16 years and wouldn't treat my dog the way I was treated today." She went on to discuss the ways that she had not received medical treatment, including being told that she would not be given access to a doctor because she would not endure further mistreatment from Medical. In response, Nurse Debbie Echele said that she would "talk with the two nurses involved." Then, Nurse Echele saaid, "We practice "evidence-based" medication and

5

treatment and they did not see any evidence of infection." Without any indication of follow up with those two nurses, Nurse Echele promptly closed the claim two seconds later. Exhibit 37, Defendant's Bates 1411-1412.

E. **Completely Innocent Inmate Pepper Sprayed**. On February 13, 2020, an inmate was pepper sprayed without cause. Exhibit 37, Defendants' Bates 1358-1359. A follow-up investigation confirmed that this inmate was wrongfully pepper sprayed. Id. at Defendants' Bates 1360-1361. Defendant Steven Harris was one of the officers involved in the incident. Id. at Defendants' Bates 1364.

F. **Inmate Pepper Sprayed for Complaining He Was in Fear for His Life**. On September 18, 2017, an inmate complained that he was in fear for his life. After he persisted in his complaint, and while his hands were behind his back, he was pepper sprayed and no follow up medical attention was provided for him. The complaint was assigned to Lieutenant Michael McKee, which was then assigned to "None." The record reflects no further action was taken in response to this complaint. Exhibit 37, Defendant's Bates 1421.

G. **Lieutenant McKee Ignores Another Complaint of Excessive Force**. On May 20, 2019 and May 27, 2019, an inmate complained of excessive force used against him. After clarification by the inmate that, yes, this incident involves Defendant's employees, Lieutenant Michael McKee simply responded that "All Use of Force incidents are reviewed." and closed the complaint. Exhibit 37, Defendant's Bates 1378.

H. **Threatened with Pepper Spray for No Reason**. On July 27, 2017, an inmate complained that an officer "was rude for no reason" and "also threatened to mace me" even though "[she] did nothing to provoke this." Exhibit 37, Defendant's Bates 1420.

Complaints in litigation are just as valid as those complainants who never filed suit. In the face of many complaints, Defendant contends it has never done anything wrong in any way – until of course its Director and employees are deposed and admit many egregious deviations of accepted correctional practice. It seems Defendant's position would be that if it settled every claim of litigation, then there would be no available evidence of an unlawful custom for this Court to consider. Setting aside the exhaustively-discussed causes of *Quraishi v. St. Charles County*, *Robison v. Clawson*, *Ramsey v. St. Charles County, Smith v. St. Charles County* and *Qandah v. St. Charles County*, the following complaints against the institution were adduced in discovery, again with parallels to this case:

**I.** **Medical Complaints Just "Bitching Too Much"**. On February 8, 2017, an inmate complained that, in response to his medical complaints, "[he] was ridiculed, and told that [he] "bitched too much" and that he was "being a crybaby."" Exhibit 37, Defendant's Bates 1510. On June 7, 2017, the inmate was told by Medical that they had "lost" his medication while laughing at him. Id. at Defendant's Bates 1511. Around September 2017, despite informing Nurse Debbie Echele and Nurse Theresa Martin that he had blood in his stool, the inmate complained that no medical care was provided to him. Id. On November 8, 2017, the inmate complained that he was told that he needed to wait to get a "very serious medical problem" fixed because the jail "does not want to pay for such expensive medical treatments." Id. at Defendant's Bates 1512.

**J.** **Savagely Beaten Inmate's Collapsed Lung Ignored**. In the summer of 2018, a pre-trial detainee inmate was allowed to be savagely beaten by other inmates, and then his medical needs were completely ignored. Later only found guilty of a misdemeanor driving violation, the inmate was forced to stay in solitary confinement for days with a collapsed lung from the beating that later required surgical intervention. Exhibit 37, Defendant's Bates 1535-1538.

**K.** **Inmate Dies of Stroke after Medical Needs Ignored**. In the summer of 2016, a pre-trial detainee's high blood pressure and symptoms consistent with stroke were ignored by Medical. The charges for which the inmate was being detained while awaiting trial were later dropped. Exhibit 37, Defendant's Bates 1500-1501.

The above instances are not hyperbole. These are real complaints that a jury could hear from real people (the final inmate excluded since he died in the custody of Defendant). That Defendant is steadfast that these are proper ways to treat detainees and its practices are constitutional does not make them so. Defendant maintains an unlawful custom of casually allowing excessive force against Defendant's inmates, denying adequate medical care to those inmates, and then failing to investigate those failures and ratifying or supporting the conduct.

