UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JAMIE LEONARD,              )
                           )
        Plaintiff,         )
                           )
    vs.                    )          Case No. 4:19-cv-00927-MTS
                           )
ST. CHARLES COUNTY, *et al.*, )
                           )
        Defendants.        )

## MEMORANDUM AND ORDER

This case involves the criminal justice system managing a mental health crisis, and the particulars of the case are difficult.  Indeed, at first blush, a listener hearing about the events that transpired could possibly conclude that the government officials involved in the case could partially be at fault and are partially to blame.  And, to an extent, some of their actions may be blameworthy to some degree.  But this Court does not stand in judgment of whether state actors do their jobs well or whether they could have done their jobs differently to bring about a better result.  Rather, in this case, the Court decides whether Defendants violated Plaintiff's clearly established constitutional rights.  After watching the videos of the events at issue, reviewing the undisputed facts and the briefing, and applying the established legal standards, the Court concludes that no Defendant violated Plaintiff's clearly established constitutional rights.  Accordingly, Defendants are entitled to judgment as a matter of law on all counts.

I.      **Background**

Plaintiff Jamie Leonard has experienced episodes of psychosis.  On July 19, 2017, he experienced one of these psychotic episodes.  After an encounter with officers of the Wentzville, Missouri Police Department ("Wentzville"), Wentzville officers took Plaintiff into their custody

and, later that same evening, transferred Plaintiff to the custody of the St. Charles County, Missouri Department of Corrections ("St. Charles DOC").  While confined at St. Charles DOC's Justice Center, Plaintiff was sprayed with oleoresin capsicum spray ("OC spray"), a chemical irritant some refer to as pepper spray, during a search of his cell.  Officers allowed Plaintiff to rinse off the spray.  But a short time later, once alone in his cell, Plaintiff, who had a preexisting eye disease and was mentally unwell, began to touch his left eye.  He repeatedly, but intermittently, pulled and scraped at his left eye so severely that he eventually removed it from its socket.  Though St. Charles DOC personnel quickly intervened, and emergency medical personnel transported Plaintiff to hospital for treatment, Plaintiff irreversibly had damaged his eye, and a surgeon later removed Plaintiff's left eye altogether.

Based on these events and his time in confinement with St. Charles DOC, Plaintiff brought suit against St. Charles County, Missouri ("the County") and four of its employees, corrections officer Steven Harris, suicide prevention officer Donte Fisher, sergeant Lisa Baker, and nurse Theresa Martin (collectively, the "Individual Defendants"), asserting claims under 42 U.S.C. § 1983 for violations of his constitutional rights.  In his Fourth Amended Complaint, Plaintiff asserts four counts, which the Court will address out of numerical order.  In Count Two, Plaintiff asserts the Individual Defendants violated his Fourth and Fourteenth Amendment rights "to be free from unreasonable seizures of his person and the use of excessive force."  Doc. [88] ¶ 208.  In Count Three, Plaintiff alleges the Individual Defendants violated his Eighth and Fourteenth Amendment rights by subjecting him to "deliberate indifference to his serious medical needs, in violation of his Eighth Amendment rights for inadequate prison care and Fourteenth Amendment rights to due process of law and to be free of punishment prior to adjudication of guilt."  *Id.* ¶ 225.  Lastly against the Individual Defendants, Plaintiff alleges in

Count Four that the individual Defendants conspired to violate his Fourth, Eighth and Fourteenth Amendment rights. *Id.* ¶ 231. As for Count One, Plaintiff alleges that Defendant St. Charles, County itself violated his Fourth, Eighth, and Fourteenth Amendment rights. *See Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658 (1978). He alleges "St. Charles maintains, condones, and is deliberately indifferent to unconstitutional policies, customs and practices of its Department of Corrections," and that those policies, customs, and practices "directly caused" his "constitutional deprivations." Doc. [88] ¶¶ 197, 202.

Plaintiff moved for summary judgment only on Count One against Defendant St. Charles County, except for the issue of damages. Doc. [99]; *see also* Fed. R. Civ. P. 56(a) (noting party may move for summary judgment on "part of [a] claim"). Defendants also moved for summary judgment. Doc. [92]. They seek it on all claims against them in their entirety.

## II.    Collateral Issues

### a.  *Motion for Sanctions*

Plaintiff has renewed its Motion for Sanctions against Defendant St. Charles because of the County's failure to preserve video footage from one camera outside of Plaintiff's cell. Doc. [97]. Plaintiff requests that the Court "presume that the destroyed information was unfavorable to Defendant when ruling on the parties' summary judgment motions pursuant to Rule 37(e)(2)(A)" or in the alternative give a proposed jury instruction requiring the jury to presume the information in the video would have been unfavorable to the County. *Id.* The Court previously denied Plaintiff's Motion for Sanctions without prejudice to allow Plaintiff further discovery to establish the intentionality of the failure to preserve. Doc. [59]; Doc. [85].

As the Court previously noted, the Federal Rules of Civil Procedure allow for Plaintiff's desired remedies "only upon [a] finding that the party acted with the intent to deprive another

party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2); *accord Morris v. Union Pac. R.R.*, 373 F.3d 896, 901 (8th Cir. 2004). In light of all the evidence and circumstances, the Court cannot conclude that Defendant St. Charles intentionally destroyed the recordings of this one particular camera. First, the St. Charles County Justice Center, where the events at issue unfolded, retains recorded video for twenty-eight to thirty days, at which point new video overwrites the oldest video. Thus, the video was overwritten by the system; there is no indication the video was deleted or destroyed in any other way. Second, the County's Department of Corrections maintains over two-hundred individual security cameras throughout the County's Justice Center. The County preserved and provided Plaintiff with all the video it had that showed Plaintiff, including the video of a Defendant spraying Plaintiff with OC spray and the video of Plaintiff self-harming his left eye. The video that has been lost is the footage from outside Plaintiff's cell at the time Plaintiff was inside injuring his eye, which seemingly would have shown officials' actions during Plaintiff's self-harming behavior. Absent any other indication that the failure to preserve this one camera's footage was nefarious, the Court finds it too great a leap to conclude the County saved and turned over all the plainly relevant footage but intentionally allowed this less relevant, at least on its face, footage to be overwritten with the intent to deprive Plaintiff of its use in this litigation.

Therefore, the Court will deny Plaintiff's Renewed Motion for Sanctions.

*b. Motion to Exclude*

Plaintiff also moves to exclude the affidavit of Lauri Smit "for nondisclosure and untimeliness." Doc. [106]. Defendants did not oppose this Motion. Accordingly, the Court will not consider the affidavit in ruling on the motions for summary judgment. *See* Fed. R. Civ. P. 37(c)(1).

- 4 -

III.     **Summary Judgment Standard**

Under Federal Rule of Civil Procedure 56, a court must grant summary judgment to a moving party "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party, but only if there is a "genuine" dispute as to those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Mere "metaphysical doubt as to the material facts" is insufficient to defeat summary judgment. *Id.* A party asserting that a fact is genuinely disputed must support the assertion by citing to particular parts of materials in the record. Fed. R. Civ. P. 56(c). A district court, however, is not "constrained to view only the evidence submitted by [the moving party] to support its summary judgment motion; the court c[an] consider any evidence in the record." *Terra Indus., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Penn.*, 383 F.3d 754, 759 (8th Cir. 2004); *accord* Fed. R. Civ. P. 56(c)(3) (providing court "may consider other materials in the record" besides just "cited materials").