**IV.    Post-incident ratification is a valid legal theory and should be applied to this case.**

Defendant's main argument against ratification is the following quote from the 2015 decision, *Lollie v. Johnson*:

> "Plaintiff concedes that the Eighth Circuit has not expressly recognized a post-incident ratification theory under Monell. (See Pl.'s Obj. at 8 [Doc. No. 17].) Nonetheless, Lollie argues that his novel Eighth Circuit claim meets the threshold pleading standard required by other circuits that have recognized the post-incident ratification theory. (See id.)"

*Lollie v. Johnson*, No. 14-CV-4784 SRN/HB, 2015 WL 3407931, at *7 (D. Minn. May 27, 2015). While the quotation above actually shows that the post-incident ratification theory has not been rejected, *Lollie* is but one District Court in the Eighth Circuit that discusses ratification. Last year, Judge Jean Hamilton noted facts asserted in a plaintiff's complaint regarding post-incident ratification when refusing to dismiss a plaintiff's § 1983 civil conspiracy count.[4] *Hall v. City of St.*

---

[4] Defendant makes no argument regarding Plaintiff's civil conspiracy count in its Response, but the purpose of mentioning this case is to show that post-incident ratification is at least being considered in this very District. The particular allegations in the complaint that were considered as a part of the analysis

*Louis*, 465 F. Supp. 3d 937, 946 (E.D. Mo. 2020). Furthermore, it has been acknowledged that, when an officer's conduct is reviewed and approved by a municipality's authorized policymakers, "their ratification would be chargeable to the municipality because their decision is final." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). The municipality could be held responsible because "an unconstitutional government policy can be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business." *Davison v. City of Minneapolis*, 490 F.3d 648, 659 (8th Cir. 2007).

To that second point, Defendant goes on to say that Nurse Echele is not one of the highest officials responsible for setting policy in that area of the government's business. Defendant's Response, Doc. 111, pp. 4-5. Instead, Defendant notes that the Director is responsible for setting policy in that area of the government's business. Id. Conveniently, Defendant ignores the willful blindness of the then-acting Director Crawford; the current Director Keen admits that the use of force should have been investigated, but it was not, and that each level of authority in Defendant ratified Defendant's conduct against Mr. Leonard. [DRPF 232, 235, 241].[5]

V.      **Plaintiff has alleged that more than one policy was unconstitutional.**

Defendant wrongly claims that Plaintiff points to only to one unconstitutional policy of Defendant. Defendant's Response, Doc. 111, p. 5. This misstatement of fact continues a pattern of Defendant ignoring what its own Director and expert says, who agreed with Plaintiff's retained

---

are: "Plaintiff additionally alleges that "[i]n a press conference held on September 18, 2017, even though Defendant O'Toole knew [Plaintiff] was seriously injured by fellow officers, he told the media 'I'm proud to say the City of St. Louis and the police owned the night. Our officers are doing outstanding work." Id. ¶ 54. Plaintiff alleges that such statements show a ratification of the unlawful conduct of the officers at the scene. Id. Plaintiff additionally asserts that Defendant O'Toole promoted Defendant Marcantano even though he had been identified as participating in the beating of Plaintiff. Id. ¶ 61"

[5] The response to ¶ 232 of the PSUMF is "Admit", while the response to ¶¶ 235 and 241 of the PSUMF is merely to say that Defendant's own Director's (and own expert's) opinions are irrelevant and immaterial. Defendant does not even deny ¶¶ 235 and 241 of the PSUMF.

expert Ken Katsaris as discussed in the first one-third of Plaintiff's brief that was apparently ignored by Defendant. Plaintiff's Memorandum in Support, Doc. 99, pp. 1-13. Furthermore, Defendant ignores the many unconstitutional polices that were actually referenced by Plaintiff in his Memorandum in Support, Doc. 99, pp. 25-28:

  **A.**  **Policy Allowing Failure to Intervene**. Plaintiff cited how Defendant's policy did not require adequate custody staff in the suicide prevention unit. Indeed, Plaintiff expressly discussed how none of Defendant's policies talk about mental health or how actions should be different for an inmate with psychological issues. That is a problem in a suicide prevention unit. Furthermore, Defendant's policies did not state that staff are required to go into a cell of someone who could potentially cause harm to others or himself immediately in a suicide prevention unit. This created an ambiguity as to when intervention should occur in a circumstance like an inmate tearing his eye out in Defendant's suicide prevention unit.