In reviewing the record, a court must not weigh evidence at the summary judgment stage but instead should decide simply whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott*, 550 U.S. at 380. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* Thus, accurate videos of events in question can allow a court to determine how events transpired without weighing evidence. *See White v. Jackson*, 865 F.3d 1064, 1077 (8th Cir. 2017) (noting

that given "video and audio evidence" in the case, the court "need not accept [a party's] version of the facts"); *Coker v. Ark. State Police*, 734 F.3d 838, 843 (8th Cir. 2013) (reversing a grant of summary judgment because "[w]ithout the aid of video or an understandable audio recording, it is impossible to determine what happened . . . without weighing [the officer's] version of [the facts] against [the plaintiff's] story"); *Michael v. Trevena*, 899 F.3d 528, 533–34 (8th Cir. 2018) (finding genuinely disputed material fact precluded summary judgment on unlawful arrest claim because recordings were inconclusive and jury could reasonably adopt either the officers' or the plaintiff's version of facts); *see also Brown v. City of St. Louis*, No. 4:18-cv-00389-MTS, 2021 WL 2413364, at *7 (E.D. Mo. June 14, 2021).

## IV.      Facts[1]

Plaintiff was confined in the St. Charles DOC's Justice Center between July 19, 2017 and July 22, 2017. The lead-up to his confinement began when Wentzville officers first took Plaintiff into custody sometime on July 19, 2017 while Plaintiff experienced a psychotic episode. Doc. [110] ¶ 8. That same day, they took him to a local hospital where medical staff diagnosed his psychosis but deemed him "fit for confinement." Doc. [108] ¶ 21. Later that same night,

---

[1] The Local Rules of this District require a party moving for summary judgement to file a Statement of Uncontroverted Material Facts, which must "set forth each relevant fact in a separately numbered paragraph stating how each fact is established by the record, with appropriate supporting citation(s)." Rule 4.01(E). Each party opposing summary judgment must file a Response to Statement of Material Facts, which "must set forth each relevant fact as to which the party contends a genuine issue exists." *Id.* And the opposing party must support the dispute "with specific citation(s) to the record." *Id.* For their responses to numerous paragraphs in Plaintiff's Statement of Uncontroverted Material Facts, Defendants did *not* indicate that it contended a genuine issue existed, nor did it cite to the record showing a contradiction. Rather, Defendants simply objected, most frequently saying that many of Plaintiff's paragraphs violated Local Rule 4.01(E) because they stated multiple facts in a single paragraph—though many to which they object do not. In any event, Defendants did not dispute these facts nor provide the Court any citations in the record to suggest they are disputed, and the Court has not seen any contradictory evidence on the points discussed herein in its review of the admittedly vast record. Accordingly, the Court takes those facts discussed herein that Defendants did not dispute with citation as uncontroverted facts. *See, e.g.*, *DaPron v. Spire, Inc. Ret. Plans Comm.*, 377 F. Supp. 3d 946, 950 (E.D. Mo. 2019) (finding objections plaintiff raised "that d[id] not cite to the record" were "ineffective for purposes of establishing a genuine factual dispute"), *aff'd*, 963 F.3d 836 (8th Cir. 2020); *Benford v. Schneider Nat'l Carriers, Inc.*, No. 4:19-cv-00550-MTS, 2021 WL 3033346, at *2 (E.D. Mo. July 19, 2021) (deeming "several" of opposing-party's factual submissions as uncontroverted where party "failed to respond" to the particular "factual assertions," in violation of Local Rule 4.01(E)).

Wentzville officers transferred Plaintiff into the custody of St. Charles DOC at the County's Justice Center. *Id.* ¶ 20.

On the evening of July 21, while still confined at the Justice Center, Plaintiff exhibited unusual behavior that continued into the following day. Doc. [110] ¶ 35. Just after 1:00 a.m. on July 22, Plaintiff attempted to choke himself by putting his hand down his throat. *Id.* ¶ 37. Officers at the Justice Center reported it to medical, and Defendant Theresa Martin, a nurse at the Justice Center, responded. *Id.* Defendant Martin thereafter decided to have Plaintiff transferred to the suicide prevention unit, and officers transferred him accordingly and placed him on close observation. *Id.* ¶¶ 53, 61. At 1:37 a.m. that morning, July 22, Defendant Martin made a segregation report regarding Plaintiff that noted he made suicidal statements and would be on close observation until mental health and a medical supervisor cleared him. *Id.* ¶ 65.

Defendant Donte Fisher worked in the suicide prevention unit. In those early morning hours that Plaintiff first spent in the unit, Defendant Fisher observed Plaintiff exhibiting concerning behaviors like pacing, standing on his bunk, using profane language, and repeatedly flushing his toilet. *Id.* ¶ 74; Doc. [108] ¶ 5. The Department's policies required officers to search the cells of those in the suicide prevention unit at the change of each suicide prevention officer's shift. Doc. [110] ¶ 70. Pursuant to that policy, Defendant Fisher, whose shift neared its end, needed to search Plaintiff's cell. *Id.* ¶ 72. Prior to the search, Defendant Fisher had a meeting with two other officers—Defendant Steven Harris and Officer Scott, who is not a party to this case. *Id.* ¶ 79–80. At the meeting, Defendant Fisher instructed Defendant Harris to have his OC spray unholstered, as a precaution, prior to entering Plaintiff's cell, *id.* ¶ 81, and the three began Plaintiff's cell search as planned. Doc. [108] ¶ 6.

- 7 -

A video in the record shows the search.  Doc. [101-35].  In the video, most of Plaintiff momentarily goes off screen showing only his head.  Seconds later, he reappears with his hands cuffed behind his back and walks away from the door toward the back of his cell.  Once at the far wall in his cell, he kneels.  Shortly thereafter, Defendant Fisher enters the cell and walks to Plaintiff, who remains kneeling.  Officer Scott and Defendant Harris then enter, and Officer Scott begins searching Plaintiff's bunk.  Though the video lacks audio, the parties agree that Defendant Harris told Plaintiff that if he moved, Defendant Harris would spray Plaintiff with pepper spray.  Doc. [110] ¶ 111.  Immediately after Defendant Harris gave Plaintiff that warning, Plaintiff, who is six feet eight inches tall and weighed three-hundred pounds, Doc. [108] ¶ 16, rises to his feet.  Defendant Fisher places both hands on Plaintiff, and Defendant Harris and Officer Scott move toward Plaintiff and Defendant Fisher.  Defendant Fisher and Officer Scott try to subdue Plaintiff and push him against the wall, but he is able to continue sliding along the wall.  Plaintiff reaches the corner of the cell, climbs on his bunk, and begins to dart.  Defendant Harris then deploys a quick burst of OC spray to Plaintiff's face, and Plaintiff falls down on his bunk.  Defendant Harris immediately lowers his spray, and the three officers place their hands on Plaintiff's legs and back keeping him in a prone position.

After Plaintiff's exposure to the OC Spray, Defendant Martin, the nurse, inspected him. Doc. [110] ¶ 154.  She directed the washing out of Plaintiff's eyes with water and recommended he be given a shower.  *Id.* ¶¶ 154–55.  Defendant Martin asked that officers bring Plaintiff back to the medical department afterwards so Plaintiff could be monitored.  *Id.* ¶ 158.  Officers, however, believed Plaintiff was too volatile to be given a shower or to remain in the medical department.  *Id.* ¶¶ 158, 156. Officers allowed Plaintiff to rinse out his eyes in a sink for at least one minute, and then placed Plaintiff into a new cell in the suicide prevention unit.  *Id.* ¶¶ 146–

47, 153–54.  Plaintiff was then in his new cell and had not been provided any "sedation" or "psychiatric medications."  *Id.* ¶ 178.