  **B.**  **Lack of Policy Focused on Use of Force in Mental Health Situations**. In addition to the failure of these policies that allow a failure to intervene in a mental health crisis in a suicide prevention unit, Defendant admitted that it does not have *any* policy, including a use of force policy, that focuses on inmates with mental health issues. Even though Director Keen admits that inmates with mental health conditions should be treated differently, Defendant's policy is so deficient that it allows for inmates having psychotic episodes to be pepper sprayed.

  **C.**  **The "If the Situation Allows" Policy**. The "if the situation" allows policy was discussed by Plaintiff. This is the policy that only requires Defendant's officers to check with Medical "if the situation allows" instead of having a "planned use of force" standard. As discussed in Plaintiff's Memorandum, this makes the policy constitutionally deficient in that it allows for subjective decision making. As admitted by Defendant's corporate representative, who was

coincidentally Nurse Echele in this case, not even the "if the situation allows" policy was enforced until Director Keen took over for Director Crawford in 2018, so Defendant's officers did not even know what "if the situation" allows even meant in July 2017. Regardless, however, the "if the situation allows" policy gives authority without supervisory authorization, which is not the recognized, trained, and accepted procedure in correctional facilities for a planned use of force. Unbelievably, Defendant cites the lack of an enumerated health conditions in the "if the situation allows" use of force policy as the reason for why it is inapplicable to Mr. Leonard. Defendant's Response, Doc. 111, p. 6. The fact that respiratory conditions or heart conditions in inmates are listed as the only examples of what Medical should consider before pepper spray is used – again, only "if the situation allows" – merely makes the policy even *more* deficient.

        **D.**     **Lack of Medical Conditions Cited in Policy**. In his Memorandum in Support, Plaintiff notes that Defendant's policy is deficient because the current pepper spray policy is unclear as to when Medical needs to be consulted and how to contact Medical prior to using pepper spray. The policy failure is so bad that Director Keen claimed he is planning to the policy to state that any subject has to be cleared prior to a planned use of pepper spray. As noted in Plaintiff's Memorandum, Director Keen has not updated the policies for years since he took over in 2018, and somehow that failure is COVID-19's fault.

        **E.**     **Failure to Enact NCCHC Standards Despite Citing to Them**. Nurse Echele, again in her role as a 30(b)(6) representative of Defendant's in her deposition, said that Defendant follows NCCHC standards despite not actually having written policies modeled after NCCHC standards, a deficiency that in and of itself ironically violates NCCHC standards as stated in Plaintiff's Memorandum in Support. Had Defendant actually followed the NCCHC standards as discussed in Plaintiff's Memorandum in Support, there would have been a mental health

professional on call more than two days per week. As Nurse Echele admitted, Defendant had no policy as to emergency psychiatric care at the time of this incident. Such a policy would have allowed for Mr. Leonard to receive timely mental health care that would have allowed for a timely restraints or Haldol injections, which were only used on Mr. Leonard <u>after</u> he tore his eye out. Furthermore, had the NCCHC standards been followed, there would have been a written policy requiring that Mr. Leonard's prescription medications be reviewed for appropriateness after gathering medical information regarding those prescriptions. As a result, Defendant failed to take the simple steps needed to verify the need for Mr. Leonard's eye medication, much less his psychiatric medication or his Suboxone. Finally, had the NCCHC standards been followed, there would have been a written policy regarding how Medical can or should convey necessary information to corrections officers or suicide prevention officers that are guarding, supervising and monitoring the inmates. Had there been a more effective policy, then the segregation reports would have advised the officers against the use of pepper spray on Mr. Leonard.

As set forth *supra*, Defendant's claim that only one unconstitutional policy of Defendant was cited in Plaintiff's Memorandum in Support is just flat-out untrue. These policy failures contributed to Mr. Leonard's loss of his eye as set forth *supra* and in his Memorandum in Support.

**VI. Defendant just ignores that its Director and own expert agreed that Defendant was deliberately indifferent with its training and supervision of employees.**

Once again, Defendant chooses to ignore the evidence in this case. Defendant wrongly claims that "Plaintiff cannot prove that the alleged inadequacies or the alleged failure to train reflects a deliberate and conscious choice by St. Charles County." Defendant's Response, Doc. 111, p. 7. In a rare turn of events in any case, much less a § 1983 case, Plaintiff's expert explicitly found such a complete failure of the institution, and then Defendant's expert and highest-ranking officer agreed with those contentions. Indeed, as discussed in prior briefing, Director Keen even

admitted that he had to get Defendant's employees "back to policies" because they were not trained and supervised. The existence of *admittedly* inadequate training before that point in time does not save Defendant from *Monell* liability.