Another video in the record shows what happened shortly thereafter.  Doc. [101-36].  The timestamped video shows Plaintiff pacing in his cell.  For a bit, he is out of view of the camera but returns in view and can be seen at the sink washing his face and splashing it with water.  He then returns to pacing.  At about 07:38:31 he briefly goes out of view but is seen again about four seconds later, and for the first time, appears to scratch at his eye for several seconds.  Over the next twenty seconds or so, he intermittently rubs his left eye.  At about 07:39:04 he begins touching his eye with considerable force.  He continues to move around the cell and touch his eye with force, but he sporadically pauses for varying lengths of time only to resume touching it.  At about 07:40:45 he begins using both hands on his eye, and it is evident that the way he is beginning to touch his eye would injure it.  At about 07:40:57, he briefly pauses and falls to the floor.  He begins to lay face down on the floor of his cell.  His hands are clasped together with his elbows turned outward, and he his resting his forehead on his hands.  He is not still, but it is unclear whether he is, at that point, further damaging his eye.  He mostly stays in that position until, still lying face down, he reaches his arms above his head at about 07:41:18.  A small amount of blood is visible on the floor under his face.  At about 07:41:30, he begins touching his eye once again, and at 07:42:15 blood is visible on his hands.  At 07:42:53, more blood is visible on the ground where Plaintiff continues to lie.  At 07:43:03, officials enter Plaintiff's cell and begin to restrain him.

At some point during Plaintiff's self-harm, an official made a medical emergency call.  Doc. [110] ¶ 200.  In response to that call, Defendant Lisa Baker, a sergeant on duty, went into the hall outside Plaintiff's cell.  *Id.* ¶ 201.  Officer Scott also was present outside of Plaintiff's

- 9 -

cell.  Pursuant to Department policy, the two waited outside of Plaintiff's cell for "appropriate backup," until they had "at least three officers" present.  *Id.* ¶¶ 202, 204, 207.  By the time the officers entered Plaintiff's cell at 07:43:03, Plaintiff had injured his eye.  *Id.* ¶ 209.

Defendant Martin arrived at Plaintiff's cell, responding to the medical emergency call, after the officials had already entered the cell and subdued Plaintiff.  *Id.* ¶ 216.  She observed Plaintiff's eye out of its socket but still attached via tissue.  *Id.* ¶ 218.  She placed Plaintiff's eye back into its socket to the extent she could and covered it with gauze moistened with saline.  *Id.* ¶ 220.  Emergency medical technicians who responded to the Justice Center transported Plaintiff to a local hospital, but the hospital sent Plaintiff to Saint Louis University Hospital given the nature or extent of his injury.  *Id.* ¶¶ 223, 225.  Plaintiff's doctor later concluded that the eye was permanently blind.  *Id.* ¶ 227.

## V.       Discussion

### a.       *Qualified Immunity Entitles the Individual Defendants to Summary Judgment on Count Two's Claim of Excessive Force.*

Defendants argue that qualified immunity shields them from any liability on Count Two and entitles them to summary judgment.  The doctrine of qualified immunity shields officials from civil liability when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (internal quotations omitted).  A right is "clearly established" when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (internal quotations omitted).  Though there need not be "a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate."  *White*, 137 S. Ct. at 551 (internal quotations omitted).  It is not enough that a rule

merely is "suggested by then-existing precedent." *D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018). Rather, the "precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.*

The "clearly established" standard requires that the legal principle clearly prohibit the official's conduct "in the particular circumstances before him." *Id.* Thus, the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (internal quotations omitted). The Supreme Court repeatedly has told courts, and continues to tell courts, "not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018); *City of Tahlequah, Okla. v. Bond*, __ S. Ct. __, No. 20-1668, 2021 WL 4822664, at *2 (U.S. Oct. 18, 2021).

In Count Two, Plaintiff alleges that the Individual Defendants violated his Fourth Amendment rights through excessive force. The Fourth Amendment protected Plaintiff from "unreasonable . . . seizures," U.S. Const. amend. IV, and excessive force constitutes an unreasonable seizure. *See Torres v. Madrid*, 141 S. Ct. 989, 994 (2021). Since an official "is only liable for his . . . own misconduct," *Whitson v. Stone Cty. Jail*, 602 F.3d 920, 928 (8th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009)), the Court must examine each Individual Defendants' own actions to determine whether he or she violated Plaintiff's Fourth Amendment rights. *Pitts v. City of Cuba*, 913 F. Supp. 2d 688, 708 (E.D. Mo. 2012) (noting specific facts must "show[] what each named defendant allegedly did, or failed to do, that allegedly violated the plaintiff's federal constitutional rights"). Further, to overcome qualified immunity, precedent must have clearly established that each Individual Defendant's own actions "in the particular circumstances" at issue violated Plaintiff's Fourth Amendment rights. *See*

*Wesby*, 138 S. Ct. at 590.  Relevant to Count Two, the Supreme Court has said the "specificity" regarding the particular circumstances is "especially important in the Fourth Amendment context," where it is "sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix*, 577 U.S. at 12.

Puzzlingly, though, despite the need for the existence of specific precedent to defeat the Individual Defendants' entitlement to qualified immunity, Plaintiff cited none.[2]  Instead, Plaintiff discussed "multiple recent cases" against St. Charles County or its employees where the County's "summary judgment attempts on qualified immunity were defeated."  Doc. [107] at 5 (emphasis in original).  The facts in those cases, however, are "dramatically different from the facts here."  *See Bond*, 2021 WL 4822664, at *2 ("Suffice it to say, a reasonable officer could miss the connection between th[ose] case[s] and this one.").  Further, most of them were decided *after* the events giving rise to this case occurred.  Doc. [107] 3–10 (citing, *e.g.*, *Quaraishi v. St. Charles Cnty., Mo.*, 986 F.3d 831 (8th Cir. 2021); *Smith v. St. Charles Cty., Mo.*, No. 4:18-cv-171-JCH, 2021 WL 253998, at *1 (E.D. Mo. Jan. 26, 2021); *Qandah v. St. Charles Cty., Mo.*, No. 4:20-cv-53-JCH, 2021 WL 808857, at *4–5 (E.D. Mo. Mar. 3, 2021)).  Post-incident cases,

---

[2] *See Rivas-Villegas v. Cortesluna*, __ S. Ct. __, No. 20-1539, 2021 WL 4822662, at *2–3 (U.S. Oct. 18, 2021) ("[T]o show a violation of clearly established law, [respondent] must identify a case that put [the officer] on notice that his specific conduct was unlawful. [Respondent] has not done so."); *Bond*, 2021 WL 4822664, at *3 ("Neither the panel majority [below] nor the respondent have identified a single precedent finding a Fourth Amendment violation under similar circumstances. The officers were thus entitled to qualified immunity."); *Wesby*, 138 S. Ct. at 582 (noting arrestees "failed to identify a single precedent finding a Fourth Amendment violation under similar circumstances"); *Kasiah v. Crowd Sys., Inc.*, 915 F.3d 1179, 1185 (8th Cir. 2019) (finding plaintiff "failed to meet his burden of showing that [defendant] violated a right that was clearly established"); *Chambers v. Pennycook*, 641 F.3d 898, 904 (8th Cir. 2011) (noting that plaintiff alleging excessive use of force "must establish that the constitutional right was clearly established"); *Monroe v. Arkansas State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007) ("Although the defendant bears the burden of proof for [qualified immunity], the plaintiff must demonstrate that the law was clearly established."); *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989) ("The plaintiff must demonstrate that the law is clearly established[.]").  *But see Preston v. Waddle*, No. 4:06-cv-0835-AGF, 2008 WL 11512023, at *7 (E.D. Mo. Apr. 29, 2008) (noting some panels of the Eighth Circuit have been inconsistent regarding the burden to demonstrate that right was clearly established).

though, are "of no use in the clearly established inquiry." *Bond*, 2021 WL 4822664, at \*2; *accord Williams v. Herron*, 687 F.3d 971, 974 (8th Cir. 2012) (noting "government officials possess qualified immunity unless . . . the right violated was clearly established when the alleged misconduct occurred").