Furthermore, the case cited by Defendant in this portion of its brief, *Teasley v. Forler*, 548 F. Supp. 2d 694 (E.D. Mo. 2008), was a case decided by Judge Hamilton, who has ruled against Defendant's motions for summary judgment on *Monell* liability not once, but <u>twice, this year</u> as discussed extensively in Plaintiff's prior briefs. Indeed, in both cases, Judge Hamilton found that from 2010 through 2017, this Defendant did not have policies, protocols or procedures in place to retain, record and track fully inmate complaints of being denied medical care. *Smith v. St. Charles Cty., Missouri*, No. 4:18CV171 JCH, 2021 WL 253998, at *8 (E.D. Mo. Jan. 26, 2021) and *Qandah v. St. Charles Cty.*, Missouri, No. 4:20CV53 JCH, 2021 WL 808857, at *8 (E.D. Mo. Mar. 3, 2021). How could such an institution seriously train and supervise its employees? The answer is that it could not, as is reflected in the pattern of similar constitutional violations by Defendant's untrained employees set forth in Section III of this brief, *supra*.

Finally, Defendant glibly – and wrongly – claims that "Plaintiff appears to be claiming St. Charles County Department of Corrections staff failed to supervise Plaintiff." Defendant's Response, Doc. 111, p. 8. It certainly would be simple to torch so feeble a straw man; that a suicidal inmate should be supervised on a suicide prevention unit is (or should be) a given. While this Court would not be served by reciting the contents of Plaintiff's other briefs here, it is crystal clear that Plaintiff has actually argued that <u>Defendant</u> failed to supervise its own officers. Defendant chooses to ignore that its top officer and own expert agreed with Plaintiff and then Defendant unbelievably misrepresents that "Plaintiff make no such claims [regarding inadequate supervision] in his Motion for Summary Judgment". To believe that, the record must be flat-out ignored.

## VII. Conclusion

Defendant admits that "[s]ummary judgment is appropriate against a party who fails to make a showing sufficient to establish that there is a genuine issue for trial about an element essential to that party's case. … The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Defendant's Response, Doc. 111, p. 3. Defendant's lawyers substitute their opinions for that of their own Director and expert in this case, Daniel Keen. As set forth in Plaintiff's contemporaneously filed Reply to Defendant's Responses to the PSUMF, Defendant goes so far as to contradict statements in its Responses to the PSUMF that were verbatim admitted in Defendant's April 29, 2021 Answer. Defendant's completely false assertions about the arguments and evidence in this case do not create a genuine issue for trial about any element of Plaintiff's case.

In conclusion, Defendant does not contest the gravamen or uncontested nature of Plaintiff's facts in support of his summary judgment or the inescapable result of applying those facts to well-established law in this Circuit. Summary Judgment for Plaintiff against Defendant St. Charles County is well-supported and should be granted by this Court. There should be a trial as to damages only for Defendant as requested by Plaintiff's motion.

| | |
|---|---|
| Date: June 1, 2021 | Respectfully submitted by, |

| | |
|---|---|
| **DONNER APPLEWHITE,** <br> **ATTORNEYS AT LAW** | **BURGER LAW, LLC** |
| By: */s/ Thomas R. Applewhite* <br> Thomas R. Applewhite, #64437MO <br> Steven A. Donner, #63789MO <br> 906 Olive Street, Suite 1110 <br> St. Louis, Missouri 63101 <br> Phone: (314) 293-3526 <br> Fax: (888) 785-4461 <br> Email: tom.applewhite@da-lawfirm.com <br> steve.donner@da-lawfirm.com <br><br> *Co-Counsel for Plaintiff* | By: */s/ Gary K. Burger* <br> Gary K. Burger, #32460MO <br> 500 N. Broadway, Suite 1860 <br> St. Louis, Missouri 63102 <br> Phone: (314) 542-2222 <br> Fax: (314) 542-2229 <br> Email: gary@burgerlaw.com <br><br> *Co-Counsel for Plaintiff* |

## CERTIFICATE OF SERVICE

I certify on June 1, 2021 that a true and correct copy of the above and foregoing document was filed with the Clerk of Court, which sent a copy to all counsel of record.

*/s/ Thomas R. Applewhite*