Beyond those factually distinct, subsequent cases, Plaintiff offered only factual assertions regarding what is "well-known" in the "corrections industry," made policy arguments, and offered other possible alternatives to OC spray that Defendants could have employed. *See, e.g.*, Doc. [107] at 13 (claiming pepper-spraying handcuffed individual is "well-known to be objectively unreasonable in the corrections industry"); *id.* at 14 ("What message does that send to Defendant Harris – and our community – if he is [entitled to qualified immunity]?"); *id.* at 15 (noting there "were other means that could have been employed to avoid the use of pepper spray"). Those points do not overcome qualified immunity.

Plaintiff pointed the Court to no case or set of cases that made it clear that every reasonable official would have known that the conduct at issue in the circumstances at issue was unlawful. *Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015) (noting "an officer enjoys qualified immunity and is not liable for excessive force unless he has violated a clearly established right, such that it would have been clear to a reasonable officer that his conduct was unlawful in the situation he confronted" (internal alterations and quotations omitted)). Nevertheless, the Court undertook its own search. *See Kuessner v. Wooten*, No. 1:17-cv-57-AGF, 2018 WL 6788602, at \*6 (E.D. Mo. Dec. 26, 2018) ("Neither [plaintiff] nor the Court has identified a precedent finding a Fourth Amendment violation under similar circumstances."), *aff'd*, 987 F.3d 752 (8th Cir. 2021); *see also Bell v. Neukirch*, 979 F.3d 594, 613 (8th Cir. 2020)

- 13 -

(Stras, J., concurring in part and dissenting in part) (noting "neither [the arrestee] nor the court" identified "a single precedent" finding a constitutional violation under similar circumstances).

      1.  <u>Defendant Harris</u>

The Court has not located or been provided with precedent that clearly established that Defendant Harris's spraying of Plaintiff with OC spray while Plaintiff was handcuffed, but disobeying directions by standing up and moving away, violated Plaintiff's Fourth Amendment rights. As a broad general proposition, it is clearly established that using pepper spray on an individual who is secured, is not acting violently, and who poses no threat to officers or anyone else violates the Fourth Amendment. *See, e.g.*, *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002). But that is not what happened here, and the Court's inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau*, 543 U.S. at 198 (internal quotations omitted).

Defendant Harris's actions were vastly different from those of the official in *Henderson v. Munn*, for example, where the Eighth Circuit found summary judgment for the official on the qualified immunity issue was improper. 439 F.3d 497, 503 (8th Cir. 2006). There, the plaintiff brought suit for a Fourth Amendment violation alleging that the defendant used excessive force in spraying the plaintiff's face with pepper spray during his arrest. *Id.* The plaintiff asserted that he did not resist arrest, and that he was "under control" and "lying face down on the ground with both arms handcuffed behind his back." *Id.* From those facts, the Eighth Circuit made the easy conclusion that a jury could conclude plaintiff's "compromising position" made him "little or no threat" to the safety of anyone around. *Id.* Accordingly, the Eighth Circuit concluded, under the circumstances, "the use of pepper spray may have been a gratuitous and completely unnecessary act of violence" that violated plaintiff's Fourth Amendment rights. *Id.* (internal quotations and

- 14 -

alterations omitted); *see also Ross v. Buck*, 186 F. App'x 697, 699 (8th Cir. 2006) (per curiam) (finding questions of fact prevented summary judgment for officer on qualified immunity grounds because reasonable jury could find officer's conduct "was gratuitous and therefore unreasonable" where officer sprayed pepper foam on plaintiff three times while plaintiff was lying down and had his feet held down by another officer).

Even looking outside this Circuit, the Court found nothing suggesting that Defendant Harris's conduct violated a clearly established right.  In *Dean v. Jones*, for example, the Fourth Circuit found material facts "sharply disputed by the parties" prevented summary judgment on an excessive force claim.  984 F.3d 295, 304 (4th Cir. 2021).  In that case, unlike here, no party disputed that the defendant-officer sprayed the plaintiff-detainee with pepper spray while the plaintiff was handcuffed *on the ground*. *Id.* at 303.  The plaintiff claimed he was "fully subdued and non-resistant, lying on his back with handcuffed arms beneath him" whereas the defendant claimed the plaintiff was "still largely unsubdued and grappling on the ground." *Id.* at 304. With those facts in dispute, the court found "a reasonable jury could find that [the plaintiff] was pepper-sprayed only after any threat to safety had passed, and from that infer an impermissible retaliatory motive." *Id.* at 305; *see also Tracy v. Freshwater*, 623 F.3d 90, 99 (2d Cir. 2010) ("[I]f a jury credited [the plaintiff's] version of the events and determined that [the defendant] applied pepper spray after [the plaintiff] had already been handcuffed and was offering no physical resistance of police commands, it might well conclude that the use of that pepper spray was unreasonable under the circumstances.").

Video of the incident at issue here plainly shows a much different event than the cases discussed above.  It shows that Plaintiff, who is six feet eight inches tall and weighed approximately three-hundred pounds, stood up from the kneeling position in which officers had

him.  Doc. [108] ¶ 16.  The parties do not dispute that Defendant Harris told Plaintiff before he stood up that "if he moved, he would be sprayed with pepper spray."  Doc. [110] ¶ 111.  After Plaintiff stood up, the video shows the officers tried to subdue him by placing their hands on him, but he begins to walk.  Officers continued to use their hands to keep him against the wall, but as he approached the corner of the cell, he darted.  Defendant Harris then administered a short burst of OC spray, about twelve to eighteen inches from Plaintiff's face, and Plaintiff immediately fell to his bunk.  Once Plaintiff was down, Defendant Harris helped the two other officers keep Plaintiff subdued; Defendant Harris did not use any more OC spray on Plaintiff once officers had Plaintiff under control.  Defendant Harris, then, is entitled to summary judgment on Count Two.

### 2.  Defendants Fisher, Baker, and Martin

Plaintiff also asserts a Fourth Amendment claim against Defendants Fisher, Baker, and Martin.  Like Defendant Harris, each of these three Defendants is liable, if at all, only for his or her own conduct.  *Whitson*, 602 F.3d at 928; *Manning v. Cotton*, 862 F.3d 663, 669 (8th Cir. 2017) (noting that a person may only be held liable for a constitutional violation if his or her own conduct violated a clearly established constitutional right).  Once again, Plaintiff provided no precedent showing that Defendants Fisher, Baker, or Martin violated Plaintiff's clearly established right by their involvement—to the extent they even were involved—in the use of force, and the Court found no precedent.

Plaintiff argues that summary judgment for Defendant Fisher on Count Two would be improper since he "organized and directed the planned use of force" against Plaintiff and instructed Defendant Harris to have his pepper spray "unholstered" and "in his hand and ready to use."  Doc. [107] at 14.  The Court finds nothing unconstitutional about such conduct under the

facts of this case, and, in any event, it certainly was not clearly established by any case the Court located.  Further, given the conclusion that Defendant Harris's use of OC spray did not violate any clearly established right, the Court cannot conclude that any precautious preparation to use the OC spray violated Plaintiff's clearly established rights.  Accordingly, Defendant Fisher is entitled to summary judgment on Count Two.

For Defendant Martin, Plaintiff argues she violated his Fourth Amendment rights when she "failed to convey that pepper spray should not be used" on him due to his "acute psychosis" and "uveitis/iritis."  Doc. [107] at 15.  Even assuming for the sake of argument that Plaintiff had a constitutional interest in *not* being pepper-sprayed regardless of his conduct, because of his acute psychosis and uveitis, it does not follow that Defendant Martin somehow violated Plaintiff's Fourth Amendment rights by failing to convey a message.  And yet again, Plaintiff provided no precedent whatsoever showing that this right was clearly established.  The Court cannot conclude that it was "sufficiently clear that every reasonable official would have understood" that when Defendant Martin did not convey to others that OC spray should not be used on Plaintiff that she violated Plaintiff's clearly established right.  *See Mullenix*, 577 U.S. at 11.

Lastly, Plaintiff argues that Defendant Baker violated Plaintiff's Fourth Amendment rights because Defendant Baker "was supposed to be supervising th[e] entire occurrence," but she "abdicat[ed] her duty."  Doc. [107] at 16.  As an initial point, given that the Court concluded none of the other three Individual Defendants violated a clearly established right related to the use of force on Plaintiff, it seems to follow logically that a failure to supervise the "entire occurrence" would fail.  Nevertheless, the Court will review the claim under its specific standard.  "[A] general responsibility for supervising the operations of a prison is insufficient to

- 17 -

establish the personal involvement required to support liability." *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995).  Here, it is undisputed that Defendant Baker did not participate in the use of force.  "When a supervising official who had no direct participation in an alleged constitutional violation is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015). Plaintiff has not cited record evidence establishing either point.  The Court has been pointed toward nothing in the record that shows a prior pattern of unconstitutional acts—not subsequent acts or sporadic allegations—existed.  And, even if there was a prior pattern, there is no indication that Defendant Baker received notice of the events establishing the pattern.

Having found that qualified immunity entitles all named Defendants in Count Two to summary judgment, the Court will dismiss Count Two in its entirety.

        b.    *The Individual Defendants Are Entitled to Summary Judgment on Count Three Because None Was Deliberately Indifferent to Plaintiff's Serious Medical Needs.*

In Count Three, Plaintiff alleges the Individual Defendants violated his Eighth and Fourteenth Amendment rights.  The Eighth Amendment to the Constitution prohibits the infliction of "cruel and unusual punishments."  Since Plaintiff was not incarcerated as a convicted offender, his Count Three is "more properly viewed under the Fourteenth Amendment." *Hartsfield v. Colburn*, 371 F.3d 454, 456–57 (8th Cir. 2004).  However, the Due Process Clause of the Fourteenth Amendment "affords pretrial detainees at least as much protection as the Eighth Amendment provides to convicted prisoners." *Edwards v. Byrd*, 750 F.3d 728, 732 (8th Cir. 2014).  Therefore, if the action or inaction at issue in this case would have violated the Eighth Amendment had Plaintiff been a prisoner, the conduct "necessarily

- 18 -

violated" Plaintiff's rights under the Fourteenth Amendment.  *Id.*; *see also Leftwich ex rel. Leftwich v. Cty. of Dakota*, 9 F.4th 966, 972 (8th Cir. 2021) (noting pretrial detainees are entitled to at least as great protection as that afforded to convicted prisoners under Eighth Amendment and evaluating claims for pretrial detainee under Eighth Amendment standard).  Plaintiff's claim for deliberate indifference, therefore, will survive summary judgment if a reasonable jury could find (1) he suffered from an objectively serious medical need, and (2) the official knew of the need yet deliberately disregarded it.  *Hartsfield*, 371 F.3d at 457.

Deliberate indifference "is a difficult burden for a plaintiff to meet."  *Liebe v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998) (quoting *Rellergert v. Cape Girardeau Cty., Mo.*, 924 F.2d 794, 796 (8th Cir. 1991)).  "Deliberate indifference is equivalent to criminal-law recklessness."  *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011).  There must be "more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation."  *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995).  There must be "a highly culpable state of mind approaching actual intent."  *Choate v. Lockhart*, 7 F.3d 1370, 1374 (8th Cir. 1993).  There must be "apathy or unconcern."  *Rellergert*, 924 F.2d at 797.

Plaintiff seems to offer numerous specific actions or inactions by the Individual Defendants that he argues amounted to deliberate indifference, like a failure to administer specific medications or the failure to contact a specific type of specialist.[3]  But the failure to perform specific actions that Plaintiff would have had Defendants take does not amount to

---

[3] Plaintiff details them, at least in part, as: "(a) the failure to note Plaintiff's medical unfitness to be pepper sprayed, (b) the failure to administer Haldol injections, (c) the failure to timely contact a psychiatrist, (d) the failure to administer Plaintiff his psychiatric medications, (e) the failure to administer Plaintiff his eye medication, (f) the failure to administer Plaintiff his Suboxone, (g) the failure to otherwise restrain Plaintiff in his cell before his eye was torn out, (h) the failure to decontaminate Plaintiff's eye post-pepper spray, and (i) the failure to intervene while Plaintiff was actively tearing out his eye over the course of minutes while Defendant's staff just watched it."  Doc. [117] at 3–4.

deliberate indifference. *Estate of Rosenberg*, 56 F.3d at 37 (noting "disagreement with treatment decisions does not rise to the level of a constitutional violation"). Rather, the question is whether their actions, or inaction, toward Plaintiff amounted to apathy, unconcern, or exceeded gross negligence and approached actual intent. Plaintiff's specific instances fall into two categories: a failure to treat Plaintiff and a failure to intervene during Plaintiff's self-harm.

First, the alleged deliberate indifference through the failure to treat Plaintiff. As noted earlier and equally applicable to Count Three, each Individual Defendant may only be held liable for his or her own actions or inactions. *Manning*, 862 F.3d at 669. Of the four Individual Defendants, only Defendant Martin, a nurse, was a member of the Department's medical team. *See* Doc. [88] ¶¶ 8–11. Defendants Harris, Fisher, and Baker were not medical professionals. But Plaintiff "provides no specific evidence to show that any of the[se] nonmedical defendants were involved in, or directly responsible for, his allegedly insufficient medical care." *Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir. 2016). Since these non-medical professional Defendants did not prevent Plaintiff from receiving medical treatment, "they cannot be held liable for the treatment decisions made by the medical professionals." *Muhammad v. Robinson*, No. 5:15-cv-00240-DPM-JTK, 2016 WL 3023849, at *3 (E.D. Ark. Apr. 27, 2016) (citing *Keeper v. King*, 130 F.3d 1309, 1315 (8th Cir. 1997)); *accord Olson v. Hansen*, 221 F.3d 1343 (8th Cir. 2000) (per curiam) ("Because . . . the non-medical defendants did not delay or deny him access to medical care, [the plaintiff's] deliberate-indifference claims fail."). Thus, Defendants Harris, Fisher, and Baker, are entitled to summary judgment on Plaintiff's theories in Count Three that they were deliberately indifferent by failing to treat his psychosis or his reactive arthritis.[4]

---

[4] In addition, regarding the failure to treat theory premised on the post-OC spray treatment, since Defendant Harris did not show apathy or unconcern but allowed Plaintiff to wash the OC spray off his face, and Plaintiff, in fact, did wash it off his face, neither Defendant Harris, nor any other Individual Defendant, was deliberately indifferent in that regard.

Defendant Martin, however, was a medical professional and responsible for Plaintiff's medical care. But it is uncontroverted that she provided medical care to Plaintiff for the serious medical conditions of which she was aware. She was aware of Plaintiff's acute psychosis, and she acted on it. She moved him to a suicide prevention unit. *Id.* ¶ 53. She noted in his segregation report that he should be under "close observation" until he was cleared by mental health and a medical supervisor. Doc. [101-28]. Later, but before Plaintiff removed his eye, she even asked that he be brought back to medical so he could be monitored. *Id.* ¶ 158. She plainly was not indifferent to Plaintiff's acute psychosis. *See Luckert v. Dodge Cty.*, 684 F.3d 808, 818 (8th Cir. 2012) (finding despite detainee's suicide and nurse being "mistaken as to [detainee's] risk of suicide," her limited "actions d[id] not indicate [she] was apathetic or unconcerned with [detainee's] condition"). Similarly, Defendant Martin was not deliberately indifferent after Plaintiff was sprayed with OC spray. She inspected Plaintiff, directed that his eyes be washed out, and asked that he be given a shower. Doc. [118] ¶ 154. The record plainly shows she had concern for Plaintiff's wellbeing. Her actions, or alleged inactions, do not rise to the high level of deliberate indifference.

While the record establishes that Defendant Martin was aware of Plaintiff's psychosis and his OC spray exposure, the Court has been pointed toward nothing in the record showing Defendant Martin had actual knowledge of Plaintiff's reactive arthritis or eye conditions. Without knowledge of the condition, she could not have been deliberately indifferent to it. *Kulkay v. Roy*, 847 F.3d 637, 644 (8th Cir. 2017) ("A necessary element of deliberate indifference is that the defendant officials had actual knowledge of the substantial risk posed to an inmate's health and safety."). In hindsight, now knowing how the events would unfold, it may be easy to come up with examples of things that Defendant Martin perhaps could have done

- 21 -

that *may* have altered the trajectory of this unfortunate occurrence, but her actions and attention to Plaintiff cannot be said to even amount to gross negligence, let alone criminal recklessness. *See Schaub v. VonWald*, 638 F.3d 905, 915 (8th Cir. 2011) (noting deliberate indifference is not measured by "hindsight's perfect vision").

Next is Plaintiff's claims that the Defendants' failure to treat Plaintiff's self-harm amounted to deliberate indifference.  Looking at the actions or inactions of each Individual Defendant, as the Court must, Defendants Harris, Fisher, and Martin plainly are entitled to summary judgment since they were not present for Plaintiff's self-harm.  Defendant Harris was "off duty" and thus "not there" when it happened.  Doc. [101-26] at 10 (63:14-20); *see also* Doc. [118] ¶ 149 (noting Defendant Harris "departed from [Plaintiff]" prior to the beginning of his self-harm).  Nor was Defendant Fisher present for the events.  Doc. [101-25] at 20 (84:2-3, 9-13) (noting Fisher "departed the unit" after the OC spray and that Fisher "wasn't there" during the self-harm); *see generally* Doc. [118] (not describing any involvement of Defendant Fisher during the self-harm); Doc. [108] (same).  Officers had already entered Plaintiff's cell and subdued him by the time Defendant Martin arrived responding to the sick call.[5]  Doc. [118] ¶ 216.  When she did, she immediately started tending to Plaintiff.  *Id.* at 220.  The Court has seen no evidence or argument that any of these three Defendants were supposed to be there but failed to be.  Since they were neither there nor required to be there, they could not have been deliberately indifferent when they did not intervene.

---

[5] In addition, by the same principle that holds non-medical staff to a different standard than medical staff on medical care, it stands to reason that a non-security focused staff member would not be held to the same standard as a security focused staff member on a security issue. *Cf. Saylor*, 812 F.3d at 644 (noting absence of evidence to show that nonmedical defendants were involved in, or directly responsible for, insufficient medical care).  For example, there is nothing in the record that tends to show Defendant Martin, as a nurse, had the ability or authority to open Plaintiff's cell.

That leaves only Defendant Baker, who unlike the other three Individual Defendants was present for some part of the self-harm and was among the officials that responded. Defendant Baker arrived outside Plaintiff's cell in response to a medical emergency call that someone placed because of Plaintiff's actions. Doc. [118] ¶¶ 200–01. It is uncontroverted that when Defendant Baker arrived at Plaintiff's cell she waited for additional officers before entering because she could not enter without "appropriate backup." *Id.* ¶¶ 202, 205. Defendant Baker waited until three officers were present, which she believed to be required policy, and then entered Plaintiff's cell. *Id.* ¶¶ 206–07. Once inside Plaintiff's cell, officers subdued Plaintiff and stopped his self-harm.

As a matter of law, Defendant Baker's actions cannot be said to be deliberately indifferent. She did not have apathy toward Plaintiff or unconcern for him; she responded to the medical emergency call and entered his cell. *See Rellergert*, 924 F.2d at 797. And there is nothing in the record that even suggests that Defendant Baker chose to delay entering the cell, even in part, just for the sake of delay—that is, that she had a highly culpable mental state approaching intentionality—when she waited to enter the cell until appropriate backup arrived. *See Choate*, 7 F.3d at 1374. The mere fact that Plaintiff was able to harm himself before Defendant Baker intervened does not itself establish deliberate indifference. *See Luckert v. Dodge Cty.*, 684 F.3d 808, 818 (8th Cir. 2012) (noting detainee's suicide was "not probative" of deliberate indifference question because "tying the suicide to proof of deliberate indifference is tantamount to requiring jailers to provide suicide-proof institutions" and "ensure against suicide ever happening"). Before she put herself and her fellow officers in harm's way by entering Plaintiff's cell, she needed to ensure her safety and theirs. Recall that Plaintiff stood six feet eight inches tall and weighed around three-hundred pounds. He was mentally unstable, and less

- 23 -

than one hour earlier, he did not follow officers' orders and tried to avoid being restrained by them.  Doc. [118] ¶ 219.

Further, even ignoring the sensible reason that the record shows the delay occurred, the video of the event that shows the grisly incident puts the abstract idea of a delay in perspective.  While the video eventually becomes undeniably disturbing to watch, the time between when a person would recognize Plaintiff had a serious medical need and when officials entered the cell is relatively short—too short to exhibit a deliberate indifference.  And the time between when Defendant Baker recognized it and when she intervened is, if anything, shorter because it is not established when, exactly, Defendant Baker heard the medical emergency call or when she realized what Plaintiff was doing to himself.  *See Crew v. Minor*, No. 2:18-cv-27-CAS, 2018 WL 4922218, at *7 (E.D. Mo. Oct. 10, 2018) (noting importance of facts relating to "how much of the incident [the officer] saw, how quickly she would have been able to respond, [and] how much time she had to intervene").  Additionally, viewing the event with hindsight's advantage shows that Plaintiff damaged his eye before it would have become apparent to someone that Plaintiff had a serious medical need.  *See Tucker v. Evans*, 276 F.3d 999, 1002 (8th Cir. 2002) (finding no deliberate indifference where, even if policy had allowed officer to intervene sooner, "by the time [officer] knew something was wrong," the damage already was done and officer "would not have been able to intervene in time" to prevent inmate's death).

Even when viewing the video and looking at the facts in the most favorable light to Plaintiff, a reasonable jury could not conclude that Defendant Baker was deliberately indifferent for failing to intervene sooner.  *See Rellergert*, 924 F.2d at 797–98 (noting "jury might reasonably conclude that [jail official] acted imprudently, wrongly, or negligently" but "as a matter of law" the "evidence cannot permit the conclusion that [jail official] acted with deliberate

indifference"); *see also Williams v. Kelso*, 201 F.3d 1060, 1065 (8th Cir. 2000) ("At best, plaintiff's proof in this [case] amounts to negligent conduct, not deliberate or willful conduct on [the jail official's] part."); *Tucker*, 276 F.3d at 1002 ("[V]iewed in the light most favorable to the appellees, these facts at best only demonstrate negligence.").

Accordingly, the Individual Defendants are entitled to summary judgment on all of Count Three.

c.   *The Individual Defendants Are Entitled to Summary Judgment on Count Four Because No Evidence in the Record Suggests a Conspiracy Existed.*

In Count Four, Plaintiff alleges that the four Individual Defendants had a conspiracy to violate his Fourth, Eighth, and Fourteenth Amendment rights.  A conspiracy claim under 42 U.S.C. § 1983 requires three elements: (1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff.  *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008).  Besides establishing these three elements, a plaintiff must also have faced an actual deprivation of a constitutional right or privilege.  *Id.*; *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999).

Plaintiff notes that Defendant Harris and Defendant Fisher planned together or discussed how they would proceed before they searched Plaintiff's cell, the event during which Defendant Harris used OC spray on Plaintiff.  But even if that prior meeting established that Defendant Harris and Defendant Fisher conspired together, the Court already has concluded that none of the Defendants violated Plaintiff's Fourth Amendment rights during the cell search.  Thus, Plaintiff has not demonstrated he "suffered a constitutional deprivation as a result of the alleged conspiracy," and his § 1983 civil conspiracy claim against Defendant Harris and Defendant

Fisher must fail. *Kingsley v. Lawrence Cty., Mo.*, 964 F.3d 690, 702–03 (8th Cir. 2020) (quoting *Askew*, 191 F.3d at 957).

Plaintiff's conspiracy claims against Defendant Martin and Defendant Baker fare no better since the Court has concluded Plaintiff suffered no constitutional deprivation by any of the alleged conspirators. But even if he had suffered a constitutional deprivation, Plaintiff references no evidence whatsoever that even suggests a conspiracy containing Defendant Martin or Defendant Baker to violate Plaintiff's rights existed. Plaintiff merely argues that Defendant Martin, who was not even present during Plaintiff's self-harm, gave her "assent" to the conspiracy to violate Plaintiff's rights by her "complete lack of interest" in Plaintiff's medical care. Doc. [107] at 21. And he argues that Defendant Baker likewise exhibited a "complete lack of interest" in the use of force on Plaintiff and his medical care. *Id.* at 21–22. But he ties no other actions or inactions to them. The Court is cognizant that "the elements of a conspiracy are generally proved by circumstantial evidence." *Helmig v. Fowler*, 828 F.3d 755, 763 (8th Cir. 2016) (quoting *Burton v. St. Louis Bd. of Police Comm'rs*, 731 F.3d 784, 799 (8th Cir. 2013). But the Court is "convinced that the evidence presented is insufficient to support any reasonable inference of a conspiracy." *Id.*; *accord Askew*, 191 F.3d at 958 (finding judgment as a matter of law appropriate on § 1983 civil conspiracy claim when "record contains no proof beyond speculation to support the verdict"). The Court therefore also will grant summary judgment on Count Four to Defendant Martin and Defendant Baker.

> d.  *Defendant St. Charles County Is Entitled to Summary Judgment on Count One Because Plaintiff Has Not Shown a Constitutional Violation Occurred, Let Alone One That Resulted from a Policy or Custom of the Municipality.*

Plaintiff's remaining count is against St. Charles County, Missouri itself. While Defendant St. Charles County is a "person" that can be liable under 42 U.S.C. § 1983, the

Supreme Court has made clear that the County "cannot be held liable on a *respondeat superior* theory, that is, solely because it employs a tortfeasor." *Szabla v. City of Brooklyn Park, Minn.*, 486 F.3d 385, 389 (8th Cir. 2007) (en banc) (citing *Monell*, 436 U.S. at 691). While the County cannot be held liable solely because it employed a tortfeasor, "there must be an unconstitutional act by a municipal employee before [it] can be held liable." *Webb v. City of Maplewood*, 889 F.3d 483, 487 (8th Cir. 2018) (internal quotations omitted). Then, if there has been an unconstitutional act by an employee, the County would be liable under § 1983 only if the execution of its policy or custom inflicted Plaintiff's injury. *Brewington v. Keener*, 902 F.3d 796, 801 (8th Cir. 2018) (citing *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)); *see also Calgaro v. St. Louis Cty.*, 919 F.3d 1054, 1058 (8th Cir. 2019) ("A county may be liable for a constitutional violation under § 1983 only if the violation resulted from a policy or custom of the municipality.").

The Court has concluded that none of the Individual Defendants are liable for the claims Plaintiff has brought against them. But because municipal liability does not require a plaintiff to bring a substantive claim against the individual employee, Plaintiff could theoretically succeed on a *Monell* claim despite a finding that the named municipal employees were entitled to summary judgment. *See Meier v. St. Louis, Mo.*, 934 F.3d 824, 829 (8th Cir. 2019), *cert. denied*, 140 S. Ct. 2566 (2020). Plaintiff puts forward multiple theories on how Defendant St. Charles's policy or custom inflicted his injuries: (i) it "ratified" the constitutional violations; (ii) certain policies were unconstitutional as written; (iii) it was deliberately indifferent in its failure to train or supervise; and (iv) it had unconstitutional unofficial customs. The Court will take them each in turn.

1.   Ratification

Plaintiff's first theory is that Defendant St. Charles County is liable because it ratified the alleged constitutional violations after they had ended.  He cited *Lollie v. Johnson*, No. 14-cv-4784-SRN, 2015 WL 3407931, at *7 (D. Minn. May 27, 2015), where the court noted "a municipality may be held liable for a constitutional violation where an authorized policymaker approved the subordinate's unconstitutional *decision* and the basis for it." (emphasis added). Though even the *Lollie* court denied plaintiff's attempts to use the theory.  *Id.*

Even assuming that a local government's post-incident response could ratify the actions or inactions of its employees in a use of force and deliberate indifference case like this one,[6] Plaintiff seeks to attribute liability to the County through an email where an employee of Defendant St. Charles County thanked other employees for their "response and assistance" with Plaintiff and praised their "teamwork" and the "exceptional job."  Doc. [100] at 24.  *Monell*, though, rejected liability for local governments based on *respondeat superior*.  Yet Plaintiff bases this ratification argument on a version of *respondeat superior*.  He seeks to make the County liable based on what yet another one of its employees did—send an appreciative email.[7] There is no indication whatsoever that the employee who sent the email, even if in a managerial

---

[6] Compare the possible application of a ratification theory in this case to the § 1983 case involving an employment decision from which the ratification theory *Lollie* references developed, for example.  *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion) (noting "[i]f the authorized policymakers approve a subordinate's *decision* and the basis for it, their ratification should be chargeable to the municipality because their decision is final" (emphasis added)).  Or compare the possible application in this case to a § 1983 case involving protracted, ongoing conduct about which high-ranking municipal officials were aware.  *See Dixon v. Lowery*, 302 F.3d 857, 867 (8th Cir. 2002) (remanding case for development of record as to whether dispute of material facts existed on issue of municipal liability for the alleged ratification of officers' unconstitutional conduct given "the failure to order the officers to cease [the unconstitutional conduct] earlier").  In this case, there was no reversible decision and nothing ongoing that the County could ratify.

[7] For this same reason, Plaintiff's theory that the County's positions or arguments in this suit ratify the conduct also fails because they too are made by its employees.  But even if those with final policymaking authority set the County's positions or made its arguments in this suit, finding that a municipality ratifies conduct and becomes liable under *Monell* whenever it defends itself or its employees in a suit would subject every municipality to *Monell* liability in every suit they defended against.

role, sets the official policies of the County. The Supreme Court has refused to accept a "broad definition of municipal policymakers." *Praprotnik*, 485 U.S. at 131. "[A]d hoc searches for officials possessing such '*de facto*' [final policymaking] authority" would be "a step towards overruling *Monell* and adopting the doctrine of *respondeat superior*" and would "foster needless unpredictability in the application of § 1983." *Id.* Accordingly, the Court finds the actions by other County employees cited by Plaintiff did not ratify the conduct such to make the County liable under *Monell*.

### 2. Unconstitutional as Written

Plaintiff next argues that some of the County's policies were unconstitutional as written. Much of the argument Plaintiff provides deals with the County's policies, or lack of policies, regarding a "planned use of force" or a "pepper spray policy." Doc. [100] at 25–26. Given that the Court has found that no underlying constitutional violation occurred regarding the use of force as seen on the video in the record, these policies or lack of policies did not cause an unconstitutional act. Thus, there is nothing for which the County can be held liable regarding those alleged policy issues.

Plaintiff also argues that the lack of other policies, besides the use of force policies, made the County's policies unconstitutional as written. Namely, he argues the County's policies did not require adequate custody staff in the suicide prevention unit, and that the County's policies did not reflect those of the National Commission on Correctional Health Care ("NCCHC"). "The failure to have a policy does not give rise to municipal liability unless such failure reflects a deliberate indifference to the citizenry's constitutional rights." *Der v. Connolly*, 825 F. Supp. 2d 991, 1000 (D. Minn. 2010) (citing *Szabla*, 486 F.3d at 392 ("As we have explained, however, a written policy that is facially constitutional, but fails to give detailed guidance that might have

averted a constitutional violation by an employee, does not itself give rise to municipal liability.")).

"Notice is the touchstone of deliberate indifference in the context of § 1983 municipal liability." *Atkinson v. Mountain View, Mo.*, 709 F.3d 1201, 1216 (8th Cir. 2013). But "[o]ther than the single incident at issue in this case," Plaintiff has submitted no evidence of the Individual Defendants' or any other County DOC employees' deliberate indifference through failure to intervene or failure to treat. *Id.*; *see also Szabla*, 486 F.3d at 393 (quoting *Young v. City of Augusta*, 59 F.3d 1160, 1172 (11th Cir. 1995) ("[T]he need for a particular type of training may be obvious where jailers face clear constitutional duties in recurrent situations.")). Accordingly, since no reasonable jury could find the County had notice that its lack of written policies on the precise number needed in the suicide prevention unit or policies that matched the NCCHC's policies were likely to result in a constitutional violation, the County is not liable under this theory even if Plaintiff suffered a constitutional violation.

### 3. Deliberately Indifferent in Its Failure To Train or Supervise

For this theory, much of the argument Plaintiff provides, like noted above, deals with the County's alleged failure to train or supervise regarding the use of OC spray. Given that the Court has found that no underlying constitutional violation occurred regarding the use of force at issue here, these policies or lack of policies did not cause an unconstitutional act. Consequently, there is nothing for which the County can be held liable regarding the alleged failure to train or supervise concerning the OC spray.

The other point on which Plaintiff argues the County was deliberately indifferent in its failure to train and supervise was on "how closely to watch an inmate." Doc. [100] at 29. The Court finds that the record is insufficient to make a submissible case of deliberate indifference on

this theory.  The evidence does not show that the County had a history of failing to watch inmates under observation or even failing to intervene in necessary situations for inmates under observation.  "So far as the record reveals, this was a one-time incident, and there is no evidence of a pattern of constitutional violations making it 'obvious' that additional training or safeguards were necessary." *Szabla*, 486 F.3d at 392.  This isolated incident "cannot support a claim that the County acted with deliberate indifference by inadequately training its officers" on how closely to watch an inmate. *Id.*  This theory also fails regardless of whether Plaintiff suffered a constitutional violation.

### 4.  Unconstitutional Unofficial Customs

Lastly, Plaintiff asserts there were unconstitutional unofficial customs.  Establishing municipal liability through an unofficial custom is a "heavy burden." *Mick v. Raines*, 883 F.3d 1075, 1080 (8th Cir. 2018).  To establish municipal liability through an unofficial custom of the municipality a plaintiff must demonstrate "(1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation." *Corwin v. Indep., Mo.*, 829 F.3d 695, 700 (8th Cir. 2016) (quoting *Snider v. Cape Girardeau*, 752 F.3d 1149, 1160 (8th Cir. 2014)).

Here, Plaintiff has failed to show that prior to the events at issue in this case there was a continuing, widespread, persistent pattern of unconstitutional misconduct by the County's corrections employees.   To be sure, Plaintiff has described various alleged incidents of wrongdoing by corrections staff, but they almost all occurred *after* the incident at issue here.

- 31 -

*See, e.g.*, Doc. [117] at 4–8 (describing events that allegedly occurred in or on: July 27, 2017; September 18, 2017; "summer of 2018"; July 8, 2018; December 25, 2018; February 28, 2019; May 20 & 27, 2019; and February 13, 2020).   Even if the exceedingly few allegations that occurred prior to the events at issue here and to which Plaintiff cites were factually similar enough to establish a custom, see *id.* at 7, 8 (describing events that allegedly occurred on February 8, 2017 and in the "summer of 2016"), and were numerous enough to establish a continuing, widespread, persistent pattern, Plaintiff provided no evidence that the County and its officials ignored the alleged misconduct.  *See Parrish v. Luckie*, 963 F.2d 201, 204–05 (8th Cir. 1992) (noting plaintiff "presented detailed and compelling" evidence that defendant police department avoided, ignored, and covered up complaints of physical and sexual misconduct by officers); *Harris v. City of Pagedale*, 821 F.2d 499, 501–06 (8th Cir. 1987) (finding plaintiff had proven a municipal custom through the presentation of detailed evidence regarding particular officer's identical misconduct, and numerous allegations of identical misconduct, and the city's failure to investigate or punish that conduct).  When a plaintiff has not shown "prior complaints sufficient to demonstrate that the municipalities and their officials ignored" alleged misconduct, "the mere existence of previous . . . complaints does not suffice to show a municipal custom." *Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999).

The undisputed facts show that even if a constitutional violation occurred, it did not result from the County's policy or custom.  As such, the County is entitled to summary judgment on Count One because it did not cause any constitutional violation.

## CONCLUSION

It would be easy for the Court, with the advantage of hindsight, thorough evaluation, and unrushed consideration, to come up with ways the officials involved in the events of this case

- 32 -

could have acted differently and brought about a better outcome.[8]  But that is not the standard by which to judge the merits of Plaintiff's claims.  *See Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (noting the court should *not* ask "whether another reasonable, or more reasonable, interpretation of the events can be constructed five years after the fact").  Nor would it be just to set such a standard for those required to make these daily difficult decisions in an instant.  Applying the established legal standards on these claims to the undisputed material facts, Defendants are entitled to judgment as a matter of law.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Renewed Motion for Sanctions, Doc [97], is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Exclude Affidavit of Lauri Smit, Doc. [106], is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment, Doc. [99], is **DENIED**.

**IT IS FINALLY ORDERED** that Defendants' Motion for Summary Judgment, Doc. [92], is **GRANTED**.

An appropriate judgment will accompany this Memorandum and Order.

Dated this 5th day of November, 2021.

_____
MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE

---

[8] Indeed, even Defendants acknowledge that, in hindsight, the St. Charles County Department of Corrections "could have performed better."  Doc. [115] at 5